# United States District Court
# Southern District of New York

JERRY PINKS,
      individually and on behalf of others
      similarly situated,
*Plaintiffs,*

          *-against-*

M & T BANK CORP.,
*Defendant.*

No.: 1:13-cv-1370 – LAK-RLE

## MEMORANDUM OF POINTS AND AUTHORITIES

## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (Dkt. #7)

**HERZFELD & RUBIN, P.C**.
Daniel V. Gsovski (dg4413)
125 Broad Street
New York, New York 10004-1300
Telephone: (212) 471-8512
E-mail: dgsovski@herzfeld-rubin.com
ATTORNEYS FOR PLAINTIFF

June 21, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

SUMMARY OF ARGUMENT ......................................................................................... 1

RELEVANT FACTS ........................................................................................................ 3

OVERVIEW OF APPLICABLE UCC PROVISIONS ..................................................... 4

ARGUMENT ................................................................................................................... 8

    I.   M&T'S Notice Lacks a Statement That Pinks Was "Entitled to an Accounting of the Unpaid Indebtedness." ............................................................................................ 8

        A.  *A notice which "lacks" this information is "insufficient as a matter of law."* ............................................................................................................ 8

        B.  *M&T's Notice understates the amount of Pinks' "unpaid indebtedness" by well over $50,000.* ......................................................................... 10

        C.  *M&T's "breakdown" of the amount due to redeem in its Notice does not qualify as a UCC "accounting."* ...................................................... 13

    II. M&T's Notice Lacks an Adequate "Description of Any Liability For a Deficiency." ............................................................................................................ 14

    III. The Authorities  M&T Relies Upon Are Inapposite or Do Not Support M&T'S Position. ................................................................................................................ 18

        A.  *The "substantial compliance" standard does not apply to defects in a notice under § 36-9-614(1).* ........................................................... 18

        B.  *Plaintiff is not required to allege "materiality of defects" to state a cause of action under § 36-9-614(1).* ....................................................... 22

CONCLUSION ............................................................................................................... 25

STATUTORY APPENDIX (attached)

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Gen. Fin. Serv. Inc. v. Woods-Witcher,*
  294 Ga.App. 685, 669 S.E.2d 709 (Ga.App. 2008) ................................................. 9

*Brockbank v. Best Capital Corp.,*
  241 S.C. 372, 534 S.E.2d 688 (2000) ......................................................... 2, 5, 6, 7

*Chisholm v. Transouth Fin. Corp.,*
  194 F.R.D. 538 (E.D. Va. 2000) ............................................................................ 8

*Coxall v. Clover Comm'l. Corp.,*
  4 Misc.3d 654, 781 N.Y.S.2d 567 (N.Y. City Civ. Ct. 2004).......................... 6, 7, 9

*Davenport v. Chrysler Credit Corp,*
  818 S.W.2d 23 (Tenn. App. 1991) .......................................................................... 8

*Erdmann v. Rants,*
  442 N.W.2d 441 (N.D. 1989) ................................................................................ 8

*First Bank and Trust Co. of Ithaca, N.Y. v. Mitchell, et al.,*
  123 Misc.2d 386, 473 N.Y.S.2d 697 (Sup.Ct. 1984)...................................... 21, 22

*General Electric Cap. Corp. v. Net Transportation, Inc.,*
  2006 WL 3741828  (D. Conn. Dec. 8, 2006)................................................... 20, 21

*Hassler v. Account Brokers of Larimer Cty.,*
  2012 CO 24, 274 P.3d 547 (2012) ....................................................................... 17

*Hudson v. Eaglemark Savings Bank et al.,*
  2011 WL 1755540 (E.D. Pa. May 9, 2011)
  aff'd, 475 F.Appx. 423 (3d. Cir. 2012)............................................... 22, 23, 24, 25

*Mancuso v. Longbeach Accept. Corp.,*
  254 S.W.3d 88 (Mo. App. 2008) ........................................................................ 6, 7

*Mosca v. Brookline Bank,* No. 07-771-G,
  2009 WL 3779818 (Mass.Super.Ct. Jan. 26, 2009).................................... 18, 19, 20

*Parks v. CNAC-Joliet, Inc.,*
  381 Ill. App.3d 586, 886 N.E.2d 376 (Ill. App. 2008).................................... passim

*Reuter v. Citizen & Northern Bank,*
  410 Pa. Super. 199, 599 A.2d 673 (1991)............................................................. 21

*Rothman v. Gregor*,
  220 F.3d81 (2d Cir. 2000) ................................................................................5


**Statutes**

S.C. Code Ann. § 36-9-210  (UCC § 9-210) ........................................................ 12

S.C. Code Ann. § 36-9-602  (UCC § 9-602) ........................................................ 5

S.C. Code Ann. § 36-9-610 (UCC § 9-610) ......................................................... 4

S.C. Code Ann. § 36-9-611 (UCC § 9-611) ......................................................... 4

S.C. Code Ann. § 36-9-613 (UCC § 9-613) ......................................................... 8

S.C. Code Ann. § 36-9-614 (UCC § 9-614) ................................................... passim

S.C. Code Ann. § 36-9-624 (UCC §9-624) ....................................................... 5, 6

S.C. Code Ann. § 36-9-625 (UCC §9-625) .................................................... passim

UCC, Cmt. 2, Official Comment to § 9-210 ........................................................ 12

UCC, Cmt. 2, Official Comment to § 9-611 ......................................................... 4

UCC, Cmt. 2, Official Comment to § 9-612 ........................................................ 23

UCC, Cmt. 2, Official Comment to § 9-614 .................................................... 1, 5, 6

UCC, Cmt. 3, Official Comment to § 9-614 ......................................................... 5

UCC, Cmt. 3, Official Comment to § 9-624 ......................................................... 5

UCC, Cmt. 4, Official Comment to § 9-625 ..................................................... 8, 25


**Treatises**

W.H. Lawrence, *et al.*, <u>Understanding Secured Transactions</u> (5th ed.) .................................. 11, 16

James White, *et al.,* <u>Uniform Commercial Code</u>  (6th ed.). ................................................. 21, 22

## PRELIMINARY STATEMENT

Plaintiff Jerry Pinks ("Pinks,") respectfully submits this Memorandum of Points and Authorities, together with the accompanying Declaration of Daniel V. Gsovski, Esq. and Exhibit, in opposition to Defendant M&T Bank Corp.'s ("M&T's") Motion to Dismiss and accompanying Memorandum and Declaration. For the convenience of the Court, a Statutory Appendix of the complete text and Official Comments of cited sections of Article 9 of the Uniform Commercial Code ("UCC"), as enacted in South Carolina, is attached.[1]

## SUMMARY OF ARGUMENT

This action raises the question of whether the contents of a secured party's written notice of intended disposition of repossessed collateral, in a consumer-goods transaction, complied with the notice requirements of South Carolina's UCC. Pinks has pled that M&T's notice of disposition (the "Notice") did not comply with the statute's requirements in two critical respects, each of which renders the Notice insufficient as a matter of law – 1) it lacks a statement "that the debtor is entitled to an accounting of the unpaid indebtedness" as required by § 36-9-614(1)(A), Complaint, (Dkt. #1), ¶18(A); and, 2) it lacks an adequate "description of any liability for a deficiency" as required by § 36-9-614(1)(B).  Dkt. #1, ¶18(B).

Section 36-9-614(1), the statute governing the mandatory contents of such notices, is a strict liability statute, rendering any notice which "lacks" the required information in a consumer-goods notice "insufficient as a matter of law." Comment 2, Official Comment to § 9-

---

[1]     South Carolina's version of the UCC, adopted in 2001, tracks the numbering system promulgated by the National Conference of Commissioners on Uniform State Laws, as revised in 1999, by substituting a "36" for the title number in front of the uniform section, *e.g.*, § 36-9-601, S.C. Code Ann. (Cum. Supp. 2012) All citations in the form of "§ 36-9-601" are to the South Carolina Code. The Official Comments, also adopted in South Carolina, however, are cited according to the UCC citation, *e.g.*, "Comment 2, Official Comment to § 9-614."

614. Consequently, Pinks is not required to plead additional facts establishing prejudice, reliance, or actual harm flowing from the Notice deficiencies in order to state his cause of action. South Carolina's highest court has held that a secured party is "required to scrupulously adhere" to the procedures outlined in Article 9, including all notice of disposition requirements. *Brockbank v. Best Capital Corp.*, 241 S.C. 372, 534 S.E.2d 688, 694 (2000). When the secured creditor fails to comply, the debtor is entitled to a statutory damages award as a matter of law. *Id.,* at 695.

M&T's Notice did not conform to the "safe-harbor" form notice for secured creditors found at § 36-9-614(3). As to the first alleged defect that the Notice "lacks" a "state[ment] that the debtor is entitled to an accounting of [his] unpaid indebtedness," the Notice does not provide this information. It does not provide any language equivalent to the safe-harbor provision: "If you want us to explain in writing how we figured the amount that you owe us, you may call us at [telephone number]." § 36-9-614(3). Yet notwithstanding the express statutory mandate that the Notice "must provide" this information, M&T asserts that its complete silence in this regard "went above and beyond the requirement of the UCC [at § 36-9-614(1)(A)] by providing an actual accounting." Dkt. #8, at 6.

M&T's purported "accounting," as included in the Notice and totaling "$2,128.75," grossly understated Pinks' "unpaid indebtedness" – by well over $50,000. By M&T's own calculation (divulged only after the sale of the collateral), Pinks' "unpaid indebtedness," or "payoff prior to auction date," was actually "$55,580.64." (*See,* M&T's letter dated Sept. 21, 2010 (Dec. of D.V. Gsovski, Esq., Exh. 1), referenced in Dkt. #1, ¶14.) These facts, well-pleaded in the Complaint and supported by documents written by M&T, refute M&T's claim that it provided an "actual accounting" of Pinks' "unpaid indebtedness."

2

For all of these reasons and as discussed further herein, M&T's Motion to Dismiss for failure to state a cause of action upon which relief may be granted should be denied.

## RELEVANT FACTS

On August 8, 2008, Pinks, a South Carolina resident, entered into a twenty-year purchase money security agreement (the "Retail Installment Contract and Security Agreement" or "RICSA") in South Carolina, as the purchaser/obligor of consumer-goods collateral, a recreational camper trailer. Dkt. #9, Exh. B.[2]  The RICSA was then assigned to M&T which became the secured party to the contract. The purchase terms set out in the RICSA were: a "cash price" – $59,302.00; a principal debt (or the "amount financed") – $55,462.00; "finance charges" – $64,214.00; and, repayments – $496.65 monthly for 240 months. *Id*.

By July, 2010 Pinks had fallen into arrears and M&T, in accordance with its rights under the RICSA, repossessed the collateral. M&T sent a letter entitled "Notice of Repossession and Sale of Merchandise" (the "Notice"), dated July 29, 2010 to Pinks at his South Carolina address. Dkt. #1, Exh. 2. The Notice states that a private sale of his collateral would occur "on or after 8/07/10," and that he could "redeem" his collateral "at any time before the sale" by paying "the full amount of past due installment payments," plus accrued late charges and a repossession fee, for a "total amount due" of "$2,128.75." *Id.*

Pinks did not redeem the collateral, and on September 21, 2010 M&T sent him a second notice, advising him that the camper had been sold six days earlier. Dec. of D.V. Gsovski, Esq., Exh. 1[3]. That letter states that his outstanding contractual balance at the time of sale (the "payoff

---

[2]       This is a more legible copy of the RICSA than the copy attached to Plaintiff's Complaint as Dkt. #1, Exh. 1.

[3]       For the purposes of deciding the instant Motion, the Complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir. 2000). As this letter dated September 21, 2010 was written by M&T and incorporated by reference by ¶ 14 of the Complaint, Dkt. #1, it is properly before this Court on the present Motion.

prior to auction date") was $55,580.64. *Id.* After the sale proceeds of $15,000.00 were credited to his account, and after an "auction expense" ($383.13) and "repossession expense" ($1,000.00) were added to the balance of his account, M&T claimed a "Total Amount Due/Deficiency" of $41,963.82.

<u>**OVERVIEW OF APPLICABLE UCC PROVISIONS**</u>

Part 6 (Default) of Article 9 (Secured Transactions) of the UCC, adopted in South Carolina and applicable to this case, sets forth a complete scheme of interrelated rights and duties of secured parties and debtors in default, including the secured party's obligation to conduct a "commercially reasonable" sale of the debtor's repossessed collateral. § 36-9-610(b). A "commercially reasonable" sale includes, but is not limited to, the secured party sending the debtor "reasonable authenticated notification" prior to disposition. § 36-9-611(b). "Reasonable authenticated notification" includes, but it is not limited to, statutorily-mandated contents of the notification. Comment 2, Official Comment to § 9-611 ("The notification must be reasonable as to manner in which it was sent, its timeliness *and its contents.*") (Emphasis added.)

Because this case involves allegations regarding the contents of a consumer notice, and not the timeliness or the manner of the notice, it is controlled by § 36-9-614(1). Even though § 36-9-614(1) lists or incorporates eight different items of information that the secured party "must provide" to the consumer debtor in order for the notice contents to be "sufficient," the secured party's compliance is neither difficult nor onerous. This is because § 36-9-614(2) permits, but does not require, the secured party to copy a sanctioned "safe-harbor" form notice set out in paragraph (3).

When the safe-harbor form is "properly completed" and sent, its contents will be deemed "sufficient" to satisfy the secured party's obligation to send "reasonable notification" to the

4

consumer debtor. Comment 3, Official Comment to § 9-614 (The safe-harbor form, "when properly completed satisfies paragraph (1) [of § 36-9-614."]

