13‑1776 (L)
*Retirement Board v. BNYM*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2013

(Argued: May 16, 2014          Decided: December 23, 2014)

Nos. 13‑1776‑cv, 13‑1777‑cv

───────────────────────────

RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, ON BEHALF OF ITSELF AND SIMILARLY SITUATED CERTIFICATE HOLDERS, WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM,
*Plaintiffs‑Appellants‑Cross‑Appellees*,


-v.-


THE BANK OF NEW YORK MELLON, AS TRUSTEE UNDER VARIOUS POOLING AND SERVICING AGREEMENTS,
*Defendant‑Appellee‑Cross‑Appellant*.

───────────────────────────

Before:       JACOBS, CABRANES, and LIVINGSTON, *Circuit Judges*.

Plaintiffs appeal from an April 3, 2012 decision and order of the United States District Court for the Southern District of New York (William H. Pauley III, *Judge*), granting in part and denying in part the Bank of New York Mellon's ("BNYM's") motion to dismiss.  The district court held that Plaintiffs lacked standing to assert claims related to residential mortgage‑backed securities ("RMBS") trusts in which they did not invest.  Because Plaintiffs' own claims do not raise the "same set of concerns," *NECA‑IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012), as claims arising from trusts in which Plaintiffs did not invest, we

affirm the district court's dismissal of these claims.  BNYM cross-appeals from the district court's holding that the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa-77aaaa, applies to RMBS certificates governed by pooling and servicing agreements.  We hold that these certificates are exempt from the TIA under § 304(a)(2) of the statute, which applies to "certificate[s] of interest or participation in two or more securities having substantially different rights and privileges."  15 U.S.C. § 77ddd(a)(2).  We therefore reverse the portion of the district court's decision declining to dismiss Plaintiffs' TIA claims related to these certificates, and remand the case for further proceedings consistent with this opinion.

> WILLIAM C. FREDERICKS (Beth A. Kaswan, Max R. Schwartz, Deborah Clark Weintraub, *on the brief*), Scott+Scott LLP, New York, NY, *for Plaintiffs-Appellants-Cross-Appellees.*
>
> CHARLES A. ROTHFELD (Christopher J. Houpt, Paul W. Hughes, Matthew D. Ingber, James F. Tierney, *on the brief*), Mayer Brown LLP, Washington, DC, *for Defendant-Appellee-Cross-Appellant.*
>
> Eric A. Schaffer, Paige Hennessey Forster, Colin E. Wrabley, Reed Smith LLP, Pittsburgh, PA, *for Amici Curiae* American Bankers Association and New York Bankers Association.
>
> Martin L. Seidel, Nathan Bull, Blake Adam Gansborg, Cadwalader, Wickersham & Taft LLP, New York, NY, *for Amici Curiae* Securities Industry and Financial Markets Association and The Clearing House Association L.L.C.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

These interlocutory appeals require us to resolve two questions that have

recurred in recent cases involving residential mortgage-backed securities ("RMBS"),

but that this Court has not yet had occasion to address. The first question is whether, under our decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624 (2013), a named plaintiff in a putative class action has "class standing" to assert, on absent class members' behalf, breach-of-duty claims against the trustee of an RMBS trust in which the named plaintiff did not invest. The second question is whether the provisions of the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa-77aaaa, impose obligations on the trustees of RMBS trusts governed by pooling and servicing agreements ("PSAs"). We answer both questions in the negative, and we therefore affirm in part and reverse in part the decision of the district court.

## BACKGROUND

### A.

Since the collapse of financial markets in the latter part of the last decade, the RMBS trust has become a familiar subject of litigation in this circuit. *See, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775 (2d Cir. 2013). We have described in the past how an RMBS trust operates:

> To raise funds for new mortgages, a mortgage lender sells pools of
> mortgages into trusts created to receive the stream of interest and

> principal payments from the mortgage borrowers.  The right to receive
> trust income is parceled into certificates and sold to investors, called
> certificateholders.  The trustee hires a mortgage servicer to administer
> the mortgages by enforcing the mortgage terms and administering the
> payments.  The terms of the securitization trusts as well as the rights,
> duties, and obligations of the trustee, seller, and servicer are set forth
> in [governing agreements, frequently styled as PSAs].

*BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp.*, 673 F.3d 169,

173 (2d Cir. 2012).

At issue in this case are 530 RMBS trusts created between 2004 and 2008 for

which defendant The Bank of New York Mellon ("BNYM") acts as trustee.  The

majority of these trusts are governed by PSAs, although some are governed by so-

called sale and servicing agreements ("SSAs") paired with indentures.  The PSA-

governed trusts are organized under New York law, and the SSA- and indenture-

governed trusts are organized under Delaware law.  Plaintiffs[1] are pension funds

that invested in certain of the 530 trusts for which BNYM serves as trustee;

specifically, they hold certificates issued by twenty-five of the PSA-governed New

York trusts and one of the SSA- and indenture-governed Delaware trusts.  Plaintiffs

---

[1] Plaintiffs are the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago, Westmoreland County Employee Retirement System, City of Grand Rapids General Retirement System, and City of Grand Rapids Police and Fire Retirement System.

assert claims on behalf of a putative class comprising investors who purchased certificates from any one of the 530 trusts.

Countrywide Home Loans, Inc. and its affiliates ("Countrywide"), now owned by Bank of America Corporation, originated the residential mortgage loans underlying the 530 trusts at issue and sold them to the trusts.  (Countywide also acted as "master servicer" for the trusts, meaning that it was charged with collecting payments from the mortgage loans and remitting them to the trusts.)  In connection with these loan sales, Countrywide made numerous representations and warranties about the characteristics, credit quality, and underwriting of the mortgage loans.  If Countrywide received notice that particular loans breached these representations and warranties in a way that materially and adversely affected the certificateholders, it was obligated to cure the defect or repurchase the defective loans from the trust. Plaintiffs allege that defects among the loans sold to the trusts were "systemic and pervasive" as a result of Countrywide's failure to adhere to prudent underwriting standards, leading to widespread breaches of its representations and warranties. J.A. 968.  These defects allegedly caused significant losses to certificateholders because the loans underlying the trusts defaulted at higher-than-expected rates.