Therefore, a secured party who sails from the safe harbor in order to send a different, non-sanctioned form of notice in a consumer transaction does so at its own risk. Two dangers can easily arise to imperil it: first, if its notice "lacks" any of the mandatory contents listed in § 36-9-614(1), the notice is "*insufficient as a matter of law.*" Comment 2, Official Comment to § 9-614.[4] (Emphasis added.) Second, if it sends a non-sanctioned form and *adds* information that is not required in § 36-9-614(1), the notice *may* be deemed insufficient as "law other than this chapter determines the effect of including information not required by item (1)." § 36-9-614(6). As M&T's Notice is not in the form of the safe-harbor notice, this Court will determine whether the Notice "lacks" mandatory information required under paragraph (1), and thus is "insufficient as a matter of law" as Pinks claims.

To the extent that these statutes "give rights to the debtor…and impose duties on a secured party, the debtor…may *not waive or vary*" the notice requirements of § 36-9-614(1) unless there is "an agreement to that effect entered into and signed after default," which Pinks did not enter into or sign. Complaint ¶20, Dkt. #1; §§ 36-9-602 (7) & 624(a); *Brockbank v. Best Capital,* 534 S.E.2d at 694 (Applying former version of statute found at § 36-9-504(3), South Carolina Supreme Court held: "This Article 9 provision allows a debtor to waive his right to notice only by executing a written statement after default which is signed by the debtor. It has been strictly construed to require a specific, knowing waiver of the right to notice.")

---

[4]     The Official Comment to § 9-614 provides:

Paragraph (1) sets forth the information *required* for a reasonable notification in a consumer-goods transaction. A notification *that lacks any of the information* set forth in paragraph (1) *is insufficient as a matter of law.* Compare Section 9-613(2) [for non-consumer goods notices], under which the trier of fact may find the notification to be sufficient even if it lacks some information listed in paragraph (1) of that Section.

Comment 2, Official Comment to § 9-614. (Emphasis added.)

Accordingly, the various facts that M&T points to in its Memorandum, to wit: that Pinks consented to or "authorized" the repossession (Dkt. #8, at 2); informed M&T that he could not afford to make the payments (*i.e.,* "anticipatorily defaulted") (*Id.*); did not attempt to redeem his collateral prior to sale (*Id.,* at 2 & 3); or, did not contact M&T with questions about its Notice (*Id.*, at 3) – *did not*, and could not, waive or vary M&T's notice obligations under § 36-9-614(1). *E.g.,* § 36-9-624(a); *Brockbank v. Best Capital,* 534 S.E.2d at 695 ("[A] creditor must give a debtor the notice required by Article 9 even when the creditor believes the debtor has abandoned or voluntarily surrendered the collateral.")

In consumer goods notices, such as the one sent to Pinks, the secured party is held to a standard of strict compliance under § 36-9-614(1). *See, e.g.,* Comment 2, Official Comment to § 9-614 (comparing the "substantial compliance" standard under UCC § 9-613(3) in non-consumer goods notices with the standard for compliance in consumer goods notices – in which a notice that "lacks" any of the information required by § 36-9-614(1) "is insufficient as a matter of law."); *Mancuso v. Longbeach Accept. Corp.*, 254 S.W.3d 88, 92 (Mo. App. 2008) ("A creditor is held to the requirement of strict compliance with these notice provisions [of UCC § 9-614(1)]."); *Coxall v. Clover Comm'l. Corp.,* 4 Misc.3d 654, 659, 781 N.Y.S.2d 567, 573 (N.Y. City Civ. Ct. 2004) ("A notification in a non-consumer transaction that does not include all of the prescribed information may still be found sufficient as a matter of fact… In a consumer transaction '[a] notification that lacks any of the [prescribed] information…is insufficient as a matter of law.'")

South Carolina applies a strict compliance standard to consumer-goods transaction notices by requiring that the secured party must "scrupulously adhere" to its UCC notice obligations. *Brockbank v. First Capital,* 534 S.E.2d at 694. ("In exercising its rights the creditor

was required to *scrupulously adhere* to procedures contained in Article 9," including the notice of disposition.) (Emphasis added.) Under the strict compliance standard, any doubt as to whether the secured party had complied with its notice obligations under § 36-9-614(1) must be resolved in favor of the debtor, as anything less would be inconsistent with the secured party's obligation of "scrupulous adherence." *Cf., Mancuso v. Long Beach Accept. Corp.,* 254 S.W.3d at 92 ("Any doubt about what constitutes strict compliance [with UCC § 9-614(1)] is resolved in the debtor's favor.")

Pinks seeks statutory damages under § 36-9-625(c)(2) for M&T's failure to comply with § 36-9-614(1). Complaint ¶21, Dkt. #1. Section 36-9-625(c)(1) permits the consumer debtor to elect actual damages "for [his] loss" caused by the secured party's "failure to comply with this Part"; *or*, to recover the minimum statutory damages award under § 36-9-625(c)(2) instead. Because the alternative, minimum statutory damages apply "*in any event*," Pinks need not allege reliance, that he was misled or otherwise thwarted from redeeming his collateral by the defects in M&T's Notice, that he was proximately injured or prejudiced by the defective Notice, or any elements of actual damages.[5] *See, e.g., Coxall v. Clover Accept. Corp.,* 781 N.Y.S.2d at 579. ("Coxall is entitled to this recovery [of statutory damages] even if he sustained no actual loss from Clover Commercial's failure to comply with Article 9.") (citing *Davenport v. Chrysler*

---

[5]      Section 36-9-625(c)(2) provides:

      [I]f the collateral is consumer goods, a person that was a debtor…at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus ten percent of the principal debt[.]

      The Official Comment states:

      Minimum Damages in Consumer-Goods Transactions. Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9-507(1) and *is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of the injury that may have resulted*. Subsection (c)(2) leaves the treatment of statutory damages as it was under former Article 9.

Comment 4, Official Comment to § 9-625. (Emphasis added.)

*Credit Corp,* 818 S.W.2d 23, 31-32 (Tenn. App. 1991); *Erdmann v. Rants,* 442 N.W.2d 441, 443 (N.D. 1989)*; First City Bank-Farmers Branch, Texas v. Guex,* 677 S.W.2d 25, 29 (Tex. 1984)); *Chisholm v. Transouth Fin. Corp.,* 194 F.R.D. 538, 550 (E.D. Va. 2000) (Construing pre-revision version of UCC, the district court held that a statutory damages recovery for secured party's failure to send reasonable notification of disposition did not require plaintiff to prove reliance: "An examination of the statutory remedies [of former UCC § 9-507(1)] *does not include a reliance element.*") (Emphasis added.)

## ARGUMENT

### I.   M&T'S Notice Lacks a Statement That Pinks Was "Entitled to an Accounting of the Unpaid  Indebtedness."

#### A.   *A notice which "lacks" this information is "insufficient as a matter of law."*

Section 36-9-613(1), applicable to *non*-consumer goods transactions, provides: "The contents of a notification of disposition are sufficient if the notification:…(D) states that the debtor is entitled to an *accounting* of the *unpaid indebtedness* and states the charge for an accounting[.]" § 36-9-613(1)(D) (Emphasis added.) This requirement is incorporated by reference into consumer-goods transactions notices. § 36-9-614(1)(A).

It is undisputed that M&T's Notice did not adhere to the safe-harbor form found at § 36-9-614(3), and it does not contain a "statement that the debtor is entitled to an accounting of [his] unpaid indebtedness." M&T therefore cannot claim that it scrupulously adhered to this requirement. *E.g.*, *Coxall v. Clover*, 781 N.Y.S.2d at 573 ("Clover Commercial's two letters did not provide [debtor] with all of the information it was required to provide. Neither letter stated that [debtor] was 'entitled to an accounting of the unpaid indebtedness[.]'… In a consumer transaction '[a] notification that lacks any of the [prescribed] information…is insufficient as a matter of law.'"); *American Gen. Fin. Serv. Inc. v. Woods-Witcher,* 294 Ga.App. 685, 669 S.E.2d

709, 711 (Ga.App. 2008) (Applying Virginia law, the court held: "[T]here is no merit in American General's argument that it substantially complied with the notice requirements because the other information in its notice was correct and met the requirements for a private sale. 'A notification that lacks *any* of the information set forth in Va. Code Ann., § 8-9A-614(1) is insufficient as a matter of law.'") (Emphasis in original.)

Instead, M&T's position is that its self-described "breakdown" of past due installments, plus accrued late charges and repossession fees, contained in its Notice and totaling $2,128.75, *is* an "accounting of [Pinks'] unpaid indebtedness." The Notice provided in relevant part:

| PAST DUE PAYMENTS ON YOUR LOAN: | 990.50 |
| ACCRUED LATE CHARGES: | 138.25 |
| REPOSSESSION FEES: | 1,000.00 |
| TOTAL AMOUNT DUE: | 2,128.75 |

Dkt. #1, Exh. 2. In addition, the Notice provides that "[t]his amount is subject to change as additional payments become due or costs continue to accrue." *Id.*

M&T asserts: "Plaintiff's main contention is that the [Notice] does not use the words 'you have the right to an accounting', and instead, *simply provides Plaintiff with an accounting*[.]" Dkt. #8, at 1. (Emphasis added.) And, ". . . the [Notice] went above and beyond the requirements of the UCC *by providing an actual accounting.*" *Id.*, at 6. (Emphasis added.) M&T's argument fails because, while the statute provides that no "particular phrasing of the notification is required," it is clear that the notice "must provide" a "statement that the debtor is entitled to an accounting of the unpaid indebtedness" (in this case $55,580.64) which M&T's "accounting" (totaling $2,128.75) could not possibly provide.

Moreover, even if it were not off by more than $50,000, M&T's Notice is not sufficiently detailed to qualify as an "accounting," *E.g., Parks v. CNAC-Joliet, Inc.,* 381 Ill. App.3d 586, 592, 886 N.E.2d 376, 381 (App.3d Dist. 2008) (Declining to create a rule that the defendant's

statement of charges for redemption as set out in its notice of disposition was the equivalent of stating that the debtor was entitled to an accounting of her unpaid indebtedness, the court held: "We respectfully disagree that the financial information in this case, which was devoid of detail, created the correct circumstances to develop such a rule.")

> **B.     M&T's Notice understates the amount of Pinks' "unpaid indebtedness" by well over $50,000.**

The Notice understates Pink's "unpaid indebtedness" by over $50,000, disclosing instead the much smaller amount of his "past due installment payments" ($2,128.75) which he would need to pay, along with additional fees and late charges, to redeem. Section § 36-9-614(1), however, does not require the secured party to provide a statement that the debtor is entitled to an accounting of the amount in arrears or to redeem, nor is it required to provide an "actual accounting" or "breakdown" of these amounts. Rather, it must include a statement in the notice that the debtor is entitled to an "accounting" of his "*unpaid indebtedness.*" § 36-9-614(1)(A). (Emphasis added.)

In order for M&T to prevail, not only would it have to convince this Court to create a new rule of equivalency between the consumer's right to a statement of entitlement and an "actual accounting," it would have to find that the information M&T sent in the Notice *is* an accurate and complete "accounting" of [Pinks'] "unpaid indebtedness." Pinks' "indebtedness," however, encompasses the full amount for which he was "indebted" to M&T under the RICSA. His "unpaid" indebtedness would include all of the balance of the loan which was not yet paid at that time, which M&T itself calculated to be $55,580.64 – as the Code makes no distinction between "indebtedness" that is "unpaid" because the repayment obligation has yet to mature, or which is "unpaid" because the debtor failed to make his payments, or otherwise. As one leading commentator describes it, "Article 9 permits a debtor to request that the secured party issue a

10

statement setting forth or confirming the *outstanding balance* of the debtor's *unpaid obligation*."
W.H. Lawrence, *et al.,* Understanding Secured Transactions § 19.01(6) (5th ed. 2012) at 463.
(Emphasis added.)

At the time Pinks signed the RICSA on August 6, 2008 he became "indebted" to M&T
for "$55,462.00." Dkt. #9, Exh. B. M&T's own letter dated September 21, 2010 indicates that
his unpaid indebtedness as of September 15, 2010, approximately five weeks *after* the date of the
Notice, was "$55,580.64" (the "payoff prior to auction date"). Dec. of D.V. Gsovski, Esq., Exh.
1. Therefore, at *all* relevant times – whether on the date of the RICSA, the date of Pinks' default,
the date of repossession, the date of the Notice, or the date of auction – Pinks carried an "unpaid
indebtedness" of well over $50,000. Yet nowhere in its alleged "accounting" does M&T
acknowledge the full amount of his "unpaid indebtedness."

The "accounting" that the debtor may request upon receipt of the notice of disposition is
no different from the "accounting" that he may request at any time during the lifetime of his
loan, even if he is not behind in his payments or in default. A "'[r]equest for an *accounting*'
means a record authenticated by the debtor requesting the recipient provide an *accounting of the
unpaid obligation secured by the collateral*[.]" § 36-9-210(a)(2) (Emphasis added.) If requested,
the secured party must provide the "accounting" within fourteen days of the debtor's request, §
36-9-210(c), or it will be liable to the debtor for any causally-related loss, as well as a $500.00
statutory damages award. § 36-9-625(f).