Plaintiffs seek to hold BNYM responsible for the losses allegedly caused by Countrywide's breaches of its representations and warranties.  They claim that BNYM owed to certificateholders fiduciary duties of care and loyalty, contractual duties under the trusts' governing agreements, and statutory duties imposed by the TIA.  For instance, the PSAs provided that BNYM was required to provide notice to Countrywide if it became aware of a material breach of the representations and warranties; if Countrywide did not act to remedy the breach within 60 days, BNYM was required to exercise its powers under the PSA with such "care and skill" as a "prudent person" would use under the circumstances. J.A. 958.  Plaintiffs contend that BNYM had a similar duty under the TIA.  *See* 15 U.S.C. § 77*ooo*(c) ("The indenture trustee shall exercise in case of default . . . such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.").  According to Plaintiffs, BNYM knew of the widespread defects among the trusts' loans, and it therefore had a duty to enforce Countrywide's repurchase obligation and, pursuant to the TIA, to inform certificateholders of Countrywide's breaches.  *See id.* § 77*ooo*(b).

6

Plaintiffs further claim that BNYM failed to meet its contractual obligation to ensure that the loans held by the trusts were properly documented.  Under the PSAs, BNYM had a duty to examine the mortgage loan files at the closing of each securitization and prepare an "exception report" informing Countrywide of any missing or incomplete documents. J.A. 954.  Countrywide was then required to cure any deficiencies within 540 days of the closing date.  According to Plaintiffs, the deficiencies that BNYM identified remained uncured beyond that period, thereby triggering BNYM's duty to act on certificateholders' behalf to ensure that Countrywide cured the deficiencies.  These persisting document deficiencies allegedly made it more difficult to foreclose on delinquent loans, causing losses to certificateholders.

### B.

Plaintiffs filed a complaint against BNYM in the United States District Court for the Southern District of New York on August 5, 2011, and filed a verified class action and derivative complaint (the "amended complaint") on August 31, 2011. On December 16, 2011, BNYM moved to dismiss the amended complaint, arguing, among other things, that Plaintiffs lacked standing to bring claims on behalf of investors in the hundreds of trusts in which Plaintiffs themselves did not invest, and

that certificates issued by the PSA-governed New York trusts are not subject to the TIA.

On April 3, 2012, the district court (William H. Pauley III, *Judge*) granted in part and denied in part BNYM's motion to dismiss. *Ret. Bd. of Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 914 F. Supp. 2d 422 (S.D.N.Y. 2012) ("*BNYM I*"). The court determined that Plaintiffs did not have standing to bring claims pertaining to RMBS trusts in which no named Plaintiff had invested, and accordingly dismissed those claims. *Id.* at 426. Plaintiffs challenge this dismissal on appeal.

The district court also determined that the TIA applies to certificates issued by the PSA-governed New York trusts. Looking to § 304(a)(1) of the TIA, 15 U.S.C. § 77ddd(a)(1), the provision that BNYM relied upon as exempting the certificates at issue from the TIA's reach,[2] the district court asserted that "the TIA covers only debt securities, and does not apply to equity securities." 915 F. Supp. 2d at 427. The court then rejected BNYM's argument that the certificates in question were equity

_____

[2] In relevant part, § 304(a)(1) provides as follows: "The provisions of [the TIA] shall not apply to . . . (1) any security other than (A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate." 15 U.S.C. § 77ddd(a)(1).

securities, instead finding that the certificates were similar "in form and function to bonds issued under an indenture," and also that they "resemble debt," as defined by federal tax law. *Id.* at 428, 429 (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011)) (internal quotation marks omitted). The court also declined to assign any persuasive force to interpretive guidance on the SEC's website, which indicated that PSA-governed RMBS certificates are exempt from the TIA pursuant to § 304(a)(2) thereof, which exempts "certificate[s] of interest or participation in two or more securities having substantially different rights and privileges." 15 U.S.C. § 77ddd(a)(2). The SEC's position, in the court's view, was "unsupported, contrary to the case law, and unpersuasive." *Id.* at 429.

On April 17, 2012, BNYM moved for reconsideration of the district court's TIA holding or, in the alternative, to certify the issue for interlocutory appeal. For the first time, BNYM cited § 304(a)(2) of the TIA as a basis for arguing that the statute did not apply to certificates issued by the PSA-governed New York trusts.[3] The

_____

[3] The district court's discussion of § 304(a)(2) in *BNYM I* appears to have been driven by a citation to the SEC's website in BNYM's reply brief. *See* Reply Memorandum of Law in Further Support of the Bank of New York Mellon's Motion to Dismiss at 3, *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, No. 11-cv-5459 (S.D.N.Y. Jan. 20, 2012), ECF No. 32. BNYM did not explain in that brief why the SEC's reliance on § 304(a)(2) supported, rather than undermined, BNYM's argument that the certificates were

district court rejected this new argument and denied reconsideration of its earlier holding, but it agreed to certify the question for interlocutory appeal. *Ret. Bd. of Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, No. 11-cv-5459, 2013 WL 593766, at *3-5 (S.D.N.Y. Feb. 14, 2013) ("*BNYM II*"). BNYM petitioned this Court for leave to appeal pursuant to 28 U.S.C. § 1292(b), and Plaintiffs filed their own petition seeking review of the district court's decision on standing. *See J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 115 (2d Cir. 2004) ("[W]e have the discretion to consider any aspect of the order from which the appeal is taken."). We granted both petitions on May 7, 2013.