As the Official Comment notes, the debtor is always entitled to the UCC "accounting," as
the purpose of the "accounting" is to *"make information concerning the secured indebtedness
readily available to debtors, both before and after default."* Comment 2, Official Comment to §
9-210. (Emphasis added.) If an accounting of the "unpaid indebtedness" were limited to an

11

accounting of the amount in arrears, as M&T has provided, this Comment would make no sense – as the debtor is entitled to find out from the secured party how much he "owes," *i.e.*, his "unpaid indebtedness," by way of the UCC "accounting," even when he is current in his account. What § 36-9-614(1)(A) adds is a requirement that the secured party inform the debtor *in the notice of disposition* that he is entitled to the "accounting," as he may be unaware of his right to request it under § 36-9-210.

In plain English, Pinks' "unpaid indebtedness" means the entire amount Pinks' still owed M&T under the RICSA at the time of the Notice. The applicable safe-harbor language is instructive: "If you want us to explain to you in writing how we have figured the amount you *owe*," not "if you want us to explain...the amount *due*." (Emphasis added.) M&T's Notice itself does not purport to be a statement of the amount Pinks "owed." Rather, it is a statement of only the amount "due" (or in arrears) at that time in order to redeem. ("The amount *due* as of the date of this letter is as follows"; "TOTAL AMOUNT DUE: $2,128.75." Dkt. #1, Exh. 2.) (Emphasis added.)

M&T conflates these two concepts throughout its Memorandum, repeatedly arguing that the amount "due" in the Notice is the same amount that Pinks' "owed" M&T under the RICSA. M&T argues: the Notice "provides [Pinks] with an accounting (*i.e.*, a breakdown of the amount *owed on the loan*)." Dkt. #8, at 1. (Emphasis added.) "M&T went one step further by telling [Pinks] 'how we have figured *the amount you owe us*' in the first instance." *Id.*, at 7. (Emphasis added.). "[T]he [Notice] ...included more information than provided by the *Mosca* notice by breaking down *the amount [Pinks] owed into components,* including the past due payments." *Id., at* 8. (Emphasis added.) Yet at other points in its argument M&T's position seems to be that the Notice was limited to an "accounting" of the amount then "due" to redeem: The "[Notice]

12

stated the total amount due (*i.e.*, the aggregate unpaid secured obligations)[.]" *Id., at* 7. In any event, M&T's repeated assertions that the "breakdown" reflects the amount Pinks "owed on the loan" are inaccurate, as the Notice entirely omits any information about the over-$50,000 debt that Pinks owed to M&T at that time.

M&T's contradictory positions over whether the Notice disclosed what was "due" to redeem, as opposed to what was "owed" on the loan, illustrates the confusion that a consumer debtor might have upon receipt of the Notice. This ambiguity creates a liability from which M&T could have easily insulated itself had it simply stated that [Pinks] was "entitled to an accounting of [his] unpaid indebtedness," or, as phrased in the safe-harbor form, "if you want us to explain to you in writing how we have figured out the amount you owe, you may call us[.]"

### C.   *M&T's "breakdown" of the amount due to redeem in its Notice does not qualify as a UCC "accounting."*

In *Parks v. CNAC-Joliet, Inc.,* 886 N.E.2d at 377-79, a consumer notice case in which the debtor sought statutory damages for the secured party's failure to provide compliant notice under Illinois' UCC § 9-614(1), the redemption amount was not limited to the past due payments because the alleged default occurred before the first payment was due. Thus the debtor was required to pay the entire "unpaid contract balance" plus expenses in order to redeem.

The *Parks* court did not agree with the secured party that its statement of the redemption amount was the equivalent of a statement of the debtor's "entitle[ment] to an accounting of the unpaid indebtedness," holding that simply providing the "unpaid contract balance" in summary form was insufficient:

> Common sense dictates that the components [of a UCC accounting], required by the Code, should include something more than simply the bottom line or balance due. We suggest *the components for an accounting*...should include *details* such as (1) *the amount borrowed by the consumer and secured by the collateral for repayment*; (2)

*the amounts paid by the consumer towards the secured debt*; (3) the identification of any defaulted payments; and, (4) any additional charges[.]

*Id.*, at 591.[6] (Emphasis added.) "Even though the trial court concluded that the information on the face of the notice was accurate, we do not agree that this information was sufficiently detailed to constitute an accurate 'accounting' as defined by [the UCC]." *Id.*

M&T's purported "accounting" is similarly insufficient. It also fails to include the "critical components" of an accounting, such as "the amount borrowed by the consumer," the "amounts paid by the consumer," and so forth. The *Parks* "accounting," however, at least discloses the debtor's "unpaid indebtedness" (*i.e.,* the "unpaid contract balance"), albeit in summary form, as one of the "components" of the *Parks* "accounting" – which M&T's Notice fails to do.

Therefore, this Court should decline to rule that M&T's "breakdown" of the $2,128.75 in past due installments and costs was either an accurate or a complete "accounting" of Pinks' "unpaid indebtedness," and deny its Motion to Dismiss.

## II.   M&T's Notice Lacks an Adequate "Description of Any Liability for a Deficiency."

Section 36-9-614(1)(B) requires the secured party to include "a description of any liability for a deficiency of the person to which the notification is sent." The plain statutory language thus requires more than that the notice state merely that the consumer debtor is at risk

---

[6]        The *Parks* notice provided as follows:

TO REDEEM
To REDEEM your vehicle, you must pay the amount shown below to CNAC at its address shown above:
Unpaid contract balance............................. $9,314.17
Delinquency and collection charge................. 0
Expenses of retailing the vehicle.................. 0
Expenses of repairing the vehicle................. 0
Expenses of storing the vehicle................... <u>325.00</u>
                                                          $9,639.17

*Parks v. CNAC-Joliet,* 886 N.E.2d at 379.

of a deficiency. It must provide a "*description*" sufficient to apprise him of the nature or extent of "any liability for a deficiency" which might apply.

This information is not required in non-consumer notices. Therefore, in consumer-goods transactions the notice of disposition serves to inform the debtor that he will lose his collateral if not timely redeemed, *and* that he may be still liable for a deficiency based upon his "unpaid indebtedness," not just the amount of his lapsed payments. If he has been informed that he has a right to an accounting to find out how much he owes, and if the notice is clear that his deficiency will be based upon the entire amount that he owes, he will have received an adequate "description of any liability for a deficiency."

This RICSA permits, but does not require, M&T to accelerate the full contractual balance without notice upon default. Dkt. #9, Exh. B. As one commentator notes:

> If default occurs, the secured party may invoke the remedies provided in Article 9 as well as any remedies included in the security agreement. The agreement typically will contain an acceleration clause which, when invoked, renders the entire outstanding debt presently due and payable. The secured party will then repossess the collateral and proceed with foreclosure. *The secured party need not accelerate in order to foreclose, but if it fails to accelerate, it cannot retain from the foreclosure sale any proceeds in excess of the amount due and unpaid at that time.* Thus it is exceptionally rare for a secured party to foreclose without first accelerating the maturity of the debt.

W.H. Lawrence, *et al.*, Understanding Secured Transactions § 1701(B), *supra,* at 406 and n.27. (Emphasis added.)

In the present case, M&T's Notice does *not* include the standard safe-harbor language, or its equivalent, consistent with acceleration. *E.g.,* "You may get the property back at any time before we sell it by paying the *full* amount you owe (*not just the past due payments*)." § 36-9-614(3). (Emphasis added.) Instead, M&T affirmatively represents the opposite: that Pinks' debt is *not* accelerated prior to sale, and that he may "redeem" at any time before the sale by paying

only the amount of lapsed monthly installments, plus accrued costs and fees. Since the redemption period extends until the sale, it follows that his debt was not accelerated prior to sale.

Professor Lawrence's comments cited above, however, illustrate the potential for confusion as to the extent of the debtor's deficiency when the debt is not accelerated prior to the foreclosure sale. His comments raise questions about whether a creditor such as M&T could deduct from the $15,000 proceeds realized from the auction of Pinks' collateral *only* the amount of the un-accelerated debt (the $2,178.75, plus additional past-due payments and costs accruing between July 10, 2010, the date of the Notice, and September 15, 2010, the auction date), returning the surplus over that amount (of approximately $12,000) to Pinks; or, whether it was entitled to the full amount of the accelerated debt, less the $15,000 auction proceeds realized, leaving Pinks liable for a deficiency of over $40,000.

In a recent *en banc* decision by the Colorado Supreme Court, the court held that the safe-harbor language in a notice of disposition evidenced "clear, affirmative intent" by the secured party to accelerate the contractual balance, when the contract included an optional acceleration clause. *Hassler v. Account Brokers of Larimer Cty.,* 2012 CO 24, 274 P.3d 547, 554 (2012). But, had the acceleration "*not* occur[red] prior to [the secured party's] disposition of the vehicle," the secured party "would only have been authorized to apply the proceeds" to the unpaid installments, and "return [any amounts over that] as surplus to [the debtor]." *Hassler,* 274 P.3d at 554, n.8. (Emphasis added.)

If the secured party's election to *not* accelerate the debt prior to the foreclosure sale in its notice of disposition causes legal ink to be spilled over the extent of the debtor's resulting deficiency, it should raise red flags in a consumer notice situation. The only language which M&T identifies as a "description of any liability for a deficiency" is found within the following

16

two sentences: "Once the sale of the collateral has taken place, MTB will deduct from the sales proceeds all amounts owed to it. If there is still money owing after this is done, you are responsible to pay MTB for this deficiency." Dkt. #1, Exh. 2.

However, these two sentences immediately follow both the "breakdown" of the $2,128.75 and other language that indicates, or certainly suggests, to the debtor that "the amount *due*" at the time of this letter, or the "total amount due" to redeem, is the same thing as "all amounts *owed* to it." (*E.g.,* the same confusion which M&T exhibits when it asserts in its Memorandum that the $2,128.75 is a "breakdown" of the "amount *owed on the loan*." Dkt. #8, at 1.) (Emphasis added.) These two sentences appear without any further explanation, clarification or emphasis to warn the debtor that "all amounts owed" means the same thing as "all amounts owed, *not just the past due payments*."

Given all circumstances of M&T's Notice, including that it: 1) failed to provide a statement that Pinks was entitled to an accounting of his "unpaid indebtedness," which would have put him on notice that he was entitled to find out exactly what amounts were "owed" to M&T; 2) represented that the debt was not accelerated prior to sale, and thus was ambiguous as to whether his liability for a deficiency would be limited to the past due installments or the entire accelerated balance; 3) placed the only language describing his liability for a deficiency within the Notice of Redemption section, which was concerned with the limited amount of the $2,128.75 to redeem; 4) did not include any clarifying language to convey that the deficiency would be based upon "all amounts owed, not just the past due payments," it is clear that M&T's Notice "lacks" a clear, adequate, unambiguous "description of any liability for a deficiency." "Scrupulous adherence" requires that any doubt about whether M&T complied with § 36-9-614(1)(B) to be resolved in the debtor's favor, and M&T's Motion to Dismiss should be denied.

**III.    The Authorities   M&T Relies Upon Are Inapposite or Do Not Support M&T'S Position.**

   *A.    The "Substantial Compliance" Standard Does Not Apply to Defects in a Notice under § 36-9-614(1).*

M&T heavily relies upon a Massachusetts trial court order granting summary judgment to the secured party in a consumer-goods notice case. *Mosca v. Brookline Bank,* No. 07-771-G, 2009 WL 3779818 (Mass.Super.Ct. Jan. 26, 2009). Mosca sought minimum statutory damages under UCC § 9-625, pleading several notice defects under UCC § 9-614(1). Specifically, she alleged that the secured party sent a notice which failed to provide a statement of entitlement to an accounting of her unpaid indebtedness; that the notice failed to provide "a telephone number or mailing address from which additional information concerning the disposition and obligation secured is available"; and, that the notice failed to state the method of intended disposition. *Mosca,* Slip Op., at 1. In granting summary judgment in its favor the court ruled that the secured party had met its obligations as to each of these requirements. *Id.*

M&T cites *Mosca* as authority that its Notice need not provide a statement of entitlement to an accounting because it contains an actual accounting. Dkt. #8, at 8. The *Mosca* notice stated as follows:

> You may cure your default if we receive certified funds totaling $9,587.31 within 20 days of the date of this letter. You will also be responsible for interest to the date of payment, together with all expenses incurred in this repossession. Please call for this amount.

*Mosca,* 2009 WL 3779818 at 2. Citing this language, the *Mosca* court held that the "notice sufficiently informed the plaintiff of her right to an accounting." *Id.*

M&T cites this ruling, asserting that "the [*Mosca*] court concluded that the notice 'sufficiently informed the plaintiff of her right to an accounting,'" and that "[b]y comparison [M&T's Notice]…included more information than provided by the *Mosca* notice by breaking

18

down the amount [Pinks] owed into components[.]" Dkt. #8, at 8. Unlike in the case at bar, however, it is impossible to tell from the *Mosca* order whether the $9,587.31 "default" amount in the notice was accelerated, and thus disclosed the full amount of Mosca's "unpaid indebtedness," or if it represented only a lesser amount of the lapsed payments, as was the case in M&T's Notice. What is certain is that this issue was neither discussed nor analyzed in the *Mosca* order. Additionally, the *Mosca* court relied upon *Parks v. CNAC-Joliet, Inc., supra,* in holding that the *Mosca* notice was sufficiently detailed to qualify as an "accounting" because it "[gave] notice of the components of her obligation." *Mosca,* 2009 WL 3779818 at 2, citing *Parks v. CNAC-Joliet*, 886 N.E.2d at 381.

However, as previously discussed, the *Parks* court held just the opposite – that bare bone "components" of an accounting were insufficient, as the accounting must include such "details" as "the amount borrowed by the consumer," the "amounts paid by the consumer towards the secured debt," the identification of any defaulted payments," and "any additional charges incurred by the secured creditor," which are missing from the *Mosca* notice. *Parks v. CNAC-Joliet,* 886 N.E.2d at 381. The *Mosca* court's misreading of *Parks* seriously undermines the persuasive force of the resulting order.