After we accepted the appeals, Plaintiffs filed, with the district court's permission, a second amended complaint in order to make additional factual allegations supporting their remaining claims, delete certain claims and theories that had proven unnecessary as the case progressed, and clarify the basis for the court's diversity jurisdiction. Plaintiffs later filed a motion under Federal Rules of Civil Procedure 15(a) and 62.1 seeking an indicative ruling that the district court would permit them to file a *third* amended complaint containing new class-standing

---

exempt under a different subsection, § 304(a)(1). Regardless, Plaintiffs do not suggest on appeal that any consequences (e.g., waiver) should follow from BNYM's failure to raise its § 304(a)(2) argument before the motion for reconsideration.

allegations if this Court were to remand for that purpose.[4]  The district court denied

that motion on September 11, 2013.  *Ret. Bd. of Policemen's Annuity & Benefit Fund v.*

*Bank of N.Y. Mellon*, 297 F.R.D. 218, 221-23 (S.D.N.Y. 2013) ("*BNYM III*").  Because

our decision does not turn on any allegations present in the second amended

complaint but not in the first, we need not decide which complaint is operative.

## DISCUSSION

We review de novo a district court's decision on a Rule 12(b)(6) motion to

dismiss for failure to state a claim, accepting the complaint's factual allegations as

true and drawing all reasonable inferences in Plaintiffs' favor.  *Rothstein v. UBS AG*,

708 F.3d 82, 90 (2d Cir. 2013).  The same standards apply to dismissals for lack of

standing pursuant to Rule 12(b)(1) where, as here, the district court based its

decision solely on the complaint's allegations.  *See Rajamin v. Deutsche Bank Nat'l*

*Trust Co.*, 757 F.3d 79, 81, 84-85 (2d Cir. 2014).

---

[4] The filing of a notice of appeal divests a district court of jurisdiction over the issues presented in the appeal, *see Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), and because the amendment that Plaintiffs sought would have been futile unless the district court were to reconsider its holding on standing (which was on appeal), Plaintiffs conceded that the district court lacked jurisdiction to permit their amendment.  Rule 62.1, however, which was adopted in 2009, authorizes a district court whose jurisdiction has been divested by an appeal to "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Civ. P. 62.1(a)(3).

## A.

We first address whether Plaintiffs have standing to assert claims related to certificates issued by trusts in which no Plaintiff ever invested. Plaintiffs point out that our decision in *NECA*, 693 F.3d 145, which was issued after the district court rendered its decision, permits named plaintiffs in putative class actions to assert claims related to RMBS certificates that they do not own. *NECA*, however, involved misrepresentation claims under the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, and we have not addressed its application to breach-of-duty claims against RMBS trustees. District courts have divided on the issue. *Compare Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 58-60 (S.D.N.Y. 2013), *with Policemen's Annuity & Benefit Fund v. Bank of Am., NA*, 907 F. Supp. 2d 536, 546-47 (S.D.N.Y. 2012). We conclude that Plaintiffs lack standing to assert claims against BNYM related to trusts in which they did not invest, and we therefore affirm the district court's dismissal of those claims.

Article III of the Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. One component of this case-or-controversy requirement is the doctrine of standing, which requires every federal plaintiff to establish, "for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

332, 352 (2006), a personal injury that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In addition to preventing the judiciary from adjudicating generalized grievances better directed to the political branches, *see, e.g.*, *id.* at 573-78, standing doctrine's requirements "ensure that a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse," *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008).

In *NECA*, we addressed the murky line between traditional Article III standing and so-called "class standing."  There, the named plaintiff had purchased RMBS certificates from the defendants.  It asserted claims under §§ 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), 77o, on behalf of a putative class that included purchasers of all certificates that were issued under the same allegedly false and misleading SEC Shelf Registration Statement.  Those certificates, however, had been sold in seventeen separate offerings with unique offering documents, and because the named plaintiff had purchased certificates in only two of the seventeen offerings, the named plaintiff was asserting claims related to certificates (from the fifteen other offerings) that only absent class members owned.  *See NECA*, 693 F.3d at 149.  As we noted, the named plaintiff "clearly lack[ed] standing to assert such

claims on *its* behalf because it did not purchase those Certificates" and so was not injured by any misstatements the defendants might have made about them.[5] *Id.* at 158 (emphasis added).

We nonetheless considered whether the named plaintiff had "class standing" to bring claims related to the certificates that it had not purchased on behalf of the absent class members who *had* purchased them.  We began our analysis by recognizing a "'tension' in [the Supreme Court's] case law as to whether 'variation' between (1) a named plaintiff's claims and (2) the claims of putative class members 'is a matter of Article III standing . . . or whether it goes to the propriety of class certification" under Rule 23.  *Id.* at 160 (second alteration in original) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 263 & n.15 (2003)).  Despite this tension, we ultimately rejected the plaintiff's argument that standing law had nothing to say about the plaintiff's ability to assert absent class members' claims once the plaintiff had established standing to assert its own claims.  *Id.* at 160-61.  In several cases, we recognized, the Supreme Court has addressed whether class action plaintiffs who

---

[5] Although we also rested this conclusion in part on the fact that the Securities Act grants so-called "statutory standing" only to plaintiffs who have acquired the security at issue, *see, e.g.*, 15 U.S.C. § 77k(a); *NECA*, 693 F.3d at 158, the Supreme Court has since clarified that "statutory standing" involves the scope of the cause of action authorized by Congress and is not an element of standing under Article III.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.4 (2014).

indisputably had standing to bring claims based on their own injuries also had standing to bring other claims, unrelated to those injuries, on behalf of absent class members. *Compare Blum v. Yaretsky*, 457 U.S. 991, 1001-02 (1982) (nursing home residents challenging their transfers to lower levels of care lacked standing to challenge other residents' transfers to higher levels of care), *and Lewis v. Casey*, 518 U.S. 343, 357-60 (1996) (court could not grant broad injunction against prison system to remedy injuries beyond those suffered by the named plaintiff), *with Gratz*, 539 U.S. at 262-66 (transfer applicant to the University of Michigan had standing to challenge the University's freshman admissions policy because the use of race in transfer admissions did not "implicate a significantly different set of concerns" than the use of race in freshman admissions).