Finally, the *Mosca* court, while considering Mosca's allegations under UCC § 9-614(1), erroneously applied UCC § 9-613(3), applicable to non-consumer notices. ("Gen. Law c. 106, § 9-613(3) states that a notice which provides 'substantially the information' required by the statute is sufficient even if it includes information not specified or minor errors that are not seriously misleading.") (*Mosca,* 2009 WL 3779818 at 3.) The substantial compliance/minor errors rule of § UCC 9-613(3), however, only applies in non-consumer transactions. Therefore, to the extent M&T relies upon the *Mosca* order, this Court will have to decide its authority.

19

M&T, like the *Mosca* order, also relies upon *General Electric Cap. Corp. v. Net Transportation, Inc.,* 2006 WL 3741828, at *3 (D. Conn. Dec. 8, 2006) for authority that a notice which fails to provide a statement of entitlement to an accounting may nevertheless be compliant, even if it did not include the word "accounting," but "provided the debtor with the [secured party's] contact information [which] was sufficient under the UCC." Dkt. #8, at 9. This is a correct statement of the *General Electric* ruling.

What M&T fails to recognize, however, is that *General Electric Capital* involved a *non-*consumer notice from GE Capital to Net Transportation, and thus arose out of the entirely different statutory standard found within UCC § 9-613(3). ("A notice of sale must provide information relevant to…the debtor's entitlement to an accounting of the unpaid indebtedness. Conn. Gen. Stat. § 42a-*9-613.*") *General Electric Capital*, 2006 WL 3741828, at *3. (Emphasis added.) Although the district court provided no analysis of its reasoning, presumably the judge was familiar with the correct statutory standard for compliance in non-consumer notices under UCC 9-613(3). In non-consumer transactions, "[t]he contents of a notification providing *substantially* the information specified in item (1) are sufficient, even if the notification includes:…(B) *minor errors that are not seriously misleading.*" UCC § 9-613(3)(B). (Emphasis added.) And, "[w]hether the contents of a notification that lacks any of the information specified in item (1) are nevertheless sufficient is *a question of fact.*" UCC § 9-613(2). (Emphasis added.)

Thus the *General Electric* case has nothing to do with the standard of compliance to which M&T must be held under § 36-9-614(1). *E.g.,* James White, *et al.,* Uniform Commercial Code § 34-1 (6th ed.) ("Applying 9-614 and 9-613, one can infer that that the 'substantially complying' notice rule of 9-613(3) does not apply to consumer transactions.")

In furtherance of its misplaced "substantial compliance" argument M&T cites two cases (from before the 1999 Article 9 revisions were adopted) as authority that "the sufficiency of the notice should be assessed based upon the purpose the notice is designed to serve." Dkt. #8, at 9. M&T relies upon *Reuter v. Citizen & Northern Bank,* 410 Pa. Super. 199, 599 A.2d 673, 678-79 (1991) for this point. Dkt. #8, at 9. It likewise cites *First Bank and Trust Co. of Ithaca, N.Y. v. Mitchell, et al.,* 123 Misc.2d 386, 473 N.Y.S.2d 697, 702 (Sup.Ct. 1984), as authority that "all circumstances surrounding the giving of notice must be evaluated in light of the purpose of the notice requirement." Dkt. #8, at 9.

Again, M&T neglects to mention that both of these cases involve non-consumer goods transactions. Moreover, both are oral notice cases, dealing with the reasonableness of the *manner* of providing notice in commercial transactions, as opposed to the *contents* of the notice. In *Reuter* the court held that a guarantor of a loan for an airplane, used in an aviation service business, received adequate, oral notice of a pending sale when he participated in discussions with the creditor as to how best to maximize auction proceeds. *Reuter v. Citizen & Northern Bank,* 599 A.2d at 678-79. In *First Bank & Trust Co. of Ithaca v. Mitchell, et al.,* 473 N.Y.S.2d at 701, the court held that oral notice of pending sale given to the guarantor personally was "equivalent to service on the corporation given the closely held nature of the corporation and [guarantor's] position as president." Aside from being irrelevant to Pinks' consumer cause of action, these cases may not be good law after the 1999 revisions of UCC §§ 9-611(b) and 613. (*See, e.g,* James White, *et al.,* Uniform Commercial Code § 34-12 *supra.*) ("The [revised] Code rejects oral notice.")

21

**B.    Plaintiff is not required to allege "materiality of defects" to state a cause of action under § 36-9-614(1).**

In the final section of its Memorandum M&T argues that this case should be dismissed because Pinks fails to plead facts to support that he was prejudiced by the contents of the Notice: "Alternatively, Plaintiff's Complaint should be dismissed because the alleged defects were *immaterial to him*." Dkt. #8, at 11. (Emphasis added.) M&T relies upon a district court decision, *Hudson v. Eaglemark Savings Bank, et al.,* 2011 WL 1755540 (E.D. Pa. May 9, 2011) ("*Hudson I*"), and the Third Circuit's decision affirming that lower court's decision, *Hudson v. Eaglemark Savings Bank, et al.,* 475 F.Appx. 423 (3d Cir. 2012) ("*Hudson II*"), as its only authority that prejudice must be plead in a UCC § 9-614(1) cause of action in order to avoid a Rule 12(b)(6) dismissal. M&T asserts:

> Plaintiff's claim should also be dismissed because he fails to allege any facts that suggest that Plaintiff was *in any way affected by the alleged defects in the [Notice.]*
>
> The U.S. District Court for the Eastern District of Pennsylvania and the Third Circuit Court of Appeals were *both recently presented with this issue* and *both courts held that a consumer is required to plead facts* that could support a finding *that the alleged defects in a notice to sell collateral impacted him or her in some way*.

Dkt. #8, at 11. (Emphasis added.)

This is a misrepresentation of the facts, the law, and the rulings in the *Hudson* cases. M&T is correct that Pinks' claim involves "alleged defects in the [Notice]" under the applicable UCC statute, § 36-9-614(1). However, the district court in *Hudson I* was not presented with the issue, and did not rule, that Hudson was required to plead that the several defects of which he complained in his UCC § 9-614(1) cause of action "impacted him in some way" in order to survive a Rule 12(b)(6) motion. *Hudson I* at *5-6. The court merely reviewed the notice contents, found that the contents complied with the statutory mandates of UCC § 9-614(1), and dismissed his claim – never once stating that the reason it was doing so was because Hudson failed to plead

22

that he was adversely "impacted" by the defective contents of his notice. *Hudson I* at *6. Moreover, Hudson's defective notice claim under UCC § 9-614(1) was not even the subject of, or raised on, appeal. *Hudson II,* 475 Fed. Appx. at 425-27.

What was at issue in both *Hudson* cases was whether the notice, which Hudson had admittedly received ten days before the sale of his motorcycle, was *timely* under an entirely *different* UCC statute, namely UCC § 9-612(a), as well as a Pennsylvania Motor Vehicle statute which was determined to be inapplicable. *Hudson* I, 2011 WL 1755540*,* at *5; *Hudson II,* 475 Fed. Appx. at 426-27.

UCC § 9-612(a) provides as follows: "whether a notification is sent within a reasonable time is a question of fact" in a consumer transaction. Both *Hudson* decisions referred to Comment 2, Official Comment to § 9-612 as enacted in Pennsylvania, which states that some redemption periods could be so shortened by the sale date that "a person could not be expected to act or take account of the notification [which] would be unreasonable." Comment 2, Official Comment to § 9-612. *Hudson I*, 2011 WL 1755540*,* at *5; *Hudson II*, 475 Fed. Appx. at 426-427. In order to survive a Rule 12(b)(6) motion to dismiss, Hudson was required under Rule 8 to plead some factual basis for his UCC § 9-612(a) cause of action that he "could not be expected to act" within the ten days notice which he received. *Id.* Hudson did not plead any facts; consequently, his cause of action under UCC § 9-612(a) was dismissed. *Id.*

   M&T argues:

> Hudson appealed, and the Third Circuit agreed with the district court that Hudson's allegations failed to satisfy *Twombley: "*Hudson's conclusory assertion that the notice was unreasonable, *without facts showing how he could not be expected to act in response to the notice or take account of the notice,* was insufficient to state a claim upon which relief may be granted." (Internal citations omitted.)

Dkt. #8, at 13. (Emphasis original in Memorandum.)

M&T neglects to clarify that this quote concerned Hudson's timeliness claim under UCC § 9-612(a) only, and had nothing do with his defective contents claim under UCC 9-614(1), which was not before the Third Circuit. The *Hudson* quote that M&T relies upon (*i.e.,* that Hudson "could not be expected to act" "or take account of the notice") is a direct quote from Comment 2, Official Comment to § 9-612.

The difference between the two statutes is obvious. Because a question of fact arises under UCC § 9-612(a) as to whether a notice was sent within a "reasonable time" before the sale, the debtor must plead facts to support his claim that "he could not be expected to act" within the resulting time constraints, in order to survive a Rule 12(b)(6) motion to dismiss. On the other hand, a notice which "lacks" any of the information required by UCC § 9-614(1) is "insufficient as a matter of law" and involves no question of fact. Comment 2, Official Comments to § 9-614. A notice which is "insufficient as a matter of law" is not a "reasonable authenticated notice of disposition" under UCC § 9-611(b).

M&T's argument that Pinks must plead that he was adversely affected by the defects in M&T's Notice in order to survive a Motion to Dismiss is wrong. It is contrary to the plain meaning of the statutory language of § 36-9-614(1) that says the notice "*must provide*" the information at issue; to the Official Comments which provide that a notice which "lacks" the mandated information is "insufficient as a matter of law"; to South Carolina's requirement that the secured party "scrupulously adhere" to its notice obligations; and, to the "in any event" language of the statutory damages award under § 36-9-625(c)(2), which is "designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, *regardless of any injury* [or prejudice or adverse "impact"] that might have resulted." Comment 4, Official Comment to § 9-625. (Emphasis added.)

24

Neither *Hudson I* nor *II* will carry the burden which M&T attempts to place upon it. As the *Hudson* cases are the only authority which M&T cites in support of it prejudice argument, this Court should decline to rule that Pinks must plead prejudice, or an adverse "impact," in order to state a cause of action under § 36-9-614(1).

## CONCLUSION

For the reasons set forth more fully herein, this Court should deny Defendant M&T Bank Corp.'s Motion to Dismiss.

Dated:  June 21, 2013                                Respectfully Submitted,

HERZFELD & RUBIN, P.C.
By: /s/Daniel V. Gsovski (dg4413)
A Member of the Firm
125 Broad Street
New York, New York 10004-1300
Telephone: (212) 471-8512
E-mail: dgsovski@herzfeld-rubin.com

PHILIP FAIRBANKS, ESQ., P.C.
1214 King Street
Beaufort, SC 29902
Telephone: (843) 521-1580
E-mail: philip@lowcountrybankruptcy.com
PENDING ADMISSION PRO HAC VICE

LAW OFFICE OF FREDERICK CORLEY
1214 King Street
 Beaufort, SC 29902
Telephone: (843) 524-3232
E-mail: rcorley@islc.net
PENDING ADMISSION PRO HAC VICE

KATHY D. LINDSAY, P.A
1214 King Street
Beaufort, SC 29902
Telephone: (843) 521-1581
E-mail: klindsay@islc.net
PENDING ADMISSION PRO HAC VICE

ATTORNEYS FOR PLAINTIFF
AND THE CLASS

# STATUTORY APPENDIX

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 2. EFFECTIVENESS OF SECURITY AGREEMENT; ATTACHMENT OF SECURITY
INTEREST; RIGHTS OF PARTIES TO SECURITY AGREEMENT
SUBPART 2. RIGHTS AND DUTIES

*S.C. Code Ann. § 36-9-210* (2012)

§ 36-9-210. Request for accounting; request regarding list of collateral or statement of account.

(a) In this section:

(1) "Request" means a record of a type described in item (2), (3), or (4).

(2) "Request for an accounting" means a record authenticated by a debtor requesting that the recipient provide an accounting of the unpaid obligations secured by collateral and reasonably identifying the transaction or relationship that is the subject of the request.

(3) "Request regarding a list of collateral" means a record authenticated by a debtor requesting that the recipient approve or correct a list of what the debtor believes to be the collateral securing an obligation and reasonably identifying the transaction or relationship that is the subject of the request.

(4) "Request regarding a statement of account" means a record authenticated by a debtor requesting that the recipient approve or correct a statement indicating what the debtor believes to be the aggregate amount of unpaid obligations secured by collateral as of a specified date and reasonably identifying the transaction or relationship that is the subject of the request.

(b) Subject to subsections (c), (d), (e), and (f), a secured party, other than a buyer of accounts, chattel paper, payment intangibles, or promissory notes or a consignor, shall comply with a request within fourteen days after receipt:

(1) in the case of a request for an accounting, by authenticating and sending to the debtor an accounting; and

(2) in the case of a request regarding a list of collateral or a request regarding a statement of account, by authenticating and sending to the debtor an approval or correction.

(c) A secured party that claims a security interest in all of a particular type of collateral owned by the debtor may comply with a request regarding a list of collateral by sending to the debtor an authenticated record including a statement to that effect within fourteen days after receipt.

(d) A person that receives a request regarding a list of collateral, claims no interest in the collateral when it receives the request, and claimed an interest in the collateral at an earlier time shall comply with the request within fourteen days after receipt by sending to the debtor an authenticated record:

(1) disclaiming any interest in the collateral; and

(2) if known to the recipient, providing the name and mailing address of any assignee of or successor to the recipient's interest in the collateral.