From this line of cases, our *NECA* decision distilled a two-part test for class standing, which we must apply in this case:

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*NECA*, 693 F.3d at 162 (alterations, internal quotation marks, and citations omitted). When this standard is satisfied, the named plaintiff's litigation incentives are

15

sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011) (noting that class standing is "based on the incentives of the named plaintiffs to adequately litigate issues of importance to them") (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). *NECA*'s two-part test, which derives from constitutional standing principles, is thus distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a).  *See NECA*, 693 F.3d at 158 n.9.

In this case, there is no dispute that Plaintiffs have satisfied the first part of *NECA*'s test—that is, they have adequately pled that they have personally suffered an actual injury as a result of BNYM's putatively illegal conduct.  That injury is the result of BNYM's alleged failure as trustee to take appropriate action when faced with defaults on mortgage loans held by the trusts.  The critical issue, then, is whether this conduct "implicates the same set of concerns" as BNYM's alleged failure to take action with respect to defaults in other trusts in which Plaintiffs did not invest.  We conclude that it does not.

In *NECA*, the plaintiff alleged that the defendants had violated the Securities Act by making material misrepresentations about the underwriting guidelines

16

followed by the originators who originated the mortgage loans underlying the RMBS offerings at issue. *See NECA*, 693 F.3d at 149. This Court held that the named plaintiff's claims implicated the "same set of concerns" as absent class members' claims insofar as the named plaintiff's investments and the absent class members' investments were backed by loans from the same originators. *See id.* at 164 ("[T]o the extent certain Offerings were backed by loans originated by originators common to those backing [Offerings bought by NECA], NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings.").

In so holding, we were careful to explain how the absent class members' claims were similar to those of the named plaintiff in all essential respects: the offering documents contained "similar if not identical statements" about the originators' underwriting guidelines, and the defendants "issued, underwrote, and sponsored every" certificate from each of the trusts at issue. *Id.* at 162. The confluence of these similarities led us to conclude that the named plaintiff had the right incentives, largely because the proof contemplated for all of the claims would be sufficiently similar. *Id.* at 164; *see also DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (summary order) (holding that class standing was lacking

17

because "unique evidence will . . . be required to prove that the 35-some advertising statements for each of the seven different . . . products are false and misleading"). In other words, because the stated underwriting guidelines for each originator were essentially the same across all of the offering documents, proving that those guidelines were materially misleading as to loans held by one trust would tend to prove that those same guidelines were similarly misleading as to loans held by other trusts. *See NECA*, 693 F.3d at 162-63 (reasoning that "the location of the representations"—i.e., which document they were in—"has no effect on a given purchaser's assertion that the representation was misleading").

By contrast, with respect to offerings backed by loans that were *not* made by the same originators who made the loans underlying the named plaintiff's investments, *NECA* held that the named plaintiff's claims did not raise the "same set of concerns" as the absent class members' claims, and that the named plaintiff therefore lacked class standing. For those offerings, "each of [the] alleged injuries has the potential to be very different—and could turn on very different proof." *Id.* at 163. More concretely, the question whether one originator (e.g., Wells Fargo) followed the underwriting guidelines that defendants ascribed to it might well have had nothing to do with whether another originator (e.g., Washington Mutual)

followed the guidelines that the defendants represented that *it* had followed.  *See id.* at 163-64.  If the named plaintiff's investments were backed by loans originated by Wells Fargo but not Washington Mutual, why should the plaintiff—and "not just [its] lawyers," *Nomura*, 632 F.3d at 770—have any stake in proving that Washington Mutual failed to follow the underwriting guidelines described in the offering documents?

The claims in this case—based on alleged violations of the TIA, breach of contract, breach of the covenant of good faith, and breach of fiduciary duty—are very different from the claims in *NECA*.  Plaintiffs allege that BNYM violated its duties when it failed to notify certificateholders of Countrywide's breaches of the governing agreements, failed to force Countrywide to repurchase defaulted mortgage loans, and failed to ensure that the mortgage loans held by the trusts were correctly documented.  In contrast to *NECA*, where the defendants' alleged Securities Act violations inhered in making the *same* misstatements across multiple offerings, BNYM's alleged misconduct must be proved loan-by-loan and trust-by-trust.  For example, whether Countrywide breached its obligations under the governing agreements (thus triggering BNYM's duty to act) requires examining its conduct with respect to each trust.  Whether it was obligated to repurchase a given

loan requires examining which loans, in which trusts, were in breach of the representations and warranties. And whether a loan's documentation was deficient requires looking at individual loans and documents. We see no way in which answering these questions for the trusts in which Plaintiffs invested will answer the same questions for the numerous trusts in which they did not invest.

We are not persuaded by Plaintiffs' arguments to the contrary. Plaintiffs claim that evidence of BNYM's policy of "inaction" in the face of widespread defaults will be applicable to all of the trusts at issue. But as Plaintiffs recognize, even proof that BNYM *always* failed to act when it was required to do so would not prove their case, because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place.