(e) A person that receives a request for an accounting or a request regarding a statement of account, claims no interest in the obligations when it receives the request, and claimed an interest in the obligations at an earlier time shall comply with the request within fourteen days after receipt by sending to the debtor an authenticated record:

(1) disclaiming any interest in the obligations; and

(2) if known to the recipient, providing the name and mailing address of any assignee of or successor to the recipient's interest in the obligations.

(f) A debtor is entitled without charge to one response to a request under this section during any six-month period. The secured party may require payment of a charge not exceeding twenty-five dollars for each additional response.

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. Former Section 9-208.

2. Scope and Purpose. This Section provides a procedure whereby a debtor may obtain from a secured party information about the secured obligation and the collateral in which the secured party may claim a security interest. It clarifies and resolves some of the issues that arose under former Section 9-208 and makes information concerning the secured indebtedness readily available to debtors, both before and after default. It applies to agricultural lien transactions (see the definitions of "debtor," secured party," and "collateral" in Section 9-102), but generally not to sales of receivables. See subsection ( b).

3. Requests by Debtors Only. A financing statement filed under Part 5 may disclose only that a secured party may have a security interest in specified types of collateral. In most cases the financing statement will contain no indication of the obligation (if any) secured, whether any security interest actually exists, or the particular property subject to a security interest. Because creditors of and prospective purchasers from a debtor may have legitimate needs for more detailed information, it is necessary to provide a procedure under which the secured party will be required to provide information. On the other hand, the secured party should not be under a duty to disclose any details of the debtor's financial affairs to any casual inquirer or competitor who may inquire. For this reason, this Section gives the right to request information to the debtor only. The debtor may submit a request in connection with negotiations with subsequent creditors and purchasers, as well as for the purpose of determining the status of its credit relationship or demonstrating which of its assets are free of a security interest.

4. Permitted Types of Requests for Information. Subsection (a) contemplates that a debtor may request three types of information by submitting three types of "requests" to the secured party. First, the debtor may request the secured party to prepare and send an " accounting" (defined in Section 9-102). Second, the debtor may submit to the secured party a list of collateral for the secured party's approval or correction. Third, the debtor may submit to the secured party for its approval or correction a statement of the aggregate amount of unpaid secured obligations. Inasmuch as a secured party may have numerous transactions and relationships with a debtor, each request must identify the relevant transactions or relationships. Subsections (b) and (c) require the secured party to respond to a request within 14 days following receipt of the request.

5. Recipients Claiming No Interest in the Transaction. A debtor may be unaware that a creditor with whom it has dealt has assigned its security interest or the secured obligation. Subsections (d) and (e) impose upon recipients of requests under this Section the duty to inform the debtor that they claim no interest in the collateral or secured obligation, respectively, and to inform the debtor of the name and mailing address of any known assignee or successor. As under subsections (b) and (c), a response to a request under subsection (d) or (e) is due 14 days following receipt.

6. Waiver; Remedy for Failure to Comply. The debtor's rights under this Section may not be waived or varied. See Section 9-602(2). Section 9-625(e) sets forth the remedy for noncompliance with the requirements of this Section.

7. Limitation on Free Responses to Requests. Under subsection (f), during a six-month period a debtor is entitled to receive from the secured party one free response to a request. The debtor is not entitled to a free response to each type of request (i.e., three free responses) during a six-month period.

SOUTH CAROLINA REPORTER'S COMMENT

*Section 36-9-210* provides a mechanism that debtors can use to provide prospective secured lenders or purchasers detailed information concerning the status of an existing secured obligation. The provision is necessary because financing statements filed for the public record contain no indication of the amount of a secured obligation and do not establish whether particular property is subject to a security interest.

Prospective secured lenders, however, should not place undue reliance upon the information generated under *Section 36-9-210*. Consider the following illustration.

On February 1, SP-1 entered into a security agreement with D that granted SP-1 a security interest upon D's equipment to secure a $ 100,000 loan. The value of D's equipment was $ 500,000. On February 1, SP-1 filed a financing statement covering D's equipment.

In March, SP-2 was considering making a loan to D secured by D's equipment. After discovering SP-1's financing statement, SP-2 had D submit a request for an accounting to SP-1. The response to the request established the debt D owed to SP-1 was $ 100,000.

On April 1 and in reliance upon SP-1's response to the request for an accounting, SP-2 made a $ 400,000 loan secured by a security interest in D's equipment. On April 1, SP-2 filed a financing statement covering D's equipment.

On May 1, SP-1 entered into a second security agreement with D under which SP-1 loaned D $ 400,000 secured by a security interest in D's equipment.

On June 1, D defaulted upon its security agreements with SP-1 and SP-2. Sp-1's February 1 financing statement fixed SP-1 priority for both the February 1 and April 1 loans. As a result, under *Section 36-9-322(a)(1)* SP-1 would have priority over SP-2 with respect to both the February 1 and April 1 loans. See *Section 36-9-323*, Official Comment 2, Example 1.

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-602* (2012)

§ 36-9-602. Waiver and variance of rights and duties.

Except as otherwise provided in *Section 36-9-624*, to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections:

(1) *Section 36-9-207(b)(4)(C)*, which deals with use and operation of the collateral by the secured party;

(2) *Section 36-9-210*, which deals with requests for an accounting and requests concerning a list of collateral and statement of account;

(3) *Section 36-9-607(c)*, which deals with collection and enforcement of collateral;

(4) *Sections 36-9-608(a)* and *36-9-615(c)* to the extent that they deal with application or payment of noncash proceeds of collection, enforcement, or disposition;

(5) *Sections 36-9-608(a)* and *36-9-615(d)* to the extent that they require accounting for or payment of surplus proceeds of collateral;

(6) *Section 36-9-609* to the extent that it imposes upon a secured party that takes possession of collateral without judicial process the duty to do so without breach of the peace;

(7) *Sections 36-9-610(b)*, *36-9-611*, *36-9-613*, and *36-9-614*, which deal with disposition of collateral;

(8) *Section 36-9-615(f)*, which deals with calculation of a deficiency or surplus when a disposition is made to the secured party, a person related to the secured party, or a secondary obligor;

(9) *Section 36-9-616*, which deals with explanation of the calculation of a surplus or deficiency;

(10) *Sections 36-9-620*, *36-9-621*, and *36-9-622*, which deal with acceptance of collateral in satisfaction of obligation;

(11) *Section 36-9-623*, which deals with redemption of collateral;

(12) *Section 36-9-624*, which deals with permissible waivers; and

(13) *Sections 36-9-625* and *36-9-626*, which deal with the secured party's liability for failure to comply with this chapter.

**HISTORY:** 1988 Act No. 494, § 5;  2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. Former Section 9-501(3).

2. Waiver: In General. Section 1-102(3) addresses which provisions of the UCC are mandatory and which may be varied by agreement. With exceptions relating to good faith, diligence, reasonableness, and care, immediate parties, as between themselves, may vary its provisions by agreement. However, in the context of rights and duties after default, our legal system traditionally has looked with suspicion on agreements that limit the debtor's rights and free the secured party of its duties. As stated in former Section 9-501, Comment 4, "no mortgage clause has ever been allowed to clog the equity of redemption." The context of default offers great opportunity for overreaching. The suspicious attitudes of the courts have been grounded in common sense. This Section, like former Section 9-501(3), codifies this long-standing and deeply rooted attitude. The specified rights of the debtor and duties of the secured party may not be waived or varied except as stated. Provisions that are not specified in this Section are subject to the general rules in Section 1-102(3).

3. Nonwaivable Rights and Duties. This Section revises former Section 9-501(3) by restricting the ability to waive or modify additional specified rights and duties: (i) duties under Section 9-207(b)(4)(C), which deals with the use and operation of consumer goods, (ii) the right to a response to a request for an accounting, concerning a list of collateral, or concerning a statement of account (Section 9-210), (iii) the duty to collect collateral in a commercially reasonable manner (Section 9-607), (iv) the implicit duty to refrain from a breach of the peace in taking possession of collateral under Section 9-609, (v) the duty to apply noncash proceeds of collection or disposition in a commercially reasonable manner (Sections 9-608 and 9-615), (vi) the right to a special method of calculating a surplus or deficiency in certain dispositions to a secured party, a person related to secured party, or a secondary obligor (Section 9-615), (vii) the duty to give an explanation of the calculation of a surplus or deficiency ( Section 9-616), (viii) the right to limitations on the effectiveness of certain waivers (Section 9-624), and (ix) the right to hold a secured party liable for failure to comply with this Article (Sections 9-625 and 9-626). For clarity and consistency, this Article uses the term "waive or vary" instead of "renounc[e] or modify[]," which appeared in former Section 9-504(3).

This Section provides generally that the specified rights and duties "may not be waived or varied." However, it does not restrict the ability of parties to agree to settle, compromise, or renounce claims for past conduct that may have constituted a violation or breach of those rights and duties, even if the settlement involves an express "waiver."

4. Waiver by Debtors and Obligors. The restrictions on waiver contained in this Section apply to obligors as well as debtors. This resolves a question under former Article 9 as to whether secondary obligors, assuming that they were "debtors" for purposes of former Part 5, were permitted to waive, under the law of suretyship, rights and duties under that Part.

5. Certain Post-Default Waivers. Section 9-624 permits post-default waivers in limited circumstances. These waivers must be made in agreements that are authenticated. Under Section 1-201, an " 'agreement' means the bargain of the parties in fact." In considering waivers under Section 9-624 and analogous agreements in other contexts, courts should carefully scrutinize putative agreements that appear in records that also address many additional or unrelated matters.

SOUTH CAROLINA REPORTER'S COMMENT

As a general rule *Section 36-1-102(3)* permits the parties to a transaction within the scope of the Code to vary the effect of statutory provisions. Under that provision the only duties that cannot be disclaimed are the obligations of good faith, diligence, reasonableness, and care. *Section 36-9-602*, however, further restricts the rights of the parties to vary the provisions of Article 9 relating to default. *Section 36-9-602* renders unenforceable an agreement that purports to waive or vary specified provisions of Article 9 to the extent that the provisions give rights to a debtor or obligor or impose duties on a secured party.

The provisions of *Section 36-9-602* include a statutory cross reference to the provisions of Article 9 that impose non-waiveable rights or duties. The provisions of *Section 36-9-602*, however, are subject to *Section 36-9-624* under which certain post-default waivers by a debtor or obligor are enforceable. The effect of these two provisions is as follows:

1. Right to Notification of Disposition of Collateral

*Section 36-9-611* requires a secured party to send reasonable authenticated notification of the disposition of collateral to the debtor, any secondary obligor, and certain secured parties holding conflicting security interests. *Section 36-9-602(7)* precludes the waiver of rules arising under *Section 36-9-611* that give the debtor or secondary obligor rights or impose duties on a secured party. *Section 36-9-624(1)*, however, provides that a debtor or secondary obligor may waive the right to notification of the disposition of collateral by an agreement entered into and authenticated after default. As a result, a term in a security agreement purporting to waive a debtor's right to notification of the disposition of collateral would be unenforceable, but a post-default authenticated agreement to waive notification would be effective.

2. Mandatory Disposition of Consumer Goods

*Section 36-9-620(e)* and (f)(1) require a secured party to dispose of certain repossessed consumer goods within 90 days of taking possession and, in effect, preclude acceptance of the goods in satisfaction of the secured obligation. *Section 36-9-602(1)* precludes the waiver of a debtor's rights with respect to acceptance of collateral in satisfaction of an obligation under *Section 36-9-620*. *Section 36-9-324(2)*, however, permits a debtor to waive the right to require the disposition of collateral under *Section 36-9-620(e)* by an agreement entered into and authenticated after default.

3. Redemption of Collateral

*Section 36-9-623* grants debtors and secondary obligors the right to redeem collateral. *Section 36-9-602(11)* precludes the waiver of the right to redeem collateral. *Section 36-9-324(3)*, however, provides that in a transaction other than a consumer-goods transaction, a debtor or secondary obligor may waive the right to redeem collateral by an agreement entered into and authenticated after default.

Note that the preclusions on the waiver of rights under *Section 36-9-602* extend to obligors as well as debtors. Under *Section 36-9-611* a secured party is required to send secondary obligors notice of a disposition of collateral. The term "secondary obligor" includes guarantors of a secured obligation. Thus *Section 36-9-602(5)* renders a waiver of notification provision in a guaranty of a secured obligation unenforceable. See *Section 36-9-602*, Official Comment 4. This result is consistent with *Crane v. Citicorp National Services, Inc., 313 S.C. 70, 437 S.E. 2d 50 (1993)* in

which the Court asserted that guarantors of secured obligations are entitled to notice of the disposition of collateral.

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-610* (2012)

§ 36-9-610. Disposition of collateral after default.

  (a) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

  (b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

  (c) A secured party may purchase collateral:

  (1) at a public disposition; or

  (2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

  (d) A contract for sale, lease, license, or other disposition includes the warranties relating to title, possession, quiet enjoyment, and the like which by operation of law accompany a voluntary disposition of property of the kind subject to the contract.

  (e) A secured party may disclaim or modify warranties under subsection (d):

  (1) in a manner that would be effective to disclaim or modify the warranties in a voluntary disposition of property of the kind subject to the contract of disposition; or

  (2) by communicating to the purchaser a record evidencing the contract for disposition and including an express disclaimer or modification of the warranties.

  (f) A record is sufficient to disclaim warranties under subsection (e) if it indicates "there is no warranty relating to title, possession, quiet enjoyment, or the like in this disposition" or uses words of similar import.