Plaintiffs propose to do this by using statistical sampling to show that loans in all of the trusts were defective. Whether or not that method of proof could appropriately be used to establish that BNYM breached its duties to certificateholders,[6] Plaintiffs' sampling proposal fundamentally misses the point of

---

[6] We acknowledge that district courts have sometimes permitted plaintiffs to use statistical sampling to prove the incidence of defects within individual trusts, *see, e.g.*, *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 486-87 (S.D.N.Y. 2013), but Plaintiffs cite no case in which a single sample of loans taken from hundreds of trusts was used to prove a defendant's liability with respect to each of those trusts.

the class standing inquiry that *NECA* envisions.  The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant.  Plaintiffs undertake to explain how, in the interest of proving absent class members' claims, Plaintiffs could augment the evidence that they would otherwise rely upon to prove their own claims, such as by expanding their sample to include loans from more trusts.  But such an expanded evidentiary showing does nothing to reassure us that Plaintiffs themselves have any real interest in litigating the absent class members' claims.  The plaintiff in *NECA* also *could have* offered evidence concerning whether other trusts' offering documents misstated the underwriting guidelines for originators who made the loans underlying only those trusts, but that had no bearing on its standing.  The fact that it would be possible for a plaintiff to litigate a given claim plainly does not imply that she should be the one to litigate it.  *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit . . . ."); *Warth v. Seldin*, 422 U.S. 490, 518 (1975) (describing a plaintiff's "responsibility . . . to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute").

21

In short, the nature of the claims in this case unavoidably generates significant differences in the proof that will be offered for each trust.  Given these differences, Plaintiffs' quest to show BNYM's wrongdoing with respect to their own certificates does not encompass proving claims related to certificates from other trusts.  *Cf. NECA*, 693 F.3d at 164 ("[E]ach Certificate-holder within an Offering or Group backed by loans originated by similar lenders has the same 'necessary stake in litigating' whether those lenders in fact abandoned their underwriting guidelines." (quoting *Blum*, 457 U.S. at 999)).  As a result, Plaintiffs' claims do not implicate the "same set of concerns" as those of absent class members who purchased certificates issued by trusts in which no named Plaintiff invested.  We affirm the district court's dismissal of those claims for lack of standing.

**B.**

We next address whether the district court correctly held that the TIA applies to the certificates purchased by Plaintiffs that were issued by PSA-governed New York trusts (the "New York certificates").  This issue, too, has divided the district courts.  *Compare BNYM I*, 914 F. Supp. 2d at 427-29 (TIA applies), *and Policemen's Annuity & Benefit Fund v. Bank of Am., N.A.*, 943 F. Supp. 428, 437-39 (S.D.N.Y. 2013) (same), *with Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D.

22

47, 63 (S.D.N.Y. 2013) (TIA does not apply).  Because we conclude that the TIA does not apply to the New York certificates, we reverse the district court's denial of BNYM's motion to dismiss Plaintiffs' TIA claims pertaining to those certificates.

Congress enacted the TIA in 1939 to address perceived abuses in the bond market.  Before the statute was passed, companies that issued bonds to the public frequently failed to provide trustees to represent bondholders' interests, and even where trustees were provided, they sometimes had conflicts of interest, were not obligated contractually to take action on bondholders' behalf, and/or lacked the power and information necessary to do so.  *See* 15 U.S.C. § 77bbb; *Morris v. Cantor*, 390 F. Supp. 817, 820 (S.D.N.Y. 1975); 6 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 19.1, at 468-70 (6th ed. 2009).  To help prevent these sorts of problems, the TIA provides that instruments to which it applies must be issued under an indenture that has been "qualified" by the SEC.  15 U.S.C. §§ 77eee-77ggg.  For an indenture to be so qualified, it must (generally speaking) provide for an independent trustee, require the trustee to provide information to investors and to take certain action on their behalf, and require the obligor to supply the trustee with information about the instrument's performance.  *Id.* §§ 77jjj-77qqq.

23

The TIA, however, applies only to certain kinds of instruments, which are defined by the statute's list of exemptions; in other words, only instruments that do *not* fall within at least one of these exemptions are subject to the TIA. *See id.* § 77ddd. BNYM contends that the New York certificates at issue in this case fall within two of these exemptions. First, BNYM argues that the New York certificates are exempt under § 304(a)(1) of the TIA, *id.* § 77ddd(a)(1), because they are equity securities, not debt securities. Second, BNYM argues that the certificates are exempt under § 304(a)(2) of the TIA, *id.* § 77ddd(a)(2), which provides that the TIA does not apply to "any certificate of interest or participation in two or more securities having substantially different rights and privileges."

## 1.

Section 304(a)(1) exempts from the TIA's reach any security other than "(A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate." 15 U.S.C. § 77ddd(a)(1). The parties, like the district court, assume that a security is exempt from the TIA under § 304(a)(1) if it is an "equity" security, but not if it is a "debt"

24

security.  Accordingly, pointing to language in the PSAs that governs the payments to which certificateholders are entitled, BNYM argues that the New York certificates lack the fundamental characteristics of debt, which BNYM identifies as including the obligation to pay a sum certain at a fixed maturity date.  *See Gilbert v. Comm'r of Internal Revenue*, 248 F.2d 399, 402 (2d Cir. 1957); *Comm'r of Internal Revenue v. O.P.P. Holding Corp.*, 76 F.2d 11, 12 (2d Cir. 1935).  BNYM also cites a number of industry commentators who have concluded that certificates like those at issue here are exempt from the TIA because the certificates are equity instruments.  *E.g.*, John Arnholz & Edward E. Gainor, *Offerings of Asset-Backed Securities* § 14.05[A] & nn.78, 79 (2006).  For their part, Plaintiffs primarily point out that courts often describe RMBS in terms evocative of debt (although we note that these references are typically made in passing, and not in contexts involving the scope of TIA § 314(a)(1)).  *See, e.g.*, *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010) (referring to PSAs as "trust agreements similar to bond indentures in many respects"); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005) (referring to commercial mortgage-backed securities as "bonds").