**HISTORY:**  2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

  1. Source. Former Section 9-504(1), (3)

  2. Commercially Reasonable Dispositions. Subsection (a) follows former Section 9-504 by permitting a secured party to dispose of collateral in a commercially reasonable manner following a default. Although subsection (b) permits both public and private dispositions, "every aspect of a disposition . . . must be commercially reasonable." This Section encourages private dispositions on the assumption that they frequently will result in higher realization on collateral

for the benefit of all concerned. Subsection (a) does not restrict dispositions to sales; collateral may be sold, leased, licensed, or otherwise disposed. Section 9-627 provides guidance for determining the circumstances under which a disposition is "commercially reasonable."

3. Time of Disposition. This Article does not specify a period within which a secured party must dispose of collateral. This is consistent with this Article's policy to encourage private dispositions through regular commercial channels. It may, for example, be prudent not to dispose of goods when the market has collapsed. Or, it might be more appropriate to sell a large inventory in parcels over a period of time instead of in bulk. Of course, under subsection (b) every aspect of a disposition of collateral must be commercially reasonable. This requirement explicitly includes the "method, manner, time, place and other terms." For example, if a secured party does not proceed under Section 9-620 and holds collateral for a long period of time without disposing of it, and if there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a "commercially reasonable" manner. See also Section 1-203 (general obligation of good faith).

4. Pre-Disposition Preparation and Processing. Former Section 9-504(1) appeared to give the secured party the choice of disposing of collateral either "in its then condition or following any commercially reasonable preparation or processing." Some courts held that the "commercially reasonable" standard of former Section 9-504(3) nevertheless could impose an affirmative duty on the secured party to process or prepare the collateral prior to disposition. Subsection (a) retains the substance of the quoted language. Although courts should not be quick to impose a duty of preparation or processing on the secured party, subsection (a) does not grant the secured party the right to dispose of the collateral "in its then condition" under all circumstances. A secured party may not dispose of collateral "in its then condition" when, taking into account the costs and probable benefits of preparation or processing and the fact that the secured party would be advancing the costs at its risk, it would be commercially unreasonable to dispose of the collateral in that condition.

5. Disposition by Junior Secured Party. Disposition rights under subsection (a) are not limited to first-priority security interests. Rather, any secured party as to whom there has been a default enjoys the right to dispose of collateral under this subsection. The exercise of this right by a secured party whose security interest is subordinate to that of another secured party does not of itself constitute a conversion or otherwise give rise to liability in favor of the holder of the senior security interest. Section 9-615 addresses application of the proceeds of a disposition by a junior secured party. Under Section 9-615(a), a junior secured party owes no obligation to apply the proceeds of disposition to the satisfaction of obligations secured by a senior security interest. Section 9-615(g) builds on this general rule by protecting certain juniors from claims of a senior concerning cash proceeds of the disposition. Even if a senior were to have a non-Article 9 claim to proceeds of a junior's disposition, Section 9-615(g) would protect a junior that acts in good faith and without knowledge that its actions violate the rights of a senior party. Because the disposition by a junior would not cut off a senior's security interest or other lien (see Section 9-617), in many (probably most) cases the junior's receipt of the cash proceeds would not violate the rights of the senior.

The holder of a senior security interest is entitled, by virtue of its priority, to take possession of collateral from the junior secured party and conduct its own disposition, provided that the senior enjoys the right to take possession of the collateral from the debtor. See Section 9-609. The holder of a junior security interest normally must notify the senior secured party of an

impending disposition. See Section 9-611. Regardless of whether the senior receives a notification from the junior, the junior's disposition does not of itself discharge the senior's security interest. See Section 9-617. Unless the senior secured party has authorized the disposition free and clear of its security interest, the senior's security interest ordinarily will survive the disposition by the junior and continue under Section 9-315(a). If the senior enjoys the right to repossess the collateral from the debtor, the senior likewise may recover the collateral from the transferee.

When a secured party's collateral is encumbered by another security interest or other lien, one of the claimants may seek to invoke the equitable doctrine of marshaling. As explained by the Supreme Court, that doctrine "rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. United States, 375 U.S. 233, 236 (1963),* quoting *Sowell v. Federal Reserve Bank, 268 U.S. 449, 456-57 (1925).* The purpose of the doctrine is "to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." Id. at 237. Because it is an equitable doctrine, marshaling "is applied only when it can be equitably fashioned as to all of the parties" having an interest in the property. Id. This Article leaves courts free to determine whether marshaling is appropriate in any given case. See Section 1-103.

6. Security Interests of Equal Rank. Sometimes two security interests enjoy the same priority. This situation may arise by contract, e.g., pursuant to "equal and ratable" provisions in indentures, or by operation of law. See Section 9-328(6). This Article treats a security interest having equal priority like a senior security interest in many respects. Assume, for example, that SP-X and SP-Y enjoy equal priority, SP-W is senior to them, and SP-Z is junior. If SP-X disposes of the collateral under this Section, then (i) SP-W's and SP-Y's security interests survive the disposition but SP-Z's does not, see Section 9-617, and (ii) neither SP-W nor SP-Y is entitled to receive a distribution of proceeds, but SP-Z is. See Section 9-615(a)(3).

When one considers the ability to obtain possession of the collateral, a secured party with equal priority is unlike a senior secured party. As the senior secured party, SP-W should enjoy the right to possession as against SP-X. See Section 9-609, Comment 5. If SP-W takes possession and disposes of the collateral under this Section, it is entitled to apply the proceeds to satisfy its secured claim. SP-Y, however, should not have such a right to take possession from SP-X; otherwise, once SP-Y took possession from SP-X, SP-X would have the right to get possession from SP-Y, which would be obligated to redeliver possession to SP-X, and so on. Resolution of this problem is left to the parties and, if necessary, the courts.

7. Public vs. Private Dispositions. This Part maintains two distinctions between "public" and other dispositions: (i) the secured party may buy at the former, but normally not at the latter (Section 9-610(c)), and (ii) the debtor is entitled to notification of "the time and place of a public disposition" and notification of "the time after which" a private disposition or other intended disposition is to be made (Section 9-613(1)(E)). It does not retain the distinction under former Section 9-504(4), under which transferees in a noncomplying public disposition could lose protection more easily than transferees in other noncomplying dispositions. Instead, Section 9-617(b) adopts a unitary standard. Although the term is not defined, as used in this Article, a "public disposition" is one at which the price is determined after the public has had a meaningful opportunity for competitive bidding. "Meaningful opportunity" is meant to imply that some form

of advertisement or public notice must precede the sale (or other disposition) and that the public must have access to the sale (disposition).

8. Investment Property. Dispositions of investment property may be regulated by the federal securities laws. Although a "public" disposition of securities under this Article may implicate the registration requirements of the Securities Act of 1933, it need not do so. A disposition that qualifies for a "private placement" exemption under the Securities Act of 1933 nevertheless may constitute a "public" disposition within the meaning of this Section. Moreover, the "commercially reasonable" requirements of subsection (b) need not prevent a secured party from conducting a foreclosure sale without the issuer's compliance with federal registration requirements.

9. "Recognized Market." A "recognized market," as used in subsection (c) and Section 9-611(d), is one in which the items sold are fungible and prices are not subject to individual negotiation. For example, the New York Stock Exchange is a recognized market. A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions.

10. Relevance of Price. While not itself sufficient to establish a violation of this Part, a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable. Note also that even if the disposition is commercially reasonable, Section 9-615(f) provides a special method for calculating a deficiency or surplus if (i) the transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor, and (ii) the amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

11. Warranties. Subsection (d) affords the transferee in a disposition under this Section the benefit of any title, possession, quiet enjoyment, and similar warranties that would have accompanied the disposition by operation of non-Article 9 law had the disposition been conducted under other circumstances. For example, the Article 2 warranty of title would apply to a sale of goods, the analogous warranties of Article 2A would apply to a lease of goods, and any common-law warranties of title would apply to dispositions of other types of collateral. See, e.g., Restatement (2d), Contracts '333 (warranties of assignor).

Subsection (e) explicitly provides that these warranties can be disclaimed either under other applicable law or by communicating a record containing an express disclaimer. The record need not be written, but an oral communication would not be sufficient. See Section 9-102 (definition of "record"). Subsection (f) provides a sample of wording that will effectively exclude the warranties in a disposition under this Section, whether or not the exclusion would be effective under non-Article 9 law.

The warranties incorporated by subsection (d) are those relating to "title, possession, quiet enjoyment, and the like." Depending on the circumstances, a disposition under this Section also may give rise to other statutory or implied warranties, e.g., warranties of quality or fitness for purpose. Law other than this Article determines whether such other warranties apply to a disposition under this Section. Other law also determines issues relating to disclaimer of such warranties. For example, a foreclosure sale of a car by a car dealer could give rise to an implied

warranty of merchantability (Section 2-314) unless effectively disclaimed or modified (Section 2-316).

This Section's approach to these warranties conflicts with the former Comment to Section 2-312. This Article rejects the baseline assumption that commercially reasonable dispositions under this Section are out of the ordinary commercial course or peculiar. The Comment to Section 2-312 has been revised accordingly.

SOUTH CAROLINA REPORTER'S COMMENT

Subsection (a) provides that after default a secured party may sell, lease, license, or otherwise dispose of collateral. Subsection (b) provides that every aspect of the disposition most be commercially reasonable. Although subsection (b) authorizes a secured party to dispose of collateral at a public or private proceeding, the election of the method of disposition must be commercially reasonable.

Subsection (c) provides that a secured party may purchase collateral only at a public disposition or when the collateral is of a kind customarily sold on a recognized market or subject to widely distributed price quotations. Collateral is sold on a recognized market only if items are fungible and prices are not subject to individual negotiations.

Subsection (d) provides that a disposition of collateral under *Section 36-9-610* includes warranties relating to title, possession, and quiet enjoyment which by operation of law arise upon a voluntary disposition of property of the kind subject to the *Section 36-9-610* disposition. Subsection (e), however, permits a secured party to disclaim these warranties and subsection (f) provides a language deemed effective to establish a disclaimer.

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-611* (2012)

§ 36-9-611. Notification before disposition of collateral.

(a) In this section, "notification date" means the earlier of the date on which:

(1) a secured party sends to the debtor and any secondary obligor an authenticated notification of disposition; or

(2) the debtor and any secondary obligor waive the right to notification.

(b) Except as otherwise provided in subsection (d), a secured party that disposes of collateral under *Section 36-9-610* shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition.

(c) To comply with subsection (b), the secured party shall send an authenticated notification of disposition to:

(1) the debtor;

(2) any secondary obligor; and

(3) if the collateral is other than consumer goods:

(A) any other person from which the secured party has received, before the notification date, an authenticated notification of a claim of an interest in the collateral;

(B) any other secured party or lienholder that, ten days before the notification date, held a security interest in or other lien on the collateral perfected by the filing of a financing statement that:

(i) identified the collateral;

(ii) was indexed under the debtor's name as of that date; and

(iii) was filed in the office in which to file a financing statement against the debtor covering the collateral as of that date; and

(C) any other secured party that, ten days before the notification date, held a security interest in the collateral perfected by compliance with a statute, regulation, or treaty described in *Section 36-9-311(a)*.

(d) Subsection (b) does not apply if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market.

(e) A secured party complies with the requirement for notification prescribed by subsection (c)(3)(B) if:

(1) not later than twenty days or earlier than thirty days before the notification date, the secured party requests, in a commercially reasonable manner, information concerning financing statements indexed under the debtor's name in the office indicated in subsection (c)(3)(B); and

(2) before the notification date, the secured party:

(A) did not receive a response to the request for information; or

(B) received a response to the request for information and sent an authenticated notification of disposition to each secured party or other lienholder named in that response whose financing statement covered the collateral.

**HISTORY:**  2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. Former Section 9-504(3).

2. Reasonable Notification. This Section requires a secured party who wishes to dispose of collateral under Section 9-610 to send "a reasonable authenticated notification of disposition" to specified interested persons, subject to certain exceptions. The notification must be reasonable as to the manner in which it is sent, its timeliness (i.e., a reasonable time before the disposition is to take place), and its content. See Sections 9-612 (timeliness of notification), 9-613 (contents of notification generally), 9-614 (contents of notification in consumer-goods transactions).

3. Notification to Debtors and Secondary Obligors. This Section imposes a duty to send notification of a disposition not only to the debtor but also to any secondary obligor. Subsections (b) and (c) resolve an uncertainty under former Article 9 by providing that secondary obligors (sureties) are entitled to receive notification of an intended disposition of collateral, regardless of who created the security interest in the collateral. If the surety created the security interest, it would be the debtor. If it did not, it would be a secondary obligor. (This Article also resolves the question of the secondary obligor's ability to waive, pre-default, the right to notification-waiver generally is not permitted. See Section 9-602.) Section 9-605 relieves a secured party from any duty to send notification to a debtor or secondary obligor unknown to the secured party.

Under subsection (b), the principal obligor (borrower) is not always entitled to notification of disposition.

Example: Behnfeldt borrows on an unsecured basis, and Bruno grants a security interest in her car to secure the debt. Behnfeldt is a primary obligor, not a secondary obligor. As such, she is not entitled to notification of disposition under this Section.

4. Notification to Other Secured Parties. Prior to the 1972 amendments to Article 9, former Section 9-504(3) required the enforcing secured party to send reasonable notification of the disposition:

except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this State or who is known by the secured party to have a security interest in the collateral.

The 1972 amendments eliminated the duty to give notice to secured parties other than those from whom the foreclosing secured party had received written notice of a claim of an interest in the collateral.