25

We need not decide, however, whether the New York certificates qualify as "debt," because this question, on analysis, is not dispositive.  Even assuming arguendo that the New York certificates do not qualify as debt instruments, non-debt instruments fall outside the § 304(a)(1) exemption if they constitute "certificate[s] of interest or participation" *in* a debt instrument.   15 U.S.C. § 77ddd(a)(1)(B).   In fact, by creating distinct exemptions for certain debt instruments and certificates of interest or participation in those debt instruments, § 304(a)(1) necessarily presumes that at least some certificates of interest or participation subject to the TIA will *not* be debt instruments.  At the same time, however, and contrary to Plaintiffs' position, this does not logically imply that a certificate of interest or participation *cannot* be a debt instrument.  For this reason, we are not required to conclude that the New York certificates at issue are not "debt" in order to hold that they are exempt from the TIA under § 304(a)(2).  And, for the reasons stated below, we agree with BNYM (and, as it happens, the SEC) that the New York certificates are "certificate[s] of interest or participation in two or more securities having substantially different rights and privileges," namely, the numerous mortgage loans held by each trust.  *Id.* § 77ddd(a)(2).   Therefore,

assuming arguendo that these certificates are not exempt from the TIA under § 304(a)(1), we hold that they are nonetheless exempt under § 304(a)(2).

### 2.

The scope of § 304(a)(2) is an issue of first impression.  "[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189, 193 (2d Cir. 2009) (quoting *Tom Rice Buick-Pontiac v. Gen. Motors Corp.*, 551 F.3d 149, 155 (2d Cir. 2008)) (internal quotation mark omitted).  For a given instrument to be exempt from the TIA under § 304(a)(2), the instrument must (1) be a "certificate of interest or participation" in (2) "two or more securities" that (3) "hav[e] substantially different rights and privileges."  15 U.S.C. § 77ddd(a)(2).  We address these requirements in turn.

First, we conclude that the New York certificates are "certificates of interest or participation."  There is little case law interpreting this statutory language, but the Supreme Court has provided helpful guidance in *Tcherepnin v. Knight*, 389 U.S. 332 (1967).  There, the Court concluded that withdrawable capital shares in an Illinois bank qualified as "securities" under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp, because (among other things) they could "be viewed as certificate(s)

of interest or participation in [a] profit-sharing agreement." 389 U.S. at 339 (internal quotation marks omitted). It reached this conclusion because the shares were "evidenced by a certificate," and the "payment of dividends" to the certificateholders was "contingent upon an apportionment of profits." *Id.* Here, too, the New York certificates are evidenced by a certificate (as opposed to a note): the PSAs refer to them as "mortgage pass-through certificates" and to the holders of the instruments as "certificateholders." J.A. 1191. Additionally, payments on the certificates are contingent on the cash flows generated by the underlying mortgage loans: payments on the loans are collected in a "Certificate Account," which is the source of "Available Funds" that are distributed to certificateholders according to the terms of the PSA.[7] *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013) ("The trust collects the principal and interest payments made by borrowers under the mortgages, and pays those amounts out to the holders of the RMBSs in accordance with the terms established for division of the trust's revenues and assets.").

---

[7] More specifically, the PSA provides that the master servicer will collect payments on the loans, deposit them in a "Certificate Account," and transfer the amount collected each month (the "Available Funds") from the Certificate Account to a separate "Distribution Account" maintained by the trustee. J.A. 1014, 1066-68, 1073. The trustee then distributes the Available Funds to certificateholders in the priorities and amounts prescribed by the PSA. J.A. 1088-91.

It is irrelevant that the contingent payments distributed to certificateholders are not "profits," as in *Tcherepnin*.  That case happened to involve a profit-sharing arrangement, but the TIA itself, in § 304(a)(1), contemplates the existence of certificates of interest or participation in notes and loans, whose cash flows are not generally referred to as "profits."  *See also Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1404-05 (10th Cir. 1984) (describing "certificates of participation" in bank loans).  What matters, and what makes the certificates here analogous to the ones that the Supreme Court considered in *Tcherepnin*, is that payments to certificateholders are contingent on the proceeds generated by the underlying instruments—whatever those instruments may be.

We also disagree with the district court's conclusion that the master servicer's entitlement to retain certain payments from the mortgage loans means that certificateholders' interests are not "contingent" on the loans' performance.[8]  *See BNYM I*, 914 F. Supp. 2d at 429.  We do not think investors must literally receive *all*

---

[8] The district court identified two such categories of payments:  First, if a mortgage loan generates "Excess Proceeds" (i.e., more money than was owed on a defaulted loan), the PSA provides that the master servicer may retain those funds.  J.A. 1023.  Second, the master servicer is also entitled to profits generated from investing cash from the loans that it holds temporarily.  *See BNYM I*, 914 F. Supp. 2d at 429.

of the cash flows generated by the underlying instruments in order for their investment to qualify as a certificate of interest or participation.

It is an arguably more difficult question whether the New York certificates remain "certificates of interest or participation" despite the fact that payments on the underlying loans are not simply passed through directly to certificateholders, but instead are re-directed to the various classes of certificates at the time and in the priorities and amounts prescribed by the PSAs. Indeed, it is this property of RMBS—the intricate allocation and layering of the underlying mortgage loans' cash flows—that permits different "tranches" (or groups) of certificates issued by the same trust to have different credit ratings and investment profiles. *See, e.g.*, *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 171 (2d Cir. 2011). Although authority cited by BNYM suggests that courts at the time of the TIA's enactment recognized the possibility of creating "certificate[s] of interest or participation" in residential mortgage loans, these cases did not appear to involve the structural nuances that mark the New York certificates at issue in this case and, as far as we are aware, most modern RMBS. *See, e.g.*, *Lawyers' Mortg. Co. v. Anderson*, 67 F.2d 889, 891 (2d Cir. 1933) (describing "mortgage participation certificates" that evidenced "undivided shares" in a pool of "notes secured by mortgages on real estate").