Many of the problems arising from dispositions of collateral encumbered by multiple security interests can be ameliorated or solved by informing all secured parties of an intended disposition and affording them the opportunity to work with one another. To this end, subsection (c)(3)(B) expands the duties of the foreclosing secured party to include the duty to notify (and the corresponding burden of searching the files to discover) certain competing secured parties. The subsection imposes a search burden that in some cases may be greater than the pre-1972 burden on foreclosing secured parties but certainly is more modest than that faced by a new secured lender.

To determine who is entitled to notification, the foreclosing secured party must determine the proper office for filing a financing statement as of a particular date, measured by reference to the "notification date," as defined in subsection (a). This determination requires reference to the choice-of-law provisions of Part 3. The secured party must ascertain whether any financing statements covering the collateral and indexed under the debtor's name, as the name existed as of that date, in fact were filed in that office. The foreclosing secured party generally need not notify secured parties whose effective financing statements have become more difficult to locate because of changes in the location of the debtor, proceeds rules, or changes in the debtor's name.

Under subsection (c)(3)(C), the secured party also must notify a secured party who has perfected a security interest by complying with a statute or treaty described in Section 9-311(a), such as a certificate-of-title statute.

Subsection (e) provides a "safe harbor" that takes into account the delays that may be attendant to receiving information from the public filing offices. It provides, generally, that the secured party will be deemed to have satisfied its notification duty under subsection (c)(3)(B) if it requests a search from the proper office at least 20 but not more than 30 days before sending notification to the debtor and if it also sends a notification to all secured parties (and other lienholders) reflected on the search report. The secured party's duty under subsection (c)(3)(B) also will be satisfied if the secured party requests but does not receive a search report before the notification is sent to the debtor. Thus, if subsection (e) applies, a secured party who is entitled to notification under subsection (c)(3)(B) has no remedy against a foreclosing secured party who does not send the notification. The foreclosing secured party has complied with the notification requirement. Subsection (e) has no effect on the requirements of the other paragraphs of subsection (c). For example, if the foreclosing secured party received a notification from the holder of a conflicting security interest in accordance with subsection (c)(3)(A) but failed to send to the holder a notification of the disposition, the holder of the conflicting security interest would have the right to recover any loss under Section 9-625(b).

5. Authentication Requirement. Subsections (b) and (c) explicitly provide that a notification of disposition must be "authenticated." Some cases read former Section 9-504(3) as validating oral notification.

6. Second Try. This Article leaves to judicial resolution, based upon the facts of each case, the question whether the requirement of "reasonable notification" requires a "second try," i.e., whether a secured party who sends notification and learns that the debtor did not receive it must attempt to locate the debtor and send another notification.

7. Recognized Market; Perishable Collateral. New subsection (d) makes it clear that there is no obligation to give notification of a disposition in the case of perishable collateral or collateral customarily sold on a recognized market (e.g., marketable securities). Former Section 9-504(3)

might be read (incorrectly) to relieve the secured party from its duty to notify a debtor but not from its duty to notify other secured parties in connection with dispositions of such collateral.

8. Failure to Conduct Notified Disposition. Nothing in this Article prevents a secured party from electing not to conduct a disposition after sending a notification. Nor does this Article prevent a secured party from electing to send a revised notification if its plans for disposition change. This assumes, however, that the secured party acts in good faith, the revised notification is reasonable, and the revised plan for disposition and any attendant delay are commercially reasonable.

9. Waiver. A debtor or secondary obligor may waive the right to notification under this Section only by a post-default authenticated agreement. See Section 9-624(a).

SOUTH CAROLINA REPORTER'S COMMENT

*Section 36-9-611* imposes a notification requirement upon secured parties who dispose of collateral under *Section 36-9-610*. The only dispositions exempt from these requirements are dispositions of collateral that is perishable, threatens to decline speedily in value, or is of a type customarily traded on a recognized market. *Section 36-9-610(d)*. For other dispositions, subsection (b) requires the secured party to send a reasonable authenticated notification of disposition to the persons specified in subsection (c).

Unless they have made a post-default waiver of their right to notification under *Section 36-9-624(a)*, subsection (c) requires the secured party to send notification to the debtor and any secondary obligor. If the collateral subject to the disposition is consumer goods, these are the only persons to whom the secured party must send notification.

If the collateral is other than consumer goods, subsection (c)(3) requires the secured party to send notification to certain other persons who may have an interest in the collateral. Determining the additional persons entitled to notification is made with reference to the "notification date". This term is defined in subsection (a) as the earlier of the date on which the secured party sends notification to the debtor and any secondary obligor or the date on which the debtor and any secondary obligor waive their right to notification.

Under subsection (c)(3)(A) the secured party is required to send the notification to any person from whom the secured party has received, before the notification date, an authenticated notification of a claim to the collateral. This notification obligation is consistent with the requirements of former Section 36-9-504(3).

Under subsections (c)(3)(B) and (C) the secured party is required to send notification to any secured party or lienholder who perfected in the collateral by properly filing against the debtor or pursuant to *Section 36-9-311(a)* (e.g. under a certificate of title statute) ten days prior to the notification date. These notification requirements constitute a significant change in the law. Under former Section 36-9-504(3) a secured party was not required to send notice of disposition to another secured party who had perfected by filing unless the secured party disposing of the collateral received a written claim of an interest in the collateral.

Subsection (e) assists a secured in meeting the notification requirements of subsection (c)(3)(B). Under subsection (e) if a secured party makes a timely request for information to a filing office, the secured party will satisfy subsection (c)(3)(B) by sending notification to the secured parties and lienholders named in the filing office's response.

Note that a secured party meets its obligation by sending notification. The term "send" is defined in *Section 36-9-102(a)(74)* and does not require receipt by the person to whom the communication is sent. As a result, the holding in *Altman Tractor and Equipment Co. v. Weaver, 288 S.C. 449, 343 S.E. 2d 444 (1986),* that a properly dispatched notice of sale was effective even though never received, remains valid.

Also note that because subsection (c)(2) requires a secured party to send notification to a secondary obligor, the ruling in *Crane v. Citicorp National Services, Inc., 313 S.C. 70, 437 S.E. 2d 50 (1993)* that secured party must send a guarantor notification of a disposition is consistent with the current statute.

SOUTH CAROLINA CODE OF LAWS

TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-612* (2012)

§ 36-9-612. Timeliness of notification before disposition of collateral.

(a) Except as otherwise provided in subsection (b), whether a notification is sent within a reasonable time is a question of fact.

(b) In a transaction other than a consumer transaction, a notification of disposition sent after default and ten days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition.

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. New.

2. Reasonable Notification. Section 9-611(b) requires the secured party to send a "reasonable authenticated notification." Under that Section, as under former Section 9-504(3), one aspect of a reasonable notification is its timeliness. This generally means that the notification must be sent at a reasonable time in advance of the date of a public disposition or the date after which a private disposition is to be made. A notification that is sent so near to the disposition date that a notified person could not be expected to act on or take account of the notification would be unreasonable.

3. Timeliness of Notification: Safe Harbor. The 10-day notice period in subsection (b) is intended to be a "safe harbor" and not a minimum requirement. To qualify for the "safe harbor" the notification must be sent after default. A notification also must be sent in a commercially reasonable manner. See Section 9-611(b) ("reasonable authenticated notification"). These requirements prevent a secured party from taking advantage of the "safe harbor" by, for example, giving the debtor a notification at the time of the original extension of credit or sending the notice by surface mail to a debtor overseas.

SOUTH CAROLINA REPORTER'S COMMENT

*Section 36-9-612* addresses the timeliness of a reasonable notification of disposition of collateral sent pursuant to *Section 36-9-611*. Subsection (a) provides that whether a notification is sent within a reasonable time is a question of fact. Subsection (b), however, establishes a safe harbor in transactions other than consumer goods transactions. Under subsection (b) a notification of disposition sent after default and at least ten days before the earliest time set for the disposition is sent within a reasonable time.

The parties should be able to set by agreement the standards for determining whether notification is sent within a reasonable time and those standards should be enforceable unless

manifestly unreasonable. See *Section 36-9-603(a)*. Although *Section 36-9-603(a)* authorizes agreed standards for measuring rights and duties only under the rules stated in *Section 36-9-602* and that provision does not refer to *Section 36-9-612*, a compelling argument can be advanced to support the parties' authority to agree upon standards for the timeliness of a notification. The timeliness of a notification of disposition is one aspect of whether a notification is reasonable under *Section 36-9-611(b)*. See *Section 36-9-612*, Official Comment 2. Moreover, *Section 36-9-611* is expressly referenced in *Section 36-9-602(7)*. Therefore, it follows that *Section 36-9-603(a)* authorizes agreements upon standards to determine whether notice was sent within a reasonable time. Furthermore, *Section 36-1-204(1)*, which applies to transactions under Article 9 pursuant to *Section 36-9-102(c)*, provides that "[w]henever this act requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement."

Note that under South Carolina's Public Sale Procedures a notice of sale is timely if it is posted and mailed by registered or certified mail at least five days prior to the sale. *Section 36-9-631(1)*, (2), and (4).

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-613* (2012)

§ 36-9-613. Contents and form of notification before disposition of collateral: general.

Except in a consumer-goods transaction, the following rules apply:

(1) The contents of a notification of disposition are sufficient if the notification:

(A) describes the debtor and the secured party;

(B) describes the collateral that is the subject of the intended disposition;

(C) states the method of intended disposition;

(D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and

(E) states the time and place of a public disposition or the time after which any other disposition is to be made.

(2) Whether the contents of a notification that lacks any of the information specified in item (1) are nevertheless sufficient is a question of fact.

(3) The contents of a notification providing substantially the information specified in item (1) are sufficient, even if the notification includes:

(A) information not specified by that item; or

(B) minor errors that are not seriously misleading.

(4) A particular phrasing of the notification is not required.

(5) The following form of notification and the form appearing in *Section 36-9-614(3)*, when completed, each provides sufficient information:

'NOTIFICATION OF DISPOSITION OF COLLATERAL

To: [Name of debtor, obligor, or other person to which the notification is sent]

From: [Name, address, and telephone number of secured party]

Name of Debtor(s): [Include only if debtor(s) are not an addressee]

[For a public disposition:]

We will sell [or lease or license, as applicable] the [describe collateral] [to the highest qualified bidder] in public as follows:

Day and Date:

Time:

Place:

We will sell [or lease or license, as applicable] the [describe collateral] privately sometime after [day and date].

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell [or lease or license, as applicable] [for a charge of $ ]. You may request an accounting by calling us at [telephone number]'.

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. New.

2. Contents of Notification. To comply with the "reasonable authenticated notification" requirement of Section 9-611(b), the contents of a notification must be reasonable. Except in a consumer-goods transaction, the contents of a notification that includes the information set forth in paragraph (1) are sufficient as a matter of law, unless the parties agree otherwise. (The reference to "time" of disposition means here, as it did in former Section 9-504(3), not only the hour of the day but also the date.) Although a secured party may choose to include additional information concerning the transaction or the debtor's rights and obligations, no additional information is required unless the paRties agree otherwise. A notification that lacks some of the information set forth in paragraph (1) nevertheless may be sufficient if found to be reasonable by the trier of fact, under paragraph (2). A properly completed sample form of notification in paragraph (5) or in Section 9-614(a)(3) is an example of a notification that would contain the information set forth in paragraph (1). Under paragraph (4), however, no particular phrasing of the notification is required.

SOUTH CAROLINA REPORTER'S COMMENT

Sub*section 36-9-613(1)* lists the information that must be provided in a notification of disposition of collateral In transactions other than consumer goods transactions. Subsection (5) provides a notification form which when completed provides sufficient information.

The requirements for a sufficient notification of disposition under *Section 36-9-613(1)* differ from those under *Section 36-9-630* that apply to a public sale under South Carolina's Public Sale Procedures. For a notification to be effective under the Public Sale Procedures it must meet the requirements of both *Section 36-9-613* and *Section 36-9-630*.

SOUTH CAROLINA CODE OF LAWS
TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-614* (2012)

§ 36-9-614. Contents and form of notification before disposition of collateral: consumer-goods transaction.

In a consumer-goods transaction, the following rules apply:

(1) A notification of disposition must provide the following information:

(A) the information specified in *Section 36-9-613(1)*;

(B) a description of any liability for a deficiency of the person to which the notification is sent;

(C) a telephone number from which the amount that must be paid to the secured party to redeem the collateral under *Section 36-9-623* is available; and

(D) a telephone number or mailing address from which additional information concerning the disposition and the obligation secured is available.

(2) A particular phrasing of the notification is not required.

(3) The following form of notification, when completed, provides sufficient information:

'[Name and address of secured party ]

[Date ]

NOTICE OF OUR PLAN TO SELL PROPERTY

[Name and address of any obligor who is also a debtor ]

Subject: [Identification of Transaction ]

We have your [describe collateral ], because you broke promises in our agreement.

[For a public disposition: ]

We will sell [describe collateral ] at public sale. A sale could include a lease or license. The sale will be held as follows:

Date:

Time:

Place:

You may attend the sale and bring bidders if you want.

[For a private disposition: ]

We will sell [describe collateral ] at private sale sometime after [date]. A sale could include a lease or license.

The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you [will or will not, as applicable ] still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at [telephone number ].

If you want us to explain to you in writing how we have figured the amount that you owe us, you may call us at [telephone number ] [or write us at [secured party's address ] and request a written explanation. [We will charge you $ for the explanation if we sent you another written explanation of the amount you owe us within the last six months.]