Likewise, while BNYM points to legislative history suggesting that Congress intended for a kind of instrument known as a "fixed trust certificate" to fall within the § 304(a)(2) exemption, *see* S. Rep. No. 76-248, at 13 (1939) (asserting that this exemption would apply to "fixed trust certificates evidencing an interest in a group of assorted bonds"); H.R. Rep. No. 76-1016, at 41 (1939) (same), contemporaneous authority suggests that fixed trust certificates involved conveying to investors an "undivided beneficial interest" in the underlying assets. *Comm'r of Internal Revenue v. Chase Nat'l Bank*, 122 F.2d 540, 541 (2d Cir. 1941).

Ultimately, however, we agree with BNYM that the New York certificates' structural nuances do not take them outside the scope of the TIA's definition of "certificates of interest or participation."   For one thing, as we have already explained, payments to certificateholders remain "contingent" on the payments on the underlying loans, *Tcherepnin*, 389 U.S. at 339, because there is no meaningful source of cash other than the loans themselves.  Practically speaking, moreover, *whenever* an issuer structures a certificate of interest or participation in multiple underlying securities—a variety of instrument that the TIA specifically contemplates—administrability concerns would seem to necessitate rules for parceling out the returns from those underlying securities.  Judging a given

31

instrument's status as a "certificate of interest or participation" according to the relative complexity of those rules would require a case-by-case analysis, casting a pall of uncertainty over every RMBS issuance.   Plaintiffs propose no standard pursuant to which we or other courts might conduct such an analysis.   They argue only that "pro rata" or "pass-through" RMBS certificates,[9] in which investors receive payments from the mortgage loans in proportion to the size of their investment relative to the issuance as a whole, are "certificates of interest or participation," whereas "sequential-pay" certificates, in which investors receive payments in a specified order of priority, are not.

Plaintiffs marshal no support for their preferred distinction, apart from sequential-pay certificates' apparent nonexistence at the time of the TIA's enactment. Yet the fact that Congress could not have foreseen the various kinds of instruments that would develop as the financial markets became increasingly complex since the 1930s has never been a reason to exclude new instruments from the securities laws' terms. *Cf., e.g., Caiola v. Citibank, N.A.,* 295 F.3d 312, 325-26 (2d Cir. 2002) (discussing

---

[9] As BNYM points out, the term "pass-through" has many meanings.  In this case, for example, the New York certificates are sequential-pay RMBS, but the PSAs refer to them as "mortgage pass-through certificates," apparently in keeping with industry parlance. J.A. 894, 999.  We adopt Plaintiffs' definition—i.e., that a pass-through certificate is one that "passes on a *pro rata* share of a trust's income" to each certificateholder, Pls.' Reply at 27—for simplicity's sake.

the "flexible" definition that the Supreme Court has prescribed for the term "security").  Nor do Plaintiffs provide any persuasive reason why sequential-pay RMBS certificates *ought* to be treated differently, from the perspective of the TIA, than the pass-through certificates that Plaintiffs apparently concede are "certificates of interest or participation."  Plaintiffs' argument thus centers on a distinction without a difference, and we accordingly reject it.

Having concluded that the New York certificates are "certificates of interest or participation," we turn next to § 304(a)(2)'s requirement that the certificate of interest or participation at issue must be in "two or more securities."  15 U.S.C. § 77ddd(a)(2).  As noted, the PSAs provide that payments on the certificates are contingent on the payments received from the mortgage loans held by each trust; those loans are the source of the Available Funds that are paid to certificateholders.[10] Each trust holds hundreds or thousands of loans.  Nonetheless, Plaintiffs argue that if the New York certificates are "certificates of interest or participation," then they are certificates of interest or participation in a single security: their corresponding "tranche."  We disagree.

---

[10] *See supra* note 7 and accompanying text.

33

A tranche is not an instrument separate and apart from the certificates that the trust issues to investors; a tranche is simply the name used to describe each group of those certificates. *See Forth Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 328 (S.D.N.Y. 2012) ("A 'tranche' is a grouping of MBS certificates within a given offering.").  For this reason, the security-like attributes that Plaintiffs ascribe to each tranche—a unique CUSIP number, principal balance, interest rate, credit enhancement, and credit rating—are, in fact, attributes of the certificates themselves.  Nor does a tranche become a security merely because the trust in question has issued multiple groups of certificates or because the PSA prescribes sequential, as opposed to pro rata, distributions.  Regardless of these structural nuances, any amounts paid to certificateholders remain contingent on the payments on the mortgage loans that the trust holds.  There simply are no payments generated by the "tranche" that are distinct from the trusts' distributions to certificateholders, and it is therefore impossible for the certificates at issue to be certificates of interest or participation in their corresponding tranches.[11]

-------

[11] We also disagree with the conclusion of at least one district court that the "securities" in question are *groups* of loans, and that because RMBS certificates are certificates of interest or participation in only one such group, they are certificates of interest or participation in only one security.  *See Policemen's Annuity & Benefit Fund*, 943 F. Supp. 2d at 439.  Section 304(a)(2) necessarily presumes that when many securities are grouped together so that investors may purchase a certificate of interest or participation in them, they remain distinct securities.