If you need more information about the sale call us at [telephone number ] [or write us at [secured party's address ].

We are sending this notice to the following other people who have an interest in [describe collateral ] or who owe money under your agreement:

[Names of all other debtors and obligors, if any ]'

(4) A notification in the form of item (3) is sufficient, even if additional information appears at the end of the form.

(5) A notification in the form of item (3) is sufficient, even if it includes errors in information not required by item (1), unless the error is misleading with respect to rights arising under this chapter.

(6) If a notification under this section is not in the form of item (3), law other than this chapter determines the effect of including information not required by item (1).

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. New.

2. Notification in Consumer-Goods Transactions. Paragraph (1) sets forth the information required for a reasonable notification in a consumer-goods transaction. A notification that lacks any of the information set forth in paragraph (1) is insufficient as a matter of law. Compare Section 9-613(2), under which the trier of fact may find a notification to be sufficient even if it lacks some information listed in paragraph (1) of that Section.

3. Safe-Harbor Form of Notification; Errors in Information. Although paragraph (2) provides that a particular phrasing of a notification is not required, paragraph (3) specifies a safe-harbor form that, when properly completed, satisfies paragraph (1). Paragraphs (4), (5), and (6) contain special rules applicable to erroneous and additional information. Under paragraph (4), a notification in the safe-harbor form specified in paragraph (3) is not rendered insufficient if it contains additional information at the end of the form. Paragraph (5) provides that non-

misleading errors in information contained in a notification are permitted if the safe-harbor form is used and if the errors are in information not required by paragraph (1) . Finally, if a notification is in a form other than the paragraph (3) safe-harbor form, other law determines the effect of including in the notification information other than that required by paragraph (1).

SOUTH CAROLINA REPORTER'S COMMENT

*Section 36-9-614* lists the information that must be provided in a notification of a disposition of collateral in a consumer-goods transaction. Subsection (1)(A) requires the notification to include all the information that *Section 36-9-613(1)* requires a secured party to include in the notification in a transaction other than a consumer-goods transaction. Subsections (1)(B)--(D) require additional information that is not required under *Section 36-9-613(1)*. Subsection (3) provides a notification form which when completed provides sufficient information for the disposition of collateral in a consumer-goods transaction.

South Carolina's Public Sale Procedures extend to the disposition of collateral in consumer-goods transactions. The notice of public sale requirements in *Section 36-9-630*, however, differ from the requirements for an effective notification under *Section 36-9-614*. For a notification of the disposition of collateral in a consumer-goods transaction to be effective under the Public Sale Procedures it must meet the requirements of both *Sections 36-9-614* and *Section 36-9-630*.

SOUTH CAROLINA CODE OF LAWS

TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 1. DEFAULT AND ENFORCEMENT OF SECURITY INTEREST

*S.C. Code Ann. § 36-9-624* (2012)

§ 36-9-624. Waiver.

  (a) A debtor or secondary obligor may waive the right to notification of disposition of collateral under *Section 36-9-611* only by an agreement to that effect entered into and authenticated after default.

  (b) A debtor may waive the right to require disposition of collateral under *Section 36-9-620(e)* only by an agreement to that effect entered into and authenticated after default.

  (c) Except in a consumer-goods transaction, a debtor or secondary obligor may waive the right to redeem collateral under *Section 36-9-623* only by an agreement to that effect entered into and authenticated after default.

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

  1. Source. Former Sections 9-504(3), 9-505, 9-506.

  2. Waiver. This Section is a limited exception to Section 9-602, which generally prohibits waiver by debtors and obligors. It makes no provision for waiver of the rule prohibiting a secured party from buying at its own private disposition. Transactions of this kind are equivalent to " strict foreclosures" and are governed by Sections 9-620, 9-621, and 9-622.

SOUTH CAROLINA CODE OF LAWS

TITLE 36. COMMERCIAL CODE
CHAPTER 9. COMMERCIAL CODE--SECURED TRANSACTIONS
PART 6. DEFAULT
SUBPART 2. NONCOMPLIANCE WITH CHAPTER

*S.C. Code Ann. § 36-9-625* (2012)

§ 36-9-625. Remedies for secured party's failure to comply with chapter.

   (a) If it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.

   (b) Subject to subsections (c), (d), and (f), a person is liable for damages in the amount of any loss caused by a failure to comply with this chapter. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.

   (c) Except as otherwise provided in *Section 36-9-628*:

   (1) a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under subsection (b) for its loss; and

   (2) if the collateral is consumer goods, a person that was a debtor or a secondary obligor at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus ten percent of the principal amount of the obligation or the time-price differential plus ten percent of the cash price.

   (d) A debtor whose deficiency is eliminated under *Section 36-9-626* may recover damages for the loss of any surplus. However, a debtor or secondary obligor whose deficiency is eliminated or reduced under *Section 36-9-626* may not otherwise recover under subsection (b) for noncompliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

   (e) In addition to any damages recoverable under subsection (b), the debtor, consumer obligor, or person named as a debtor in a filed record, as applicable, may recover five hundred dollars in each case from a person that:

   (1) fails to comply with *Section 36-9-208*;

   (2) fails to comply with *Section 36-9-209*;

   (3) files a record that the person is not entitled to file under *Section 36-9-509(a)*;

   (4) fails to cause the secured party of record to file or send a termination statement as required by *Section 36-9-513(a)* or (c);

   (5) fails to comply with *Section 36-9-616(b)(1)* and whose failure is part of a pattern, or consistent with a practice, of noncompliance; or

(6) fails to comply with *Section 36-9-616(b)(2)*.

(f) A debtor or consumer obligor may recover damages under subsection (b) and, in addition, five hundred dollars in each case from a person that, without reasonable cause, fails to comply with a request under *Section 36-9-210*. A recipient of a request under *Section 36-9-210* which never claimed an interest in the collateral or obligations that are the subject of a request under that section has a reasonable excuse for failure to comply with the request within the meaning of this subsection.

(g) If a secured party fails to comply with a request regarding a list of collateral or a statement of account under *Section 36-9-210*, the secured party may claim a security interest only as shown in the list or statement included in the request as against a person that is reasonably misled by the failure.

**HISTORY:** 2001 Act No. 67, § 12.

**NOTES:** OFFICIAL COMMENT

1. Source. Former Section 9-507.

2. Remedies for Noncompliance; Scope. Subsections (a) and (b) provide the basic remedies afforded to those aggrieved by a secured party's failure to comply with this Article. Like all provisions that create liability, they are subject to Section 9-628, which should be read in conjunction with Section 9-605. The principal limitations under this Part on a secured party's right to enforce its security interest against collateral are the requirements that it proceed in good faith (Section 1-203), in a commercially reasonable manner (Sections 9-607 and 9-610), and, in most cases, with reasonable notification (Sections 9-611 through 9-614). Following former Section 9-507, under subsection (a) an aggrieved person may seek injunctive relief, and under subsection (b) the person may recover damages for losses caused by noncompliance. Unlike former Section 9-507, however, subsections (a) and (b) are not limited to noncompliance with provisions of this Part of Article 9. Rather, they apply to noncompliance with any provision of this Article. The change makes this Section applicable to noncompliance with Sections 9-207 (duties of secured party in possession of collateral), 9-208 (duties of secured party having control over deposit account), 9-209 (duties of secured party if account debtor has been notified of an assignment), 9-210 (duty to comply with request for accounting, etc.), 9-509(a) (duty to refrain from filing unauthorized financing statement), and 9-513(a) or (c) (duty to provide termination statement). Subsection (a) also modifies the first sentence of former Section 9-507(1) by adding the references to "collection" and "enforcement." Subsection (c)(2), which gives a minimum damage recovery in consumer-goods transactions, applies only to noncompliance with the provisions of this Part.

3. Damages for Noncompliance with This Article. Subsection (b) sets forth the basic remedy for failure to comply with the requirements of this Article: a damage recovery in the amount of loss caused by the noncompliance. Subsection (c) identifies who may recover under subsection (b). It affords a remedy to any aggrieved person who is a debtor or obligor. However, a principal obligor who is not a debtor may recover damages only for noncompliance with Section 9-616, inasmuch as none of the other rights and duties in this Article run in favor of such a principal obligor. Such a principal obligor could not suffer any loss or damage on account of noncompliance with rights or duties of which it is not a beneficiary. Subsection (c) also affords a

remedy to an aggrieved person who holds a competing security interest or other lien, regardless of whether the aggrieved person is entitled to notification under Part 6. The remedy is available even to holders of senior security interests and other liens. The exercise of this remedy is subject to the normal rules of pleading and proof. A person who has delegated the duties of a secured party but who remains obligated to perform them is liable under this subsection. The last sentence of subsection (d) eliminates the possibility of double recovery or other over-compensation arising out of a reduction or elimination of a deficiency under Section 9-626, based on noncompliance with the provisions of this Part relating to collection, enforcement, disposition, or acceptance. Assuming no double recovery, a debtor whose deficiency is eliminated under Section 9-626 may pursue a claim for a surplus. Because Section 9-626 does not apply to consumer transactions, the statute is silent as to whether a double recovery or other over-compensation is possible in a consumer transaction.

Damages for violation of the requirements of this Article, including Section 9-609, are those reasonably calculated to put an eligible claimant in the position that it would have occupied had no violation occurred. See Section 1-106. Subsection (b) supports the recovery of actual damages for committing a breach of the peace in violation of Section 9-609, and principles of tort law supplement this subsection. See Section 1-103. However, to the extent that damages in tort compensate the debtor for the same loss dealt with by this Article, the debtor should be entitled to only one recovery.

4. Minimum Damages in Consumer-Goods Transactions. Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9-507(1) and is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted. Subsection (c)(2) leaves the treatment of statutory damages as it was under former Article 9. A secured party is not liable for statutory damages under this subsection more than once with respect to any one secured obligation (see Section 9-628(e)), nor is a secured party liable under this subsection for failure to comply with Section 9-616 (see Section 9-628(d)).

Following former Section 9-507(1), this Article does not include a definition or explanation of the terms "credit service charge," "principal amount," "time-price differential," or "cash price," as used in subsection (c)(2). It leaves their construction and application to the court, taking into account the subsection's purpose of providing a minimum recovery in consumer-goods transactions.

5. Supplemental Damages. Subsections (e) and (f) provide damages that supplement the recovery, if any, under subsection (b). Subsection (e) imposes an additional $ 500 liability upon a person who fails to comply with the provisions specified in that subsection, and subsection (f) imposes like damages on a person who, without reasonable excuse, fails to comply with a request for an accounting or a request regarding a list of collateral or statement of account under Section 9-210. However, under subsection (f), a person has a reasonable excuse for the failure if the person never claimed an interest in the collateral or obligations that were the subject of the request.

6. Estoppel. Subsection (g) limits the extent to which a secured party who fails to comply with a request regarding a list of collateral or statement of account may claim a security interest.

SOUTH CAROLINA REPORTER'S COMMENT

*Section 36-9-625* specifies the remedies for a secured party's failure to comply with the requirements of Article 9. Subsection (a) empowers a court to issue orders to compel a secured party to comply with the requirements of Article 9 in collecting, enforcing, or disposing of collateral. Under subsection (b) and (c)(1) a secured party is liable for actual damages for the amount of any loss caused by a failure to comply with the requirements of the statute. Subsection (d), however, limits a debtor's or secondary obligor's right to recover actual damages when their liability for a deficiency has been eliminated under *Section 36-9-626*. Such a debtor is limited to recovering for the loss of any surplus. A secondary obligor whose deficiency liability has been eliminated has no claim for actual damages under subsection (b).

Subsection (c)(2) provides that if the collateral is consumer goods the minimum damages a debtor or secondary obligor can recover for a secured party's failure to comply with part 6 is an amount equal to the credit service charge plus ten percent of the principal amount of the obligation or the time-price differential plus ten percent of the cash price. Note that in allowing a secondary obligor to recover minimum statutory damages when the collateral is consumer goods, subsection (c)(2) does not change the law in South Carolina. See former Section 360-9-505(2). *Section 36-9-628(e)*, however, overrules the holding in *Crane v. Citicorp National Services, Inc., 313 S.C. 70, 437 S.E. 2d 50 (1998)* that a secured party can be liable to multiple debtors and secondary obligors for minimum damages with respect to a single secured obligation. Moreover, *Section 36-9-628(d)* provides that a secured party is not liable under *Section 36-9-625(c)(2)* for a failure to respond to a request for or to provide an explanation of the calculation of a surplus or deficiency under *Section 36-9-616*.

Subsection (e) provides that in addition to actual damages, a debtor, consumer obligor, or person listed as a debtor can recover statutory damages of $ 500 for a breach of specified obligations under Article 9. Subsections (e)(1), (2), and (4) impose liability for a secured party's failure to release its claim to collateral when there is no obligation or commitment to give value secured by the collateral. Subsection (e)(3) imposes liability upon a person who files an unauthorized financing statement. Subsection (e)(5) imposes liability upon a secured party who fails to provide a timely explanation of a deficiency or surplus in consumer-goods transaction when the failure is part of a pattern, or consistent with a practice of noncompliance. Subsection (e)(6) imposes liability upon a secured party in a consumer-goods transaction who fails to send an explanation of a deficiency or surplus to a consumer obligor within 14 days after receipt of a request.

Subsection (f) provides that a debtor or consumer obligor can recover statutory damages of $ 500 when a secured party fails without reasonable cause to comply with a request for an accounting, a list of collateral, or a statement of account under *Section 36-9-210*. Moreover, under subsection (g) a secured party who fails to comply with a request for a list of collateral or statement of account is estopped by claiming a security interest in more collateral than included in the request.