Plaintiffs argue, in the alternative, that even if the New York certificates at issue in this case are certificates of interest or participation in the multiple mortgage loans held by the trusts, they are not certificates of interest or participation in two or more "securities," as required by § 314(a)(2), because mortgage loans are not securities.  Plaintiffs raise this argument in a footnote, so it would be within our discretion to consider it waived.  *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).  Regardless, we have no difficulty concluding that the mortgage loans held by the trusts do qualify as securities.

The TIA itself does not define the term "security," so we must look to the Securities Act.  *See* 15 U.S.C. § 77ccc(1) ("Any term defined in section 2 of the Securities Act of 1933 and not otherwise defined in [the TIA] shall have the meaning assigned to such term in such section 2.").  The Securities Act defines "security" to include (among many other things) "any note," "unless the context otherwise requires."  15 U.S.C. § 77b(a)(1).  Plaintiffs do not dispute that mortgage loans are notes.  Instead, they point out that courts have not regarded residential mortgage loans as securities under the anti-fraud provisions of the *Exchange* Act because the "context" of those provisions so requires.  *See Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976) (listing examples of notes that are not

securities under the Exchange Act's anti-fraud provisions, including "the note secured by a mortgage on a home").  We have explained, however, that different statutory provisions may "alter[] the 'context' to be examined to determine whether the admonition 'unless the context otherwise requires' is to be applied." *Id.* at 1139. And while it might be incongruous to apply the registration provisions of the Securities Act or the anti-fraud provisions of the Exchange Act to residential mortgages, there is nothing odd about classifying them as securities under TIA § 304(a)(2).[12]

Finally, we conclude that the numerous mortgage loans held by the trusts have "substantially different rights and privileges."  15 U.S.C. § 77ddd(a)(2). Among other things, the loans have different obligors, payment terms, maturity dates, interest rates, and collateral.  *See Okla. Police Pension & Ret. Sys.*, 291 F.R.D. at

---

[12] We express no view on how other terms should be interpreted throughout the TIA, or how narrowly the relevant "context" ought to be determined in other cases in which a given instrument's status as a "security" is at issue.  Our holding is limited to the narrow issue presented here, i.e., whether the multiple mortgage loans held by a PSA-governed RMBS trust are "two or more securities" for purposes of TIA § 304(a)(2).  In this specific "context," nothing requires the conclusion that these "notes" should not qualify as securities.  *See Exch. Nat'l Bank*, 544 F.2d at 1138 ("[C]ourts had better not depart from [the securities laws'] words without strong support for the conviction that, under the authority vested in them by the 'context' clause, they are doing what Congress wanted when they refuse to do what it said.").

63.  We therefore hold that the certificates issued by the PSA-governed New York trusts are exempt from the TIA under § 304(a)(2).

Our holding is consistent with the SEC's position that instruments like the New York certificates are exempt from the TIA under § 304(a)(2).  *See* SEC Division of Corporate Finance, *Trust Indenture Act of 1939, Interpretive Responses Regarding Particular Situations* § 202.01 (May 3, 2012), http://www.sec.gov/divisions/corpfin/ guidance/tiainterp.htm ("Certificates representing a beneficial ownership interest in a trust are offered to the public pursuant to a registration statement under the Securities Act.  The assets of the trust include a pool of mortgage loans with multiple obligors administered pursuant to a 'pooling and servicing agreement.'. . . The certificates are treated as exempt from the [TIA] under Section 304(a)(2) thereof."). The SEC has held this position with respect to PSA-governed RMBS certificates since at least as early as 1997.  *See* SEC Division of Corporate Finance, *Manual of Publicly Available Telephone Interpretations: Trust Indenture Act of 1939* at 2-3 (July 1997), http://www.sec.gov/interps/telephone/cftelinterps_tia.pdf.  Plaintiffs suggest that the SEC's interpretive guidance applies only to "pure pass-through" certificates and not sequential-pay certificates like the ones at issue in this case, but the guidance itself does not draw any such distinction.  To the contrary, sequential-pay structures are

ubiquitous in the RMBS market, and the SEC's consistent registration of non-TIA-qualified offerings of sequential-pay certificates—which it would be required by law *not* to register if it thought the certificates were not exempt, *see* 15 U.S.C. § 77eee(b)—"clearly demonstrates" that it considers such certificates exempt.[13] *FDIC v. Phila. Gear Corp.*, 476 U.S. 426, 439 (1986).

Although the SEC's position is not embodied in a formal rule, we think it carries some persuasive force in light of the complex statutory scheme and the SEC's expertise in this specialized field. *See United States v. Mead Corp.*, 533 U.S. 218, 236-38 (2001); *see also Vincent v. The Money Store*, 736 F.3d 88, 101 & n.12 (2d Cir. 2013) (looking to Federal Trade Commission staff commentary as "persuasive authority" in interpreting the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p). The SEC's position therefore lends further support to our conclusion that § 304(a)(2) exempts the certificates at issue from the TIA's reach.

Because we conclude that the TIA does not apply to the New York certificates at issue, we need not reach BNYM's alternative argument that the TIA's substantive provisions do not apply retroactively to certificates that the SEC permitted to issue

---

[13] In light of our conclusion that § 304(a)(2) exempts the New York certificates from the TIA's reach and the fact that the SEC's position is sufficiently clear from its interpretive guidance and historical practice, we need not address the various SEC no-action letters cited by BNYM, which appear to involve distinguishable instruments.

without TIA qualification.  Nor need we address the scope of the private right of action that the TIA authorizes.

## CONCLUSION

We **AFFIRM** the portion of the district court's April 3, 2012 order dismissing Plaintiffs' claims related to the trusts in which they did not invest.  We **REVERSE** the portion of that order denying BNYM's motion to dismiss Plaintiffs' TIA claims related to the PSA-governed New York trusts.  The case is **REMANDED** for further proceedings consistent with this opinion.