**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JERRY PINKS, individually and on behalf of
others similarly situated,

              Plaintiff,

              vs.

M & T BANK CORP.,

              Defendant.

Civil Action No. 13-cv-1730—LAK—RLE


**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION**


REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063

REED SMITH LLP
599 Lexington Avenue
New York, NY  10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   RELEVANT FACTS OF RECORD .....................................................................3

A.    Post-Repossession Notice Claims For "Statutory Damages" Under
      Individual State Commercial Codes Are Highly Factual And Idiosyncratic
      Claims Because They Arise In A Debt Collection Context Triggering
      Multiple, Additional Factual And Legal Issues.................................................3

B.    The Evidentiary Record As To Mr. Pinks Confirms The Individualized
      Nature Of Plaintiff's South Carolina Claim And M&T's Defenses..............7

      1.    Mr. Pinks Is A Named Plaintiff Without Any Knowledge Of His
            Claim Against M&T..............................................................................7

      2.    In August 2008, Mr. Pinks Obtains Financing To Purchase A 2009
            Big Country Fifth Wheel Trailer For His Daughter With No Intent
            To Repay The Debt Personally.............................................................8

      3.    In October 2008, Mr. Pinks Obtains Financing To Purchase A 2008
            Yellowstone Motor Home Without The Ability To Repay The Debt.............9

      4.    In December 2008, M&T Repossesses The Yellowstone Motor
            Home At Mr. Pinks' Request. ............................................................10

      5.    In July 2010, M&T Repossesses The Big Country Trailer At Mr.
            Pinks' Request After His Daughter's Divorce...................................11

      6.    In January 2012, Mr. Pinks Files Bankruptcy To Avoid The
            Deficiencies Owed To M&T................................................................12

      7.    Mr. Pinks, Through Counsel, Affirmatively Represents That His
            Claim Had A Value Less Than $5,000................................................13

      8.    Mr. Pinks Files His Putative Nationwide Class Action Complaint In
            The Southern District Of New York Demanding Over $70,000 For
            Himself. ...............................................................................................14

      9.    M&T Seeks To Reopen Mr. Pinks' South Carolina Bankruptcy
            Proceeding.............................................................................................15

      10.   Class Certification Discovery Is Completed. ....................................15

      11.   Plaintiff Files His Motion For Class Certification, Jettisoning Putative
            Class Members In 24 States.................................................................17

III.  APPLICABLE LEGAL STANDARDS ...............................................................18

IV.   PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED,
      AND THIS ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT
      MATTER JURISDICTION. ................................................................................20

A.    The Evidence Shows Plaintiff Lacks Standing To Represent The Putative
      Multi-State "Class." ......................................................................................20

1.    The Evidence Shows That Plaintiff Lacks Article III Standing.......................21

       a.    Plaintiff Lacks Article III Standing Because He Has No Concrete Injury-In-Fact..................................................................22

       b.    Plaintiff Lacks Article III Standing To Assert Claims Under The Laws Of States Other Than South Carolina. ...................24

2.    The Evidence Shows Plaintiff Lacks Statutory Standing To Assert Non-South Carolina Claims And He Is Not A Member Of 20 Of The Putative Statewide Classes. ...........................................................27

3.    The Evidence Shows That Plaintiff Lacks Class Standing. .............................29

B.    Plaintiff's Proposed "Class" Fails The Predominance Requirement Of Rule 23(b)(3)..........................................................................................................31

1.    The Nature Of The Proposed "Class"—With Claims Under The Laws Of 21 Different States—Raises A Host Of Individual Issues. ..............32

2.    The Existence Of Compulsory Counterclaims For Deficiency Balances Creates Individualized Issues. ...............................................45

3.    The Existence Of Judgments Obtained Against Putative Class Members After The Complaint Was Filed Creates Individualized Issues With Respect To Set-Off And Res Judicata Defenses. .......................47

C.    Plainitff's Proposed "Class" Fails To Satisfy The Superiority Requirement Of Rule 23(b)(3)............................................................................................49

D.    Plaintiff Fails To Satisfy All Of The Requirements Of Rule 23(a)..............................51

1.    Plaintiff Fails To Satisfy The Typicality And Commonality Requirements. ......................................................................................51

       a.    Plaintiff Fails The Typicality Requirement Because He Is Subject To Unique Defenses And Must Make Disparate Legal And Factual Arguments. ......................................................51

       b.    Plaintiff Fails The Commonality Requirement Because Of The Differences In The State Laws Applicable To The Proposed Class..........................................................................54

2.    Plaintiff Fails To Satisfy The Adequacy Of Representation Requirement.......................................................................................55

E.    Plaintiff's Proposed "Class" Fails The Ascertainability Requirement. ........................57

V.    CONCLUSION ...................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Morgan Stanley,*
    307 F.R.D. 119 (S.D.N.Y. 2015) ..................................................................................... 49

*Allstate Ins. Co. v. Serio,*
    261 F.3d 143 (2d Cir. 2001) ........................................................................................... 39

*Anderson v. Peoples Sec. Bank of Maryland,*
    503 A.2d 670 (D.C. 1986) ............................................................................................. 38

*Ault v. J.M. Smucker Co.,*
    310 F.R.D. 59 (S.D.N.Y. 2015) ..................................................................................... 57

*Banks ex rel. Banks v. Yokemick,*
    177 F. Supp. 2d 239 (S.D.N.Y. 2001) ........................................................................... 47

*Barbiero v. Citizens Fin. Group, Inc.,*
    No. 06-cv-10019-RGS (D. Mass.) .................................................................................. 37

*Barrus v. Dick's Sporting Goods, Inc.,*
    732 F. Supp. 2d 243 (W.D.N.Y. 2010) ..................................................................... 34, 55

*Beard v. Vanderbilt Mortgage & Fin., Inc.,*
    2008 WL 2323235 (M.D. Tenn. June 2, 2008) .......................................................... 37, 43

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014) ....................................................................................... 28

*Berks Cty. Employees' Ret. Fund v. First Am. Corp.,*
    734 F. Supp. 2d 533 (S.D.N.Y. 2010) ........................................................................... 32

*Bernstein v. State of New York,*
    129 A.D.3d 1358, 10 N.Y.S.3d 752 (3d Dep't 2015) .................................................... 48

*Brecher v. Republic of Argentina,*
    806 F.3d 22 (2d Cir. 2015) ....................................................................................... 57, 59

*Cafferty v. Scotti Bros. Records,*
    969 F. Supp. 193 (S.D.N.Y. 1997) ................................................................................ 43

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ...................................................................................... 34, 50

*Cole v. Gen. Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007)..................................................................................36

*Comcast v. Behrend*,
    133 S Ct. 1426 (2013) ..............................................................................19, 32

*Cotchett v. Avis Rent A Car System, Inc.*,
    56 F.R.D. 549 (S.D.N.Y. 1972)..............................................................................45

*Cropper v. Peninsula Bank*,
    1990 WL 964522 (Del. Com. Pl. Apr. 27, 1990) ..................................................38

*Czepiel v. Chemical Bank*,
    764 F. Supp. 255 (D. Conn. 1991)..................................................................46, 48

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)................................................................................................24

*Delaney v. First Financial of Charleston, Inc.*,
    2013 WL 9921461 (S.C. Com. Pl. Apr. 30, 2013).........................................44, 52

*Doll v. Chicago Title Ins. Co.*,
    246 F.R.D. 683 (D. Kan. 2007) ......................................................................50, 56

*Doster Lighting, Inc. v. E-Conolight, LLC*,
    2015 WL 3776491 (E.D. Wis. June 17, 2015) .....................................................36

*Duncan v. Nw. Airlines, Inc.*,
    203 F.R.D. 601 (W.D. Wash. 2001).....................................................................36

*Edwards v. N. Am. Power & Gas, LLC*,
    120 F. Supp. 3d 132 (D. Conn. 2015) .......................................................25, 26, 27

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)................................................................................................49

*Falcon v. Philips Elecs. N. Am. Corp.*,
    489 F. Supp. 2d 367 (S.D.N.Y. 2007), *aff'd,* 304 F. App'x 896 (2d Cir. 2008)................21

*Farmer v. Monsanto*,
    579 S.E.2d 325 (S.C. 2003) ...................................................................................52

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
    254 F.R.D. 68 (E.D.N.C. 2008) ............................................................................45

*Feinstein v. Firestone Tire & Rubber Co.*,
    535 F. Supp. 595 (S.D.N.Y. 1982) .......................................................3, 31, 36, 55

*First Bank (N.A.) W. Montana Missoula v. Dist. Court for Fourth Judicial Dist.*,
    737 P.2d 1132 (Mont. 1987) ................................................................48

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    219 F. Supp. 2d 576 (S.D.N.Y. 2002) ...................................................13

*Fitzgerald v. Thompson*,
    187 A.D.2d 557, 590 N.Y.S.2d 221 (2d Dep't 1992) ..........................43

*Ford Motor Credit Co. v. Edwards*,
    485 A.2d 1010 (Md. 1985) ....................................................................38

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ..............................................................................21

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990) .................................................................52

*Gen. Electric Corp. v. NET Transportation, Inc.*,
    2006 WL 3741828 (D. Conn. Dec. 18, 2006) .....................................41

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147, 156 (1982) .....................................................................28

*Glob. Fin. Corp. v. Triarc Corp.*,
    93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482 (N.Y. 1999) ......42

*Gunther v. Capital One, N.A.*,
    703 F. Supp. 2d 264 (E.D.N.Y. 2010) .................................................25

*Hales v. HSBC Bank U.S.A., N.A.*,
    347 F. App'x 698 (2d Cir. 2009) ......................................................2, 44

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ..........................................................................19

*Heaven v. Trust Co. Bank*,
    118 F.3d 735 (11th Cir. 1997) ..............................................................45

*Henry v. Consumer Portfolio Servs., Inc.*,
    2007 WL 1053787 (Cal. Ct. App. Apr. 10, 2007) ........................*passim*

*Hudson v. Eaglemark Sav. Bank*,
    2011 WL 1755540 (E.D. Pa. May 9, 2011), *aff'd*, 475 F. App'x 423 (3d Cir. 2012) ......................42

*IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*,
    634 F. App'x 19 (2d Cir. 2015) .............................................................42

*In re Initial Pub. Offerings Sec. Litig. ("In re IPO")*,
 471 F.3d 24 (2d Cir. 2006) ................................................................. 1, 19, 57

*In re Agent Orange Prod. Liab. Litig.*,
 597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987) ................. 43

*In re Aggrenox Antitrust Litig.*,
 94 F. Supp. 3d 224 (D. Conn. 2015) .......................................................... 25, 26

*In re Baycol Products Litig.*,
 218 F.R.D. 197 (D. Minn. 2003) ................................................................... 36

*In re Beacon Associates Litig.*,
 2012 WL 1372145 (S.D.N.Y. Mar. 19, 2012) ..................................................... 28

*In re F.C.C.*,
 208 F.3d 137 (2d Cir. 2000) ......................................................................... 13

*In re Gen. Motors Corp. Dex-Cool Products Liab. Litig.*,
 241 F.R.D. 305 (S.D. Ill. 2007) ...................................................................... 36

*In re Grand Theft Auto Video Game Consumer Litig.*,
 251 F.R.D. 139 (S.D.N.Y. 2008) .................................................................... 35

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*,
 1 F. Supp. 3d 34 (E.D.N.Y. 2014) .............................................................. 25, 26, 27

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
 2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016) ...................................................... 31

*In re Literary Works in Electronic Databases Copyright Litig.*,
 654 F.3d 242 (2d Cir. 2011) ......................................................................... 55

*In re Massaquoi*,
 412 B.R. 702 (Bankr. E.D. Pa. 2008) ............................................................... 40

*In re Old Carco LLC*,
 509 F. App'x 77 (2d Cir. 2013) ...................................................................... 13

*In re Rezulin Products Liab. Litig.*,
 210 F.R.D. 61 (S.D.N.Y. 2002) ................................................................. *passim*

*In re U.S. Foodservice Inc. Pricing Litig.*,
 729 F.3d 108 (2d Cir. 2013) ...................................................................... 1, 44

*Intellivision v. Microsoft Corp.*,
 484 F. App'x 616 (2d Cir. 2012) .................................................................... 53

*Jenkins v. Hyundai Motor Financing Co.*,
  2008 WL 781862 (S.D. Ohio Mar. 24, 2008) ................................................*passim*

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) .............................................19, 32, 33, 34

*Jurgensen v. Felix Storch, Inc.*,
  2012 WL 2354247 (S.D.N.Y. June 14, 2012) ...............................................24

*Khan v. Children's Nat'l Health Sys.*,
  2016 WL 2946165 (D. Md. May 19, 2016) ...............................................22

*Leber v. Citigroup 401(K) Plan Inv. Comm.*,
  129 F. Supp. 3d 4 (S.D.N.Y. 2015) ...............................................18

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...............................................18, 24, 26

*Limtiaco v. Auction Cars.com, LLC*,
  2012 WL 4911726 (D. Nev. Oct. 15. 2012) ...............................................41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................21, 22

*Mahon v. Ticor Title Ins. Co.*,
  683 F.3d 59 (2d Cir. 2012) ...............................................24, 26

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ...............................................57

*Mastafa v. Chevron Corp.*,
  770 F.3d 170 (2d Cir. 2014) ...............................................18

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F. 3d 1072 (2d. Cir. 1995) ...............................................57

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) ...............................................1, 20

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ...............................................*passim*

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ...............................................53

*Nouveau Indus. Inc. v. Liberty Mut. Ins. Co.*,
  2011 WL 10901796 (S.D.N.Y. Sept. 7, 2011) ...............................................47

*Oklahoma Police Pension & Ret. Sys. v. U.S. Bank Nat. Ass'n*,
    986 F. Supp. 2d 412 (S.D.N.Y. 2013)................................................................26

*Oscar v. BMW of N. Am., LLC*,
    274 F.R.D. 498 (S.D.N.Y. 2011)..........................................................2, 31, 34, 35

*Overseas Direct Imp. Co. v. Family Dollar States Inc.*,
    929 F. Supp. 2d 296 (S.D.N.Y 2013)................................................................57

*Parker v. George Thompson Ford, Inc.*,
    83 F.R.D. 378 (N.D. Ga. 1979)......................................................45, 46, 56

*Parks v. Dick's Sporting Goods, Inc.*,
    2006 WL 1704477 (W.D.N.Y. June 15, 2006)................................................25

*Prado-Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir. 2000)......................................................18, 28

*RA Glob. Servs., Inc. v. Avicenna Overseas Corp.*,
    843 F. Supp. 2d 386 (S.D.N.Y. 2012)................................................................48

*Retirement Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*,
    775 F.3d 154 (2d Cir. 2014)......................................................*passim*

*Richards v. Direct Energy Servs., LLC*,
    120 F. Supp. 3d 148 (D. Conn. 2015)......................................................24, 26

*Robainas v. Metro. Life Ins. Co.*,
    2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015)......................................................27, 28

*SCM Grp., Inc. v. McKinsey & Co.*,
    2011 WL 1197523 (S.D.N.Y. Mar. 28, 2011)................................................................43

*Scott v. New York City Dist. Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004)......................................................51, 57

*Simington v. Lease Fin. Grp., LLC*,
    2012 WL 651130 (S.D.N.Y. Feb. 28, 2012)................................................................24

*Smith Barney, Harris Upham & Co. v. Luckie*,
    85 N.Y.2d 193, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (N.Y. 1995)......................................................43

*Smith v. Ohio State Univ.*,
    2016 WL 3182675 (S.D. Ohio June 8, 2016)................................................................22

*SMS Mktg. & Telecommunications, Inc. v. H.G. Telecom, Inc.*,
    949 F. Supp. 134 (E.D.N.Y. 1996)................................................................48

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .................................................................................... *passim*

*Stadnick v. Vivint Solar, Inc.,*
    2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015) .......................................................30

*Starks v. Sunstar Acceptance Corp.,*
    No. 2000-12 (Perry Co., Ala. 2002) ....................................................................37

*States Res. Corp. v. Gregory,*
    339 S.W.3d 591 (Mo. Ct. App. 2011) .................................................................41

*Stinnette v. Medtronic Inc.,*
    2010 WL 767558 (S.D. Tex. Mar. 3, 2010) .........................................................31

*Suntrust Bank v. Wasserman,*
    2013 WL 4351725 (N.Y. Sup. Ct. Aug. 12, 2013) ...............................................42

*Taylor v. Zucker,*
    2015 WL 4560739 (S.D.N.Y. July 27, 2015) .......................................................51

*Temple v. Circuit City Stores, Inc.,*
    2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) .....................................................25

*Valencia ex rel. Franco v. Lee,*
    316 F.3d 299 (2d Cir. 2003) ...............................................................................39

*Vincent v. Money Store,*
    304 F.R.D. 438 (S.D.N.Y. 2015)*, aff'd,* 2016 WL 2956914 (2d Cir. May 23, 2016) .................34, 42

*Waithe v. Citigroup, Inc.,*
    983 N.Y.S.2d 207 (N.Y. Sup. Ct. 2013) .............................................................41

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................................................... *passim*

*Walsh v. Ford Motor Co.,*
    807 F.2d 1000 (D.C. Cir. 1986) ...................................................................2, 33, 36

*Weissinger v. First Fed. Sav. & Loan Ass'n of Warner Robins,*
    533 So. 2d 234 (Ala. 1988) ................................................................................48

*Williams v. Nat'l Mortgage Co.,*
    903 S.W.2d 398 (Tex. App. 1995) ......................................................................48

*Wynn v. New York City Hous. Auth.,*
    314 F.R.D. 122 (S.D.N.Y. 2016) ........................................................................55

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ...............................................................................49

**Statutes**

28 U.S.C. § 1332(d)(2)(A) ......................................................................................21

28 U.S.C. § 2072(b) ................................................................................................24

Ala. Code § 7-9-504 ................................................................................................37

Conn. Gen. Stat. § 36a-785(d) .............................................................................4, 39

Conn. Gen. Stat. § 42a-9-201 ..............................................................................4, 39

D.C. Code § 28:9-201 ...........................................................................................4, 39

Fla. Stat. Ann. § 679.626 ........................................................................................40

Fla. Stat. Ann. § 679.626(3) ......................................................................................6

Ky. Rev. Stat. Ann. § 355.9-614 .............................................................................41

Md. Code Ann., Com. Law § 9-201(c)(3) ...............................................................38

Md. Code Ann., Com. Law § 9-614 ........................................................................38

Md. Code Ann., Com. Law § 9-614(7) .................................................................4, 38

Md. Code Ann., Com. Law § 12-1021(e) .................................................................38

Md. Code Ann., Com. Law § 12-1021(j)(1) .............................................................38

Me. Rev. Stat. Ann. tit. 11 § 9-1626(2)(c) ............................................................6, 40

N.J. Stat. Ann. § 12A:9-626(a)(3) ........................................................................6, 40

N.Y. Pers. Prop. Law § 316 .................................................................................4, 39

N.Y. U.C.C. Law § 9-201 ....................................................................................4, 39

Ohio Rev. Code Ann. § 1309.201 ........................................................................4, 39

Ohio Rev. Code Ann. § 1309.625(D) ...................................................................5, 40

Ohio Rev. Code Ann. § 1317.12 ..........................................................................4, 39

Ohio Rev. Code Ann. § 1317.16(B) .....................................................................4, 39

S.C. Code Ann. § 15-3-570 ......................................................................................52

S.C. Code Ann. § 15-5-150 .......................................................................................... 52

S.C. Code Ann. § 36-9-613(1) ..................................................................................... 42

S.C. Code Ann. § 36-9-613(1)(D) ............................................................................... 23

S.C. Code Ann. § 36-9-614(1) ..................................................................................... 42

S.C. Code Ann. § 36-9-614(1)(A) ............................................................................... 23

S.C. Code Ann. § 36-9-614(2) ..................................................................................... 42

S.C. Code Ann. § 36-9-614(3) ..................................................................................... 42

S.C. Code Ann. § 36-9-625(c)(2) ........................................................................... 16, 52

Va. Code Ann. § 8.9A-626 .......................................................................................... 40

**Other Authorities**

D.C. Mun. Regs. tit. 16, § 341.4 ............................................................................... 4, 39

Fed. R. Civ. P. 13(a)(1)(A) .......................................................................................... 46

Fed. R. Civ. P. 23 ................................................................................................. *passim*

Fed. R. Civ. P. 23(a) ................................................................................... 19, 29, 32, 51

Fed. R. Civ. P. 23(a)(2) ................................................................................................ 54

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 51

Fed. R. Civ. P. 23(a)(4) ................................................................................................ 55

Fed. R. Civ. P. 23(b) ............................................................................................... 19, 42

Fed. R. Civ. P. 23(b)(3) ......................................................................................... *passim*

U.S. Const. Art. III, § 1 ............................................................................................... 21

U.S. Const. Art. III, § 2 ............................................................................................... 21

## I.    INTRODUCTION

Plaintiff's request for certification of a nebulous, fact-dependent, multi-state "class" of

defaulting debtors residing in 20 different states plus the District of Columbia[1] in order to pursue 21

different statutory, commercial code causes of action is unsupported by the facts or the law.

Fundamentally, Plaintiff has failed to carry his evidentiary burden of proof on his motion for class

certification ("Motion").  He completely fails to address, let alone sustain, his burden of showing

that he satisfies each of the three, independent standing tests established by the Second Circuit.  The

evidence shows that Plaintiff has no concrete injury-in-fact as required by the U.S. Supreme Court,

and he has admitted that he personally cannot assert any statutory cause of action under any state

law other than South Carolina.  As a result, he lacks both Article III and statutory standing.  He also

has made no evidentiary showing with respect to class standing.

Tellingly, Plaintiff's Brief relies heavily on six securities fraud cases, a civil RICO case and an

antitrust case, all of which are readily distinguishable on their face.[2]  The remainder of Plaintiff's

class certification authorities either ***affirmed denials*** of class certification or ***reversed*** class

certification.[3]  None of Plaintiff's cited cases address the difficulties and obstacles to class

certification when considering a request for certification of ***multi-state*** classes asserting state-law,

---

[1]    For ease of reference and clarity, M&T Bank Corp. ("M&T") will refer to these 21 separate
jurisdictions as "states."

[2]    *See, e.g.,* Pl. Brief*,* Dkt. 148 citing: (1) *In re Marsh & McClennan Cos. Sec. Litig.* (securities fraud
settlement class); (2) *Dura-Bilt v. Chase Manhattan Corp.* (securities fraud); (3) *In re Flag Telecom Holding
Ltd. Sec. Litig.* (securities fraud); (4) *In re Indymac Mortgage-backed Sec. Litig.* (securities fraud); (5) *In re
IPO Sec. Litig.* (securities fraud); (6) *In re Parmalat Sec. Litig.* (securities fraud); (7) *In re U.S. Foodservice
Inc. Pricing Litig.* (civil RICO); and (8) *In re NASDAQ Market-Makers Antitrust Litig.* (antitrust).

[3]    *See, e.g.,* Pl. Brief, Dkt. 148 citing: *Moore v. PaineWebber, Inc.* (affirming denial of certification);
*Myers v. Hertz Corp.* (affirming denial of certification); *Teamsters Local 445 Freight Div. Pension Fund v.
Bombardier, Inc.* (affirming denial of class certification); *UFCW Local 1776 v. Eli Lilly & Co.* (reversing
certification); *General Telephone Co. v. Falcon* (reversing certification); *Wal-Mart Stores, Inc. v. Dukes*
(reversing certification).

*statutory* causes of action.  And, all of Plaintiff's cited commercial code cases are individual, non-class lawsuits.[4]  After years of litigation and more than 5 months since class certification discovery ended, Plaintiff has failed to cite a ***single*** case granting multi-state, class certification of the alleged state statutory claims.

The reason for the lack of relevant, supporting authority for Plaintiff's request is clear. Plaintiff's lawyer-crafted, proposed multi-state "class" definition is incapable of being certified and does not withstand the required rigorous analysis for multiple, independent reasons.  In fact, in the two prior cases that have considered requests for certification of multi-state, commercial code claims identical to those alleged by Plaintiff, the courts have rejected the plaintiffs' requests.  *See Jenkins v. Hyundai Motor Financing Co.*, 2008 WL 781862, at *7 (S.D. Ohio Mar. 24, 2008); *Henry v. Consumer Portfolio Servs., Inc.*, 2007 WL 1053787, at *9 (Cal. Ct. App. Apr. 10, 2007).  These decisions are directly relevant and far more instructive with respect to the issues raised by Plaintiff's Motion because they analyze the key issues.

Because the Uniform Commercial Code ("UCC") is not an enacted statute and does not apply in its own right but was adopted with variations by state legislatures, "[t]he Uniform Commercial Code is not uniform."  *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 509 (S.D.N.Y. 2011) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986) (Ginsburg, Ruth Bader, J.)).  Contrary to Plaintiff's argument, courts have recognized that variations do exist in the notice requirements of commercial codes enacted from state to state.  *See Jenkins*, 2008 WL 781862, at *7; *Henry*, 2007 WL 1053787, at *9.  In fact, "[i]n many states, UCC provisions are modified or superseded by provisions contained in other statutes[,]" *Jenkins*, 2008 WL 781862, at *7, and "each jurisdiction has developed its own interpretation of the Code, thus leading to potentially conflicting

---

[4]      *See, e.g.*, Pl. Brief, Dkt. 148 citing:  *Coxall v. Clover Commercial*; *Hales v. HSBC Bank*; *In re Schwalb*; *Kruse v. Voyager Ins.*; *Muro v. Hermanos Auto Wholesalers*; *Parks v. CNAC Joliet*; *Wilmington Trust v. Conner.*

legal authorities." *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 605 (S.D.N.Y. 1982).

Indeed, as Judge Kaplan has recognized, there are "a number of areas in which identical provisions

of the Uniform Commercial Code have been construed differently in different states." Dkt. 98 at 1

n. 1.[5]

In short, this case is clearly inappropriate for class certification. The evidentiary record

demonstrates that there are material variations in state law causing individual issues to predominate,

and the applicable defenses and compulsory counterclaims only multiply those individual issues.

Plaintiff is an atypical, inadequate representative who has failed to propose an ascertainable and

administratively feasible class. Upon careful examination of the evidence ignored by Plaintiff,

proper application of controlling law, and after performing the rigorous analysis of the multi-state

statutory claims, applicable defenses and compulsory counterclaims, Plaintiff's Motion should be

denied and Plaintiff's action then should be dismissed for lack of jurisdiction.

## II.    RELEVANT FACTS OF RECORD

### A.    Post-Repossession Notice Claims For "Statutory Damages" Under Individual State Commercial Codes Are Highly Factual And Idiosyncratic Because They Arise In A Debt Collection Context Triggering Multiple, Additional Factual And Legal Issues.

Plaintiff has requested certification of a proposed "class" that includes individuals residing in

21 different states with claims pertaining to the sufficiency of post-repossession notices under the

commercial codes enacted in those 21 different states. Dkt. 148 at 6. Each of the 21 states has not

enacted the UCC in a uniform manner as Plaintiff contends. In fact, there are material textual

differences that confirm the obvious: each putative class member's claim must be analyzed, among

other things, under the governing state statute and the relevant judicial decisions construing the

particular state statute, any applicable defenses and the availability of counterclaims for deficiency

---

[5]    M&T has cited to the page numbers inserted at the bottom of the docket entry.

balances.  The differences in statutory text, the interplay of the commercial code with other state-specific consumer statutes, judicial interpretations of the statutes, the applicable defenses, including state-specific statutes of limitations, and recovery of deficiencies, all combine to create multiple state-specific, legal and factual issues with respect to the post-repossession notice claims.

**Statutory Textual Differences Exist.**  By way of illustration, section 9-614(7) of the Maryland Commercial Code, on its face, exempts secured parties, such as M&T, who are subject to either Maryland's Retail Installment Sales Act (RISA) or Credit Grantor Closed End Credit Law (CLEC) from the notice provisions of the Commercial Code.  Md. Code, Com. Law § 9-614(7) ("[s]ecured parties subject to . . .12-624 through 12-627 [the RISA], or § 12-1021 [the CLEC] of this article . . .are not subject to the provisions of this section").  Therefore, unlike South Carolina residents who may assert a South Carolina Commercial Code claim in South Carolina, Maryland residents have no viable Maryland Commercial Code claim here because M&T is a lender under the CLEC.[6]  Additionally, the commercial codes of other states—while not explicitly exempting entities subject to other state laws from the commercial code's post-repossession notice requirement, as Maryland has done—do provide that the commercial code will defer to other state laws, such as RISAs, that conflict with the commercial code.  *See, e.g.*, Connecticut (C.G.S. § 42a-9-201); Ohio (O.R.C. § 1309.201); District of Columbia (D.C. Code § 28:9-201); and New York (N.Y. UCC § 9-201).  And, as relevant here, the RISA post-repossession notice provisions in these states do not provide for a right to an accounting of the borrower's unpaid indebtedness.  *See* C.G.S. § 36a-785(d); D.C. Mun. Regs. tit. 16, § 341.4; N.Y. Pers. Prop. Law § 316; O.R.C. § 1317.12 and 1317.16(B).

**Judicial Interpretations Vary As To Claims And Defenses.**  Different state and federal courts have construed or interpreted similar statutory language in different ways that lead to different outcomes.  Dkt. 98 at 1 n. 1.  For example, some courts have adopted a reasonable or

---

[6]        Declaration of Michael P. Ryan ("Ryan Decl.") ¶ 29.

substantial compliance approach, while other courts have taken a more highly technical view.  *See*

*infra* 41-42.  Because Plaintiff is seeking certification of a putative "class" of residents in 21 states

asserting statutory causes of action and there is no overarching federal statute, these competing and

diverging state-level interpretations arise with respect to each claim and defense across 21

jurisdictions.  Such state judicial interpretations are critically important here where the creditor,

M&T, provided an accounting free of charge and judicial decisions support this approach as

beneficial to the defaulting customer and as exceeding the technical Code language.  Additionally,

the statutes of limitations vary widely among the various states and in 18 of the 21 states there is, as

Plaintiff concedes, "no appellate authority" available as to the applicable limitations periods.  Dkt.

148-1 (Pl. App. 1).  State judicial interpretations similarly will vary with respect to defenses such as

*res judicata*, set-off, recoupment, judicial estoppel, and the validity of any releases or renunciation

statements.

   **Set-Off Defenses And Compulsory Counterclaims Exist**.  Because each putative class

member is, by definition, a defaulting borrower, a significant portion of the alleged class members

will be subject to compulsory counterclaims for their underlying debts, *i.e.*, deficiency balances.

Some states have enacted specific statutory approaches, while commercial codes in other states do

not specifically address collection of deficiency balances arising from consumer secured transactions,

and thus the secured party's claim is governed by other state law.  In this regard, the Ohio

Commercial Code contains a mandatory offset clause providing that statutory damages "shall be

reduced by the amount that the sum of the secured obligation, expenses, and attorney's fees exceeds

the proceeds of collection, enforcement, disposition, or acceptance" regardless of whether the

secured party challenges the damages based on the existing deficiency.  O.R.C. § 1309.625(D).  This

contrasts, for example, with the New Jersey Commercial Code, which contains no such mandatory

statutory offset provision, but nonetheless provides parameters for recovering deficiencies in some circumstances. *See* N.J. Stat. Ann. § 12A:9-626(a)(3).

Where no mandatory offset provision exists, state commercial codes diverge as to how statutory damages are impacted when a secured party asserts a counterclaim for an underlying deficiency. With respect to such counterclaims, Florida's Commercial Code, for example, adopts a "rebuttable presumption" rule where the secured party must prove that its alleged noncompliance with the commercial code did not prejudice the individual borrower to recover the deficiency. *See* Fla. Stat. Ann. § 679.626(3). And Florida's rebuttable presumption approach contrasts with, for example, Pennsylvania's rebuttable presumption rule as developed through case law, which requires the secured party to prove that its alleged noncompliance did not affect the commercial reasonableness of the subsequent auction or sale of the collateral. *See infra* 40. These rebuttable presumption approaches stand in marked contrast to the approach taken by Maine, which has adopted an "absolute bar rule" under which the secured party's failure to comply with the commercial code precludes the recovery of any deficiency. *See* Me. Rev. Stat. Ann. tit. 11 § 9-1626(2)(c).

In many instances, a secured party, such as M&T, already has obtained judgments against the borrower for the deficiency balance and, as a result, the borrower asserting a claim against the secured party may be subject to set-off defense for the amount of the existing judgment. Alternatively, in such a situation, a borrower may be subject to a *res judicata* (or claim preclusion) defense based on the borrower's failure to assert the notice claim in the earlier deficiency action, depending upon the contours of the state's *res judicata* law. Thus, claims for statutory damages under individual state commercial codes are highly idiosyncratic claims that require consideration of multiple legal and factual issues.

**Bankruptcy Issues Are Real And Complicated.**  Finally, the defaulting debtors in many instances filed for bankruptcy protection after the repossessions occurred and notices were sent. The potential for a bankruptcy case to affect the putative class members' claim and the creditor's ability to pursue any deficiency is a highly fact-dependent inquiry that would need to be conducted with respect to each claimant across 21 states.  Ryan Decl. ¶¶ 25-26.

**B.      The Evidentiary Record As To Mr. Pinks Confirms The Individualized Nature Of Plaintiff's South Carolina Claim And M&T's Defenses.**

The highly idiosyncratic nature of the individual state commercial code claims relating to post-repossession notices is evidenced by Plaintiff's individual claim under South Carolina law. Plaintiff admitted at his deposition that he never had any intention of making payments in connection with the transaction at issue, he explicitly requested that M&T repossess the collateral, and he did not even look at the post-repossession notice that M&T sent to him.  He also admitted that if he had reviewed the notice, it provided him all the information he would have needed to redeem the collateral.  And, in a particularly unique fashion, Plaintiff listed his post-repossession notice claim in a previous bankruptcy proceeding as being worth much less than he currently demands.

**1.      Mr. Pinks Is A Named Plaintiff Without Any Knowledge Of His Claim Against M&T.**

Plaintiff Jerry Pinks resides in Bluffton, South Carolina.  Declaration of Roy W. Arnold ("Arnold Decl."), Ex. 8 at 14:14-19.[7]  He is a retired former truck driver who dropped out of high school and later earned his GED.  *Id.* at 5:2-10; 8:21-9:17.  Since retiring in 2003 due to a heart condition, Mr. Pinks has received social security disability income of approximately $1,300 per

---

[7]      Exhibits 1 through 7 are attached to the Declaration of Michael P. Ryan; Exhibits 8 through 27 are attached to the Declaration of Roy W. Arnold.

month.  *Id.* at 12:13-13-7; 17:24-19:3.  He cannot testify in his own words what he believes his claim is about.  *Id.* at 76:6-77:5.  He "leave[s] everything in [his] attorney's hands" because "I don't have any idea" what the claim is about.  *Id.* at 98:23-99:4.  Mr. Pinks has no knowledge regarding the basis for his claim or the amount of money claimed.  *Id.* at 95:8-12; 96:18-97:4; 98:18-99:5.  At his deposition, Mr. Pinks admitted that he had never read the complaint in its entirety.  *Id.* at 86:21-88:12.  He has no knowledge of any other transactions in South Carolina or any other state.  *Id.* at 93:18-94:18.  When asked about his understanding of his duties to the putative class members, he testified that he merely had to be "fair, honest, and legal."  *Id.* at 92:16-93:17.

### 2. In August 2008, Mr. Pinks Obtains Financing To Purchase A 2009 Big Country Fifth Wheel Trailer For His Daughter With No Intent To Repay The Debt Personally.

On August 6, 2008, Mr. Pinks purchased a 2009 Big Country fifth wheel trailer from Boat-N-RV Megastore in Ridgeland, South Carolina.  *Id.* at 25:8-21.  At the time of the purchase, Mr. Pinks resided in Bluffton, South Carolina.  *Id.* at 25:22-26:4.

On the credit application relating to the purchase, Mr. Pinks represented that he had $20,000 in annual income (even though he was receiving only $1,300 per month in disability benefits, *id.* at 17:24-19:3), and $36,000 of "other income," which was based on his wife's income even though she was not applying for credit, *id.* at 26:24-28:1; Ex. 9.  Mr. Pinks financed the purchase of the Big Country trailer with a retail installment contract and security agreement governed by South Carolina law.  Ex. 8 at 23:13-24:6; 26:12-23; 28:11-21; Ex. 2.  The Big Country trailer retail installment contract and security agreement was assigned from Boat-N-RV Megastore to M&T Bank.  Compl. (Dkt. 1) ¶ 11; Answer (Dkt. 38) ¶ 11.

At his deposition, Mr. Pinks admitted that he purchased the Big Country trailer for his daughter, Deanna, and then son-in-law, Paul Ray Marshall, because their credit was "too bad."  Ex. 8 at 23:13-24:6; 26:12-23.  Under the terms of the installment contract, Mr. Pinks was required to

pay 240 monthly payments in the amount of $496.65, or a total amount of $119,676.  *Id.* at 29:2-25;

Ex. 2.  However, Mr. Pinks testified that he had no intention of making the payments, did not have

sufficient income to make the payments, and did not intend to live in or use the Big Country trailer.

Ex. 8 at 30:1-20; 31:5-14.  He expected his daughter and son-in-law to "live in" the trailer and make

"all" the monthly payments.  *Id.* at 30:17-20.

### 3. In October 2008, Mr. Pinks Obtains Financing To Purchase A 2008 Yellowstone Motor Home Without The Ability To Repay The Debt.

Less than three months after purchasing the Big Country trailer, on October 22, 2008, Mr.

Pinks purchased a 2008 Yellowstone motor home from Boat-N-RV Megastore in Ridgeland, South

Carolina, the same seller from whom he recently purchased the Big Country trailer.  *Id.* at 32:3-33:9;

Ex. 10.  Mr. Pinks still resided in Bluffton, South Carolina.  Ex. 10.

On the credit application relating to the purchase, Mr. Pinks represented that he had $20,400

in annual income, and $53,000 of "other income."  Ex. 8 at 37:12-38:5; Ex. 11.  The other income

was again based on his wife's income even though she was not applying for credit.  Ex. 8 at 37:12-

38:5.  Mr. Pinks financed the purchase of the Yellowstone motor home with a motor vehicle

installment sale contract with M&T Credit Corporation.  Ex. 10.  Under the terms of the installment

contract, Mr. Pinks was required to pay 240 monthly payments in the amount of $505.37, or a total

amount of $121,289.  *Id.*

Within hours of buying the Yellowstone motor home, Mr. Pinks concluded that he could

not afford it.  Ex. 8 at 35:3-37:7.  Additionally, his wife was not with him when he purchased it and

he learned that "she didn't like it" when he went home.  *Id.* at 36:16-23.

4.     **In December 2008, M&T Repossesses The Yellowstone Motor Home At Mr. Pinks' Request.**

Mr. Pinks never made a single monthly payment on the installment contract for the Yellowstone motor home.  *Id.* at 39:14-21. Within two months of the purchase, on December 22, 2008, Mr. Pinks wrote to M&T and requested that it repossess the motor home because he was unable to afford the payments.  *Id.* at 40:3-17; 41:19-42:1; Ex. 12.  Mr. Pinks' handwritten letter informed M&T that "only twelve hours after purchasing this vehicle I [tried] to cancel this transaction with Boat & RV Megastore but to no avail."  Ex. 12.  He continued:  "Due to fact that my only income comes from social security disability in the amount of $1,304.00 per month I was deemed permanent[ly] and totally disabled in 2003.  There is no way that I can afford to pay for this motor home so I would like to voluntarily surrender this vehicle" to M&T.  *Id.*; Ex. 8 at 41:19-25; 42:1-18; 43:1-16.  It was Mr. Pinks' intention that M&T repossess the motor home and sell it to recover whatever it could.  Ex. 8 at 39:6-13.  M&T did as he requested; he gave M&T the keys and the gentleman drove off with the motor home just as Mr. Pinks wanted.  *Id.* at 43:3-16.

After M&T repossessed the Yellowstone motor home per his request, it sent Mr. Pinks a Notice of Repossession and Sale of Merchandise dated January 3, 2009 itemizing the past due payments on the loan ($505.37), accrued late charges ($14.50), repossession fees ($325.00), and total amount due ($844.87).  *Id.* at 43:25-45:18; Ex. 13.  Mr. Pinks did not call M&T with any questions regarding the letter, and he understood after reading the letter that he would have to pay M&T $844.87 if he wanted to get the motor home back.  Ex. 8 at 46:1-12; 50:8-10.  However, he had no intention of redeeming the vehicle because he could not afford it.  *Id.* at 46:13-16.

After the Yellowstone motor home was sold at a private auction on July 16, 2009, a deficiency balance of $29,823.31 remained due and owing by Mr. Pinks to M&T.  *Id.* at 47:17-48:20;

Ex. 4.  The Notice of Sale sent to Mr. Pinks accurately informed him of the "Total Amount Due/Deficiency."  *Id.*; Ryan Decl. ¶ 13.

> **5.      In July 2010, M&T Repossesses The Big Country Trailer At Mr. Pinks' Request After His Daughter's Divorce.**

On July 19, 2010, like he did with the voluntary surrender of the motor home, Mr. Pinks wrote to M&T and requested that it repossess the Big Country trailer because his daughter and son-in-law divorced, they had stopped making the monthly payments and Mr. Pinks did not have sufficient income to make the payments.  Ex. 8 at 51:21-53:25; 54:13-54:16; Ex. 14.  In his second handwritten letter to M&T, Mr. Pinks explained that he was "authorizing M&T Bank to repossess on Fifth Wheel Camping Trailer."  Ex. 8 at 51:21-53:2; Ex. 14.  He also admitted: "This item was purchased for my daughter and son in law who have now got divorced and quit making the payments on it.  I myself cannot make the payments due to fact that I am on total and permanent disability and my only source of income is social security disability."  Ex. 8 at 51:21-53:2; Ex. 14.

From October 2008 until July 2010, Mr. Pinks never personally made a single payment on the Big Country trailer.  Ex. 8 at 30:6-30:20; 31:1-14.  He did not want the Big Country trailer and did not want to make the payments.  *Id.* at 64:1-8.  After M&T repossessed the Big Country trailer per his request, it sent Mr. Pinks a Notice of Repossession and Sale of Merchandise ("Notice") dated July 29, 2010 itemizing the past due payments on the loan ($990.50), accrued late charges ($138.25), repossession fees ($1,000.00), and total amount due ($2,128.75).  Ex. 8 at 58:11-59:12; Ex. 1.  Mr. Pinks did not "even pay attention" to the Notice because he could not afford to redeem the vehicle or make the monthly payments.  Ex. 8 at 59:13-60:1; 64:1-8.  However, had he read the Notice, he admitted that it provided him with the past due amounts owed to M&T.  *Id.* at 60:7-13.

The Notice accurately stated the past due payments on the loan, accrued late charges, repossession fees, and total amount due as of July 29, 2010.  Ryan Decl. ¶ 4.  The amounts listed in

the Notice were the actual unpaid amounts due and owing as of that date. *Id.* ¶ 5. Under the terms of Mr. Pinks' applicable installment contract, the total debt under the contract was not automatically accelerated upon default. *Id.* ¶ 6. Instead, M&T had the option to accelerate the debt. *Id.* M&T did not immediately accelerate Mr. Pinks' debt after the repossession and as of July 29, 2010 in order to provide Mr. Pinks with a better opportunity to cure his default and redeem the trailer. *Id.* ¶ 7. M&T provided an actual accounting free of charge in the Notice because, based on its experience, the actual accounting provides a customer with the necessary information to allow him or her to promptly redeem the repossessed vehicle, if he or she so desires. *Id.* ¶ 9.

M&T accelerated Plaintiff's total debt in connection with the September 15, 2010 auction of the trailer. *Id.* ¶ 8. After the Big Country trailer was sold at a private auction on September 15, 2010, a deficiency balance of $41,963.82 remained due and owing by Mr. Pinks to M&T. Ex. 8 at 61:4-62:21; Ex. 3. The Notice of Sale sent to Mr. Pinks accurately informed him of the "Total Amount Due/Deficiency." Ryan Decl. ¶ 11; Ex. 3. Mr. Pinks has no personal knowledge about the circumstances surrounding the sales of the Big Country trailer or the Yellowstone motor home. Ex. 8 at 63:14-23. Mr. Pinks was "hoping" that the sale proceeds would offset the debt owed on the Big Country trailer. *Id.* at 63:3-13.

**6.    In January 2012, Mr. Pinks Files Bankruptcy To Avoid The Deficiencies Owed To M&T.**

On January 20, 2012, Mr. Pinks filed for chapter 7 bankruptcy in the United States Bankruptcy Court for the District of South Carolina.[8] *Id.* at 64:14-16; 70:16-23; Ex. 15.[9] His

---

[8]    The bankruptcy filing included Mr. Pinks' wife, Kathleen Wendy Pinks. Ex. 15 at 1. Mr. Pinks has filed for chapter 7 bankruptcy three times. Ex. 8 at 21:9-14. Mr. Pinks filed for chapter 7 bankruptcy in 1997 and 2003 in Michigan. *Id.* at 21:15-22:3; Ex. 16; Ex. 17. He received discharges in both proceedings. Ex. 8 at 22:9-13. He testified that he had to wait until 2012 to file bankruptcy to allow seven years to pass after the prior filing. *Id.* at 65:18-25.

bankruptcy petition was filed by attorney Philip Fairbanks, who is also representing Mr. Pinks in this case. Ex. 8 at 70:24-71:1; Ex. 15 at 2. In the petition, Mr. Pinks listed a "Potential UCC Notice Claim Against M&T Bank" as "Other personal property of any kinds not already listed," and he assigned a current value of "Unknown" to the purported claim. Ex. 8 at 73:6-9; Ex. 15 at 14. Mr. Pinks claimed an exemption of $4,850 on the purported claim. Ex. 15 at 16. Other than knowing that the purported claim relates to the Big Country trailer, Mr. Pinks has no knowledge of the claim, including any knowledge regarding the claim's value. Ex. 8 at 76:6-77:10. The bankruptcy petition also listed a deficiency balance owed to M&T on the Big Country trailer in the amount of $41,963.82. Ex. 8 at 77:11-78:2; Ex. 15 at 20.[10]

### 7.   Mr. Pinks, Through Counsel, Affirmatively Represents That His Claim Had A Value Less Than $5,000.

At the March 1, 2012 Meeting of Creditors and Examination of Debtor, in response to the chapter 13 trustee's question "Do you have any lawsuits you could file to collect money from someone else?," Mr. Pinks responded "No." Ex. 8 at 77:11-78:2; Ex. 18 at 6:13-15. However, Mr. Fairbanks interjected and represented: "we have listed on the schedule as they have a potential UCC notice claim. We believe that's worth about under $5,000. There's a $39,000 deficiency claim against which it would be set off." Ex. 18 at 6:17-21. Immediately after hearing those representations, the Chapter 13 trustee declared the bankruptcy a "no asset case" and "abandon[ed] the schedule[d] property," including Mr. Pinks' "Potential UCC Notice Claim Against M&T Bank." *Id.* at 7:3-5. Mr. Pinks received a discharge on May 1, 2012. Ex. 19 at 4; Ex. 20; Ex. 8 at 80:4-8. As

---

[9]       The court can take judicial notice of the filings made in the bankruptcy. *See In re Old Carco LLC*, 509 F. App'x 77, 79 (2d Cir. 2013) (bankruptcy and district courts properly took judicial notice of debtor's bankruptcy filings); *In re F.C.C.*, 208 F.3d 137, 138 (2d Cir. 2000) (taking judicial notice of bankruptcy court filing); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 584 (S.D.N.Y. 2002) (Kaplan, J.) (taking judicial notice of electronic bankruptcy filings).

[10]      Mr. Pinks also listed a deficiency balance of $39,320.59 owed to M&T on the installment contract relating to the Yellowstone motor home. Ex. 8 at 79:19-80:3; Ex. 15 at 21.

a result, the deficiency balances that Mr. Pinks owed to M&T relating to the Big Country trailer and Yellowstone motor home were extinguished.  Ex. 20.

While the bankruptcy proceeding was pending, on April 6, 2012, Mr. Pinks executed an Authority to Represent pursuant to which he hired Frederick M. Corley, Philip Fairbanks and Kathy Lindsay to "represent me in my claim against M&T Bank of Buffalo, New York, concerning defective notice of disposition of collateral."  Ex. 8 at 83:10-84:13; Ex. 21.  Mr. Pinks agreed to "serve as the named class representative in the event that a class action is filed by my attorneys."  Ex. 21.

### 8.      Mr. Pinks Files His Putative Nationwide Class Action Complaint In The Southern District Of New York Demanding Over $70,000 For Himself.

On March 14, 2013, Mr. Pinks filed his putative class action complaint in which he alleges a violation of the South Carolina Commercial Code relating to the Notice sent by M&T in connection with the repossession of the Big Country trailer.  Compl. (Dkt. 1) ¶¶ 33-35.  He seeks to recover "statutory damages" only.  *Id.* ¶¶ 21, 35.  He alleges no actual harm or actual damages.  While he valued his statutory damages claim in the bankruptcy proceeding at less than $5,000, his Complaint seeks recovery of $70,144.20.  *Id.* ¶ 21.

Although (1) he is a South Carolina resident who expressly asserts a claim under the South Carolina Commercial Code; (2) the Big Country trailer was purchased, financed and repossessed in South Carolina; and (3) he has had no dealings with M&T outside of South Carolina, Mr. Pinks alleged in this Complaint that he was seeking to represent a putative nationwide or multi-state class.  Compl. (Dkt. 1) at ¶ 26.  Mr. Pinks has admitted that he has no claim under any other state's law.  Dkt. 56 at 4 ("It is undisputed that he would lack Article III standing to bring a UCC claim under any other states' laws in his own right.").

**9.     M&T Seeks To Reopen Mr. Pinks' South Carolina Bankruptcy Proceeding.**

Based on Mr. Pinks' inconsistent valuation of his claim in his bankruptcy case, on October 31, 2014, M&T filed a motion to reopen Mr. Pinks' bankruptcy.  Ex. 19 at 4; Ex. 22.  M&T sought to reopen his bankruptcy case so that Mr. Pinks' claim could be administered by a Chapter 7 trustee for the benefit of the creditors in the bankruptcy.  Ex. 22.

In response to M&T's motion to reopen, Attorney Fairbanks submitted a letter to the court in which he articulated his previously undisclosed rationale for his valuation of Mr. Pinks' claim.  Ex. 23 at 3-5.[11]  In doing so, Attorney Fairbanks admitted that it was appropriate to offset the deficiency still owed to M&T, as well as corresponding costs and attorney's fees, against any potential recovery received by Mr. Pinks.  *Id.* at 3-4.  M&T's motion to reopen was denied by the bankruptcy court and affirmed on appeal under an abuse of discretion standard.  *See* Ex. 24.

**10.     Class Certification Discovery Is Completed.**

Pursuant to the Court's April 20, 2016 Order, all discovery pertaining to Plaintiff and class certification has been completed.  Dkt. 136.  During discovery, M&T provided Plaintiff with a spreadsheet containing information for all M&T customers in South Carolina whose consumer goods collateral was repossessed and sold during the period from March 14, 2010 until June 24, 2012.[12]  Ryan Decl. ¶¶ 14-17, 19-21; Dkt. 77-1 Ex. A.[13]  The information was obtained from M&T's

---

[11]     The Trustee participated in the hearing on the motion to reopen by telephone.  As the Trustee explained to the bankruptcy court, based on Attorney Fairbanks' representations during the § 341 meeting, she viewed this as "a $5,000 claim with a $4,850 exemption," meaning that she was "looking at a net $150 estate asset, which was clearly inconsequential."  Ex. 25 at 37:9-12.  The Trustee also advised the court:  *"I did not understand that Mr. Fairbanks was giving me some net figure on value.  There was no indication of that to me."  Id.* at 37:13-14 (emphasis added).

[12]     Per Plaintiff's request, the South Carolina transaction information excluded customers who were discharged in bankruptcy or against whom a judgment has been obtained or was pending.  Ryan Decl. ¶ 18 and Ex. 5.  M&T reserved its defense based on the shorter one year limitations period under South Carolina law.  Ex. 26 at 11.

electronic customer information system and a manual examination of individual customer transactions records.  Ryan Decl. ¶ 16; Dkt. 77-1 Ex. A.

The South Carolina information was provided after months of investigation and review of individual customer transaction files.  Ryan Decl. ¶ 17.  The spreadsheet demonstrates that there is substantially less than $5 million at issue with respect to the putative South Carolina class.  *Id.* ¶ 15; Dkt. 77-1 Ex. A; *see also* Dkt. 85.[14]  M&T also provided Plaintiff with the documentation (redacted to protect confidential personally-identifying customer information) underlying the information set forth in the spreadsheet.  Ryan Decl. ¶ 21; Ex. 6.  The spreadsheet along with the underlying documentation produced to Plaintiff conclusively establish that less than $5 million is at issue with respect to the putative South Carolina class.  Ryan Decl. ¶ 15; Ex. 7.  Plaintiff has not disputed this fact, and he can produce no evidence to the contrary.

The South Carolina spreadsheet provided to Plaintiff also demonstrates that 172 of the 176 repossession transactions (97.72%) still owe M&T a deficiency balance as to which M&T can file a claim or counterclaim.  *Id.* ¶ 22 and Ex. 7.

Per Plaintiff's request and in order to resolve the parties' discovery disputes, M&T also provided Plaintiff with the number of items of consumer goods collateral that was repossessed by M&T following a customer default prior to June 25, 2012 and then sold on or after March 14, 2010 in 44 states and the District of Columbia.  Ex. 26 (filed under seal).  A review of individual customer files underlying these transactions would be necessary in order to determine with certainty the notice

---

[13]   M&T is submitting an authenticated copy of the spreadsheet of "Confidential" South Carolina customer information under seal for the Court's review.  Ryan Decl. ¶ 20 and Ex. 7 (filed under seal).

[14]   The underlying calculation of statutory damages under Section 36-9-625(c)(2) of the South Carolina Code and the, at most, three-year statute of limitations applicable to the South Carolina claims are set forth in M&T's Supplemental Brief in Support of Motion to Stay Regarding Amount in Controversy (Dkt. 85) (the "Supplemental Brief"), Ex. 27.

of repossession that was sent to each particular customer. *See id.* By agreement, the information provided by M&T did not exclude customers who filed for and were discharged from bankruptcy following the repossession and sale of the consumer goods collateral. *Id.*; Ryan Decl. ¶ 24.

To determine whether a particular customer who filed for bankruptcy and received a discharge scheduled a claim against M&T relating to the sufficiency of the notice of repossession sent by M&T, the parties would need to: (a) conduct an individual bankruptcy filing search for each customer; and (b) analyze the docket and filings of each bankruptcy case to determine whether a claim against M&T was scheduled and, if so, whether that claim was abandoned by the bankruptcy estate. Ex. 26; *see also* Ryan Decl. ¶ 25. Any such review of individual bankruptcy dockets and filings would be enormously time consuming and expensive, and any disputes or disagreements would require adjudication in mini-trials. Ex. 26; Ryan Decl. ¶ 26. Further, the information provided by M&T did not exclude persons from whom M&T has obtained a release or a signed statement renouncing the right to be sent a notification of disposition pursuant to applicable state law. Ryan Decl. ¶ 27. A review of individual customer files underlying the transactions would be necessary to determine with certainty whether M&T has obtained a release or a signed statement renouncing the right to be sent a notification of disposition pursuant to applicable state law from a particular customer. *Id.* ¶ 28.

### 11. Plaintiff Files His Motion For Class Certification, Jettisoning Putative Class Members In 24 States.

On May 17, 2016, Plaintiff filed his Motion and Brief. Dkt. 140-41. In support, Plaintiff filed a lawyer-drafted Declaration for himself and Declarations from his four lawyers. Dkt. 140, 143-47. No other evidence was submitted. Plaintiff also attached three Appendices, which included additional legal argument focusing on various potential state statutes of limitations in the 21 states, a copy of the model UCC and a summary chart of 21 distinct state statutes. Dkt. 148-1 to 148-3.

After taking discovery as to transactions in 44 states and the District of Columbia, Plaintiff abandoned any attempt to certify a class on behalf of customers in 24 states. *Compare* Dkt. 1 with Dkt. 142. He now seeks certification of an alleged "class" of debtors located in 21 states. In fact, Plaintiff's new proposed "class" is composed of 21 distinct putative statewide classes purportedly asserting claims under 21 different state statutes. Dkt. 142. Mr. Pinks admittedly has no ability to assert any claim personally under any state law other than South Carolina. Dkt. 56 at 4. He, therefore, is not a member of any putative class of persons outside of South Carolina.

Plaintiff's proposed "class" also contains multiple, independent exclusions that turn on the resolution of factual inquiries concerning prior lawsuits, judgments, bankruptcies, releases and renunciation statements. Dkt. 142. Plaintiff submitted no evidence in support of his standing. He also failed to address numerous individual state law issues, ignored the factual and legal defenses applicable to Plaintiff's claim and referred solely to the state statutory texts without regard to judicial developments or interpretations. Dkt. 142, 148.

## III.    APPLICABLE LEGAL STANDARDS[15]

The issue of standing is "jurisdictional" in nature. *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). The Court has a "continuing obligation to ensure its own jurisdiction[,]" *Mastafa v. Chevron Corp.*, 770 F.3d 170, 187 (2d Cir. 2014), and thus "[t]he question of the named plaintiff['s] standing is appropriate for resolution upon plaintiff['s] motion for class certification[,]" *Leber v. Citigroup 401(K) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 22 & n.7 (S.D.N.Y. 2015) (citing *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon* ("*Retirement Board*"), 775 F.3d 154, 161 (2d Cir. 2014)). "Any analysis of class certification must begin with the issue of standing." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000).

---

[15]    M&T has omitted references to internal citations and quotation marks from case citations.

"The class action is an exception to the usual rule that litigation is conducted on behalf of the individual named parties only." *Comcast v. Behrend*, 133 S Ct. 1426, 1432 (2013). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members" and "must affirmatively demonstrate his compliance" with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011). Specifically, the named plaintiff must demonstrate that the case satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and fits into at least one of three subsections of Rule 23(b). *Comcast*, 133 S. Ct. at 1432; *see also Johnson v. Nextel Comm'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

A district court must not grant certification unless satisfied, "after a rigorous analysis," that the plaintiff has demonstrated that the prerequisites of Rule 23 are met. *Comcast*, 133 S. Ct. at 1432. To conduct a rigorous analysis, the court should "probe behind the pleadings," *id.*, to make a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues," and "may certify a class only after [it] . . . resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." *In re Initial Pub. Offerings Sec. Litig. ("In re IPO")*, 471 F.3d 24, 41 (2d Cir. 2006). The class certification analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim … because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 133 S. Ct. at 1432. "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)[,]" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014), and it is well established that the court must consider potential defenses in

assessing typicality and predominance.  *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010).  Here, Plaintiff has failed to carry his evidentiary burden of proof under Rule 23.

## IV.   PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED, AND THIS ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

### A.   The Evidence Shows Plaintiff Lacks Standing To Represent The Putative Multi-State "Class."

To establish standing in a putative class action, a named plaintiff must show that he has (1) Article III standing; (2) statutory standing; and (3) class standing.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ("*NECA*"), 693 F.3d 145, 158 (2d Cir. 2012).  Each of these requirements is fundamental, independent and distinct.  *See id.*  Plaintiff fails to satisfy all three requirements.

Plaintiff lacks Article III standing to assert his South Carolina Code claim because he has failed to show a concrete injury-in-fact.  Separate and apart from Plaintiff's lack of standing to assert a South Carolina claim, Plaintiff lacks Article III standing with respect to claims under the laws of states other than South Carolina because he does not reside in, and he has no cause of action under the laws of, those states.  *See infra* Part IV.A.1.b.

Because Plaintiff does not claim to have been injured under any state's law other than South Carolina, he also lacks *statutory* standing with respect to claims under the laws of states other than South Carolina.  *See infra* Part IV.A.2.  And, because the putative class claims arise under 21 different state causes of action that were created by 21 different state legislatures—all of which have been interpreted by state and federal courts in different ways—Plaintiff's South Carolina claim does not implicate the same set of concerns as the putative class claims, and thus Plaintiff also lacks *class* standing with respect to claims under the laws of states other than South Carolina.  *See infra* Part IV.A.3.

As a consequence of Plaintiff's lack of standing to assert claims under the laws of states

other than South Carolina, his Motion requesting certification must be denied.  And, because he can,

at most, pursue a South Carolina claim, this Court lacks subject matter jurisdiction over this action.

For subject matter jurisdiction, Plaintiff relies exclusively on the Class Action Fairness Act

("CAFA"), 28 U.S.C. § 1332(d)(2)(A), which establishes jurisdiction in the federal district courts

where, *inter alia,* "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of

interest and costs."  Because Plaintiff lacks standing to assert claims under the laws of states other

than South Carolina, and the amount-in-controversy with respect to the claims under South Carolina

law is less than $5 million, this Court lacks subject matter jurisdiction over the purported South

Carolina class claims.  *See* Dkt. 85 & 88; Ryan Decl. ¶ 15 & Ex. 7; *see also Falcon v. Philips Elecs. N.*

*Am. Corp.,* 489 F. Supp. 2d 367, 369 (S.D.N.Y. 2007) (dismissing for lack of subject matter

jurisdiction under CAFA after denying class certification), *aff'd,* 304 F. App'x 896 (2d Cir. 2008).

Thus, Plaintiff's lack of standing, as detailed below in Part IV.A., provides the Court with a

distinct basis to deny certification and dismiss this case in its entirety.

### 1.    The Evidence Shows That Plaintiff Lacks Article III Standing.

"The judicial power of the United States" extends only to "Cases" and "Controversies."

U.S. Const. Art. III, §§ 1 and 2.  Standing is a doctrine rooted in the traditional understanding of a

case or controversy.  *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016).  Article III standing consists

of three elements:  the plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to

the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision.  *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992).  Plaintiff, as the party invoking

federal jurisdiction, bears the burden of establishing these elements.  *FW/PBS, Inc. v. City of Dallas,*

493 U.S. 215, 231 (1990).  Here, Plaintiff lacks Article III standing to assert his South Carolina Code

claim because he has failed to show a concrete injury-in-fact.  In addition, Plaintiff lacks Article III

standing with respect to claims under the laws of states other than South Carolina because he does not reside in those states and admittedly has no cause of action under the laws of those states.

      a.      **Plaintiff Lacks Article III Standing Because He Has No Concrete Injury-In-Fact.**

To establish injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized." *Lujan*, 504 U.S. at 560. The Supreme Court has "made clear time and time again that an injury in fact must be both concrete *and* particularized." *Spokeo*, 136 S. Ct. at 1548 (citing *Susan B. Anthony List v. Direhaus*, 134 S. Ct. 2334, 2341-42 (2014)). The Supreme Court recently emphasized that "a 'concrete' injury must be '*de facto*'; that is, it must actually exist[,]" and that "[w]hen we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Spokeo*, 136 S. Ct. at 1548.

"Article III standing requires a concrete injury even in the context of a statutory violation" and thus a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)); *see also Khan v. Children's Nat'l Health Sys.*, 2016 WL 2946165, at *7 (D. Md. May 19, 2016) (citing *Spokeo* and finding "no authority for the proposition that a state legislature or court, through a state statute or cause of action, can manufacture Article III standing for a litigant who has not suffered a concrete injury"); *Smith v. Ohio State Univ.*, 2016 WL 3182675, at *4 (S.D. Ohio June 8, 2016) (applying *Spokeo* to dismiss for lack of standing where "Plaintiffs admitted that they did not suffer a concrete consequential damage").

Here, Plaintiff has suffered no concrete harm that satisfies the injury-in-fact requirement of Article III. After Plaintiff purchased the Big Country fifth wheel trailer and financed the purchase with a retail installment contract, Plaintiff wrote to M&T and explained that he was "authorizing

M&T Bank to repossess on Fifth Wheel Camping Trailer." Ex. 14.  In the letter, Plaintiff admitted that "[t]his item was purchased for my daughter and son in law who have now got divorced and quit making the payments on it.  I myself cannot make the payments due to fact that I am on total and permanent disability and my only source of income is social security disability."  *Id.*; Ex. 8 at 51:21-53:2.

After repossessing the Big Country trailer per Plaintiff's request, M&T sent Plaintiff a Notice dated July 29, 2010 itemizing the past due payments on the loan, accrued late charges, repossession fees, and total amount due.  Ex. 8 at 58:11-59:12; Ex. 1.  Plaintiff did not "even pay attention" to the Notice because he could not afford to redeem the vehicle or make the monthly payments.  Ex. 8 at 59:13-60:1; 64:1-8.  And, of course, Plaintiff's deficiency on the Big Country trailer was extinguished in his bankruptcy.  Ex. 20.  Despite these facts and the complete lack of any concrete injury, Plaintiff has brought suit on the theory that M&T violated S.C. Code Ann. § 36-9-613(1)(D) and § 36-9-614(1)(A) by not providing him a post-repossession notice stating that he had a right to an accounting.  Compl. (Dkt. 1) ¶ 18.  Plaintiff alleges only that he is entitled to "statutory damages."  *Id.* ¶ 21.

Because Plaintiff requested that M&T repossess the Big Country trailer, did not pay attention to M&T's notice, had no intention of making payments on the trailer, and his deficiency had been extinguished, Plaintiff fails to overcome his burden of showing "de facto" and "real" harm.  *See Spokeo*, 136 S. Ct. at 1548.  Plaintiff's claim amounts to an allegation that M&T committed a technical, procedural violation of the South Carolina Code and should pay him "statutory damages."  However, as the Supreme Court has emphasized, "Article III standing requires a concrete injury even in the context of a statutory violation" and thus a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of

Article III." *Spokeo*, 136 S. Ct. at 1549.  Accordingly , the evidence demonstrates that Plaintiff lacks

Article III standing because he has no concrete injury-in-fact.

> **b.** **Plaintiff Lacks Article III Standing To Assert Claims Under The Laws Of States Other Than South Carolina.**

In addition to Plaintiff's lack of Article III standing to assert his South Carolina claim,

Plaintiff lacks Article III standing to assert claims under the laws of states other than South Carolina.

It is well-established that a plaintiff "must demonstrate [Article III] standing for each claim he seeks

to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  The fact that a suit is a putative

class action does not change the Article III requirement.  *Lewis*, 518 U.S. at 357.  "[Rule 23] cannot

alter a constitutional requirement.  It is well established that a plaintiff must demonstrate standing

for each claim he seeks to press.  Thus, *with respect to each asserted claim*, a plaintiff must always have

suffered a distinct and palpable injury to [him]self."  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d

Cir. 2012); *see also* 28 U.S.C. § 2072(b) (Rules Enabling Act).

Courts of this district dutifully have applied these foundational principles, concluding

repeatedly that a named plaintiff lacks Article III standing when he or she attempts to assert claims

under the laws of states in which the named plaintiff does not reside.  *See, e.g.*, *Simington v. Lease Fin.*

*Grp., LLC*, 2012 WL 651130, at *9 (S.D.N.Y. Feb. 28, 2012) ("Plaintiffs do not have an injury

traceable to conduct that occurred in any other state than those in which they conduct business and

thus, they cannot assert a [class] claim under those states' consumer fraud statutes."); *Jurgensen v. Felix*

*Storch, Inc.*, 2012 WL 2354247, at *10 (S.D.N.Y. June 14, 2012) ("It is well settled that plaintiff does

not have standing to bring [class] claims for violations of consumer fraud statutes of states other

than Washington—*i.e.*, the state where she resides.").[16]

---

[16]    The same goes for other district courts within the Second Circuit.  *See, e.g., Richards v. Direct*
*Energy Servs., LLC*, 120 F. Supp. 3d 148, 155-56 (D. Conn. 2015) (dismissing claims of named

Plaintiff erroneously has contended, however, that the Second Circuit departed from past precedent with its decision in *NECA*, and has argued that *NECA* stands for the proposition that a named plaintiff satisfies the Article III inquiry as long as he has Article III standing to assert his own claim against the defendant, irrespective of a lack of standing to pursue other independent claims of putative class members. *See* Dkt. 56 at 1-2. The Second Circuit in *NECA*, however, did not purport to overrule past precedent. In *NECA*, unlike in this case, it was clear that the named plaintiff satisfied the Article III standing requirement with respect to **all** asserted claims. While the plaintiff in *NECA* sought to represent individuals whose claims were based on the *same* law under which the plaintiff's own claim arose—that is, the federal Securities Act of 1933—Plaintiff here is attempting to represent individuals whose claims are based on laws *different* than the law under which Plaintiff's own claim arises.

Since *NECA* was decided, a number of district courts within the Second Circuit have held that *NECA* does not stand for the proposition that a named plaintiff satisfies the Article III inquiry as long as he or she has Article III standing to assert his or her own claim against the defendant.

---

plaintiff asserted under law of state in which he did not reside and concluding that plaintiff's "plan to seek class certification at some point during this lawsuit does not relieve him of the burden of pleading facts that show he has standing personally with respect to all claims in his Complaint at this time"); *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 139-40 (D. Conn. 2015) (same); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 250-51 (D. Conn. 2015) (granting motion to dismiss putative class "claims under the laws of states (or territories) where the named indirect-purchasers do not allege to have suffered injury"); *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 49-50 (E.D.N.Y. 2014) ("[T]he Court finds that the Plaintiffs may only assert a state [class] claim if a named plaintiff resides in, does business in, or has some other connection to that state."); *Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264, 274-75 (E.D.N.Y. 2010) (dismissing named plaintiff's putative class claim under Connecticut law and agreeing with defendant that "the plaintiff has no standing to assert this cause of action, because he neither lives in Connecticut nor claims that he was damaged there"); *Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154, at *8 (E.D.N.Y. Sept. 25, 2007) (dismissing claims for lack of subject matter jurisdiction where named plaintiffs were only residents of Tennessee and thus had "no standing to bring claims for injuries under the laws of the non-Tennessee states"); *Parks v. Dick's Sporting Goods, Inc.*, 2006 WL 1704477, at *3 (W.D.N.Y. June 15, 2006) (named plaintiff lacked standing under other states' laws and certification motion was irrelevant).

*See Richards*, 120 F. Supp. 3d at 153-56; *Edwards*, 120 F. Supp. 3d at 139-40; *In re Aggrenox*, 94 F. Supp. 3d at 250; *In re HSBC*, 1 F. Supp. 3d at 49; *Oklahoma Police Pension & Ret. Sys. v. U.S. Bank Nat. Ass'n* ("*Oklahoma Police*"), 986 F. Supp. 2d 412, 419 (S.D.N.Y. 2013). Notably, in *Oklahoma Police*, the court rejected the plaintiff's argument that the Second Circuit in *NECA* held that a "similar injury" suffered by potential members of a class is sufficient to rescue a claim from dismissal for lack of standing when the named plaintiff had no such claim. 986 F. Supp. 2d at 418.

In rejecting this argument, the court recognized that "the claims that the plaintiff in *NECA* sought to bring on behalf of others were the **same** Securities Act claims that the plaintiff itself had standing to bring." *Id.* at 418-19 (emphasis added). The court concluded that "there is no case law supporting the plaintiff's theory that a plaintiff can pursue a claim that it does not have on behalf of a class simply because the plaintiff suffered a 'similar injury' for a different claim." *Id.* at 419; *see also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d at 250-51 (rejecting plaintiffs' argument that *NECA* supported their position and dismissing "all claims under the laws of states (or territories) where the named [plaintiffs] do not allege to have suffered injury") (citing *Lewis*, 518 U.S. at 358 n.6 and *Mahon*, 683 F.3d at 64).

Plaintiff has had opportunities to address these cases, but he has provided the Court with no compelling reason why they should not be followed. He has contended that *In re Aggrenox* is not technically binding on this Court. However, the authorities upon which *In re Aggrenox* is based are binding on this Court, and numerous courts within the Second Circuit are in agreement with the *In re Aggrenox* court that *NECA* does not hold that a named plaintiff satisfies the Article III inquiry as long as he or she has Article III standing to assert his or her own claim against the defendant. *See Oklahoma Police*, 986 F. Supp. 2d at 418-19; *Richards*, 120 F. Supp. 3d at 153-56; *Edwards*, 120 F. Supp. 3d at 139-40; *In re HSBC*, 1 F. Supp. 3d at 49. Plaintiff also has argued that *Edwards* and *In re HSBC* are not controlling because they did not mention *NECA* or the separate class standing test.

- 26 -

However, in *In re HSBC* and *Edwards*, there was no need for the courts to address class standing because they never got past the threshold Article III issue.[17]

Thus, because Plaintiff is a South Carolina resident who cannot show that he was injured under the law of any state other than South Carolina, Plaintiff lacks Article III standing to assert non-South Carolina claims.

### 2. The Evidence Shows Plaintiff Lacks Statutory Standing To Assert Non-South Carolina Claims And He Is Not A Member Of 20 Of The Putative Statewide Classes.

Independently, Plaintiff lacks *statutory* standing with respect to claims under the laws of states other than South Carolina.  Plaintiff's admission that he does not possess any other state law claims is fatal.  *See* Dkt. 56 at 4.

The Second Circuit, in *NECA*, held that, in addition to Article III standing and class standing, a named plaintiff must pass the "statutory standing" test.  693 F.3d at 158.[18]  For statutory standing, the question is whether the plaintiff has a cause of action under the statute.  *Robainas v. Metro. Life Ins. Co.*, 2015 WL 5918200, at *5 (S.D.N.Y. Oct. 9, 2015) (quoting *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014)).  "In other words, statutory standing 'is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular

---

[17]     Here, the record shows that M&T previously did not raise the class standing or statutory standing issues, and the Court has not addressed these Article III cases.  M&T sought partial judgment on the pleadings due to Plaintiff's lack of Article III standing.  Dkt. 52-53.  Plaintiff raised arguments about class standing in opposition.  Dkt. 56, 66.  Magistrate Judge Ellis recommended dismissal due to lack of class standing.  Dkt. 89.  At the pleadings stage and solely on Plaintiff's objections, the Court reversed, expressly deferring its analysis of class standing until the class certification stage.  Dkt. 98.  When M&T moved for reconsideration and asked the Court to address the Article III standing issue, the Court denied reconsideration.  Dkt. 103.

[18]     In *NECA*, the named plaintiff possessed statutory standing to assert the claim under the Securities Act of 1933.

plaintiff's claim.'" *Robainas*, 2015 WL 5918200, at \*5 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014)); *see also Retirement Board*, 775 F.3d at 160 n. 5.

Here, Plaintiff **admittedly** seeks to bring claims based on 21 different state causes of action created by 21 different state legislatures. *See* Dkt. 148-3 (Pl. Appendix 3) (listing 21 different state statutes). At all relevant times, Plaintiff resided in South Carolina. He has statutory standing to bring a claim *solely* under the South Carolina Code, and he has made no evidentiary showing otherwise. Nor has he timely joined any other plaintiffs, and he is now foreclosed from doing so. *See* Dkt. 135. Because he can assert, at most, a claim under the South Carolina Code, certification should be denied on all non-South Carolina claims for lack of statutory standing.

A named plaintiff also "must be part of the class and possess the same interest and suffer the same injury as the class members." *Dukes*, 564 U.S. at 348-49 (quoting *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). Once the artifice of his purported "UCC" claim is dispensed with because no such statutory law has been enacted, it is undeniable that he has identified 21 distinct, putative statewide classes. With his fictional "class" revealed, it is clear that he is trying to hide the fact that he is not a member of 20 of the putative statewide classes. Because he is not a member of any class involving claims under other states' laws, Plaintiff cannot prosecute claims on behalf of putative class members who allegedly have claims under those other states' laws. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014); *see also Prado*, 221 F.3d at 1279-80; *In re Beacon Associates Litig.*, 2012 WL 1372145, at \*3 (S.D.N.Y. Mar. 19, 2012) ("[T]he named plaintiffs … are not therefore members of the proposed class and cannot, as a result, stand as its representatives."). Thus, because he is not a member of each state-wide putative class he seeks to represent, Plaintiff's Motion must be denied.

3.      **The Evidence Shows That Plaintiff Lacks Class Standing.**

Independently, Plaintiff lacks *class* standing with respect to claims under the laws of states other than South Carolina.

In a putative class action, a plaintiff must establish class standing by demonstrating "(1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA*, 693 F. 3d at 162. This two-part test addresses whether the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members, but it nonetheless "derives from constitutional standing principles" and is thus distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a). *Retirement Board*, 775 F.3d at 161. Plaintiff fails each prong of this two-part test.

*First*, Plaintiff has not shown that he suffered some "actual injury" as a result of the challenged Notice. Plaintiff contends that M&T allegedly committed a technical, procedural violation of the South Carolina Code and he seeks "statutory damages." *See* Compl. (Dkt. 1) ¶ 21. As explained in Part IV.A.1.a. *supra*, Plaintiff requested that M&T repossess the Big Country trailer, did not pay attention to M&T's notice, and admittedly had no intention of making payments for the trailer, and thus Plaintiff fails to overcome his burden of showing "de facto," "real," or "actual" harm. Accordingly, for the same reasons that Plaintiff has failed to show a "concrete" injury for purposes of Article III standing, Plaintiff also has failed to show that he suffered an "actual" injury for purposes of class standing.

*Second*, Plaintiff has not presented any evidence demonstrating that the challenged conduct implicates the same set of concerns as the conduct alleged to have caused any purported "actual" injury. This Court previously considered Plaintiff's alleged class standing at the pleadings stage and

reasoned that although "plaintiff's attempt to limit the class to persons in states that have enacted the relevant UCC sections in terms identical to those employed in South Carolina does not carry the day because, among other things, the statutes in states other than South Carolina are nonetheless separate statutes with separate interpretative jurisprudence[,]" the question of whether Plaintiff had come forward with sufficient proof of class standing and conduct that implicates the same set of concerns was an issue to be addressed at the class certification stage.  Dkt. 98 at 1-2.  Now, at the class certification stage, it is clear that Plaintiff lacks class standing because he has not proved that M&T's conduct "implicates the same set of concerns" amongst putative class members with claims under the laws of 21 different states.

Recently, in *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *18 (S.D.N.Y. Dec. 10, 2015), the court addressed a plaintiff's contention that he had class standing to represent putative class members on claims for which he lacked statutory standing because the class claims were similar to the claims for which he had statutory standing.  The court rejected the plaintiff's argument and determined that the plaintiff lacked class standing, reasoning that "plaintiff's lack of statutory standing … is dispositive." *Id.* (citing *Police & Fire Ret. Sys. of the City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013)).

Plaintiff also fails to prove conduct that implicates the same set of concerns because "each of [the] alleged injuries has the potential to be very different—and could turn on very different proof." *Retirement Board*, 775 F.3d at 161.  Plaintiff contends that "the UCC and its decisional law" are "uniform," Dkt. 148 at 13, but as this Court already has recognized, the putative class claims are not brought under the UCC, they are brought under different state enactments, and "the statutes in states other than South Carolina are nonetheless separate statutes with separate interpretative jurisprudence." Dkt. 98 at 1.  As this Court recognized in this case, there are "a number of areas in which identical provisions of the Uniform Commercial Code have been construed differently in

different states."  Dkt. 98 at 1 n.1.  Unlike Plaintiff's superficial assertion, this Court's accurate assessment is reinforced by multiple, well-reasoned decisions.  *See Oscar v. BMW of N. America,* 274 F.R.D. 498, 509 (S.D.N.Y. 2011); *Jenkins*, 2008 WL 781862, at *7; *Feinstein*, 535 F. Supp. at 605; *see also Stinnette v. Medtronic Inc.*, 2010 WL 767558, at *3 (S.D. Tex. Mar. 3, 2010) ("While the plaintiffs point out that each state … has adopted the corresponding Uniform Commercial Code (UCC) section for several of the claims, each state still may have its own interpretation of these UCC sections.").

As explained more fully below at pp. 37-42, the state notice provisions at issue, among other things, interact with and are affected by different state laws that often modify and sometimes supersede the commercial code notice provisions, and case law confirms that courts employ different interpretative canons and reasoning in determining whether the notice provisions have been violated and what a creditor must show to prevail on a deficiency claim following disposition of the collateral.  Despite the existence of decisions emphasizing these differences and the effect of state decisional law on the various statutes when it comes to the notice provisions, *see Jenkins*, 2008 WL 781862, at *7; *Henry*, 2007 WL 1053787, at *9, Plaintiff focused primarily on the text of the state notice provisions.  *See* Dkt. 148 at 1, 13.  But this analysis only scratches the surface of how these laws are applied.  Because of the differences in the 21 state laws, "each of [the] alleged injuries has the potential to be very different—and could turn on very different proof[,]" *Retirement Board*, 775 F.3d at 161; *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *8 (S.D.N.Y. Apr. 15, 2016), and thus M&T's alleged conduct does not implicate "the same set of concerns" across the classes Plaintiff seeks to represent.  Plaintiff therefore lacks class standing.

**B.     Plaintiff's Proposed "Class" Fails The Predominance Requirement Of Rule 23(b)(3).**

Where, as here, the principal relief sought is money damages, a proponent of class certification must satisfy Rule 23(b)(3) by showing that "the questions of law or fact common to

class members predominate over any questions affecting only individual members ('predominance'),
and that a class action is superior to other available methods for fairly and efficiently adjudicating the
controversy ('superiority')." *Berks Cty. Employees' Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533,
536 (S.D.N.Y. 2010).

Rule 23(b)(3) establishes "the court's duty to take a 'close look' at whether common
questions predominate over individual ones." *Comcast*, 133 S. Ct. at 1432. The predominance
requirement of Rule 23(b)(3) is "more demanding" than the commonality requirement of Rule 23(a)
because it requires more than the mere existence of common issues; instead, it requires the court to
inquire into "whether the common issues can profitably be tried on a classwide basis, or whether
they will be overwhelmed by individual issues." *Johnson*, 780 F.3d at 138. A court examining
predominance must assess: (1) the "elements of the claims and defenses to be litigated"; and
(2) "whether generalized evidence could be offered to prove those elements on a class-wide basis or
whether individualized proof will be needed to establish each class member's entitlement to relief." *Id.*

Here, a rigorous analysis shows that generalized evidence cannot be offered to prove the
elements of the claims and defenses on a class-wide basis because: (1) the nature of the proposed
"class"—with claims under the laws of 21 different states—raises a host of individual issues; (2) the
existence of compulsory counterclaims for deficiency balances creates individualized issues; and
(3) the existence of various defenses, including *res judicata,* set off and/or recoupment defenses for
judgments obtained after the complaint was filed, creates individualized issues.

1.    **The Nature Of The Proposed "Class"—With Claims Under The Laws Of 21
      Different States—Raises A Host Of Individual Issues.**

"When claims in a class action arise under state law—and the class comprises multiple
states—the court must consider whether different state laws will apply to different members of the
class." *Johnson*, 780 F.3d at 140. In making this determination, it is proper to apply "the choice-of-

law rules of the state in which the federal district court sits." *Id.* at 141; *In re Rezulin*, 210 F.R.D. at 69. "'In tort actions, if there is a conflict of laws, New York courts apply an interest analysis, under which the law of the jurisdiction having the greatest interest in the litigation is applied.'" *In re Rezulin*, 210 F.R.D. at 70 (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)). If there is "at least one actual conflict" between the laws of the various jurisdictions, then it is appropriate to proceed to an analysis of the jurisdiction having the greatest interest in each claim. *Johnson*, 780 F.3d at 142*; see also In re Rezulin*, 210 F.R.D. at 70.

Here, as explained below at pp. 37-45, there are multiple conflicts in the laws of the 21 states at issue. In particular, conflicts exist with respect to the provisions of the different state commercial codes themselves; state laws that interact with and affect the state commercial code provisions at issue; different approaches to interpreting the state commercial code notice of repossession requirements; and the applicable limitations' periods. Thus, an "interest analysis" is appropriate. *See In re Rezulin*, 210 F.R.D. at 70-71. Because the dispositive factors for an interest analysis are, "almost exclusively, the parties' domiciles and the locus of the tort," the jurisdiction having the greatest interest in the case is the jurisdiction in which the putative class member resides. *In re Rezulin*, 210 F.R.D. at 70-71; *see also Johnson*, 780 F.3d at 143-44 (applying the laws of various states in which the putative class members resided in evaluating predominance because they had "the most significant relationship to their residents' tort claims"). Thus, because the putative class members here reside in 21 different states, the laws of those 21 different states must apply to the putative class members' claims.

Where, as here, the laws of multiple states must be applied, the proponent of class certification must carry "the burden of providing an 'extensive analysis' of state law variations" to enable the Court to determine whether there are "'insuperable obstacles' to class certification." *In re Rezulin*, 210 F.R.D. at 71 n.59 (citing *Walsh*, 807 F.2d at 1017). To provide this "extensive analysis,"

the class certification proponent must show uniformity through legal materials, and cannot carry its burden through a mere summary chart comparing a few aspects of the various laws. *See In re Rezulin*, 210 F.R.D. at 71 n.59; *see also Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243, 254 (W.D.N.Y. 2010) ("Plaintiffs have … provided a summary chart as part of their motion papers, comparing some aspects of the various state laws in the jurisdictions that are implicated in this lawsuit. They have not, though, provided an extensive analysis, and the Court's brief review, above, of the differences in just a few of the jurisdictions leads it to conclude that certification of the state law causes of action is not feasible."). Plaintiff acknowledges, as he must, that he bears the burden of proving complete "uniformity" of all relevant statutory texts **and** judicial interpretations. Dkt. 148 at 1.

The extensive analysis is necessary because differences in state laws inevitably lead to a lack of predominance and a non-certifiable class. "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Johnson*, 780 F.3d at 141 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)). Because "differences in state laws often predominate over common questions," *Oscar*, 274 F.R.D. at 509, "[a] class action that requires the application of the substantive law of twenty-seven different states to an issue at the heart of liability neither promotes judicial economy nor makes the case more manageable[,]" *Johnson*, 780 F.3d at 147; *see also id.* at 146 ("Once it is established that the substantive law of each class member's state will apply to his or her claims, the case for finding the predominance of common issues and the superiority of trying this case as a class action diminishes to the vanishing point.").

Indeed, numerous courts within the Second Circuit have held that variations in state laws preclude class certification. *See, e.g., Johnson*, 780 F.3d at 148 (vacating class certification order and concluding that "[t]he application of the different jurisdictions' laws … renders individual issues predominant"); *Vincent v. Money Store*, 304 F.R.D. 438, 442 (S.D.N.Y. 2015) (concluding that an

analysis of the "laws of more than forty-five states would lead to an abundance of individualized issues that would overwhelm any common issues in this case"), *aff'd*, 2016 WL 2956914 (2d Cir. May 23, 2016); *In re Rezulin*, 210 F.R.D. at 71 (denying class certification because "individual issues arising by virtue of the multiplicity of varying state laws predominated over the common issues"); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 161 (S.D.N.Y. 2008) (concluding that although the defendants engaged in a "uniform course of conduct," "differences in the state laws … create[d] significant questions concerning the cohesiveness" of the class). These authorities—all ignored by Plaintiff—reflect the reality that "[d]ifferences in state law, no matter how slight, are important and must be determined prior to certification because such differences may swamp any common issues and defeat predominance." *Baycol Products Litig.*, 218 F.R.D. at 208.

Here, Plaintiff argues that the state commercial code provisions at issue are "uniform" because they have their origins in the proposed UCC. *See* Dkt. 148 at 11. The existence of variation in state commercial codes, however, has been found by courts with respect to the notice provisions at issue here. *See Jenkins*, 2008 WL 781862, at *7 (denying multi-state certification because "[w]hile many aspects of the Article 9 provisions at issue in the case are uniform, variations do exist in the Notice requirements from state to state"); *see also Henry*, 2007 WL 1053787, at *9 (affirming denial of class certification based on alleged deficient notices received in different states because "individual proof would predominate the UCC claims given the differences in the UCC as adopted from state to state"). Importantly, as other courts have recognized, the various state commercial codes interact with, and are affected by, various different state statutes and are interpreted by different state judges based on different state law canons of construction.

Accordingly, courts throughout the country have recognized that state commercial codes contain variations that preclude class certification of a multi-state class. *See, e.g., Jenkins*, 2008 WL 781862, at *7; *Henry*, 2007 WL 1053787, at *9; *Oscar*, 274 F.R.D. at 509 (denying a motion for

certification of multi-state class and recognizing that "[t]he Uniform Commercial Code is not uniform"); *Feinstein*, 535 F. Supp. at 605 (denying class certification and recognizing that "each jurisdiction has developed its own interpretation of the Code, thus leading to potentially conflicting legal authorities").[19]

The non-uniformity in state commercial codes—which precludes certification of a multi-state class—shows itself with respect to the notice provisions at issue here.  In *Jenkins*, for example, the district court addressed a class certification motion for a claim that Hyundai repossessed and sold her vehicle without providing adequate post-repossession notice under the Ohio Commercial Code.  2008 WL 781862, at *1-2.  The plaintiff asserted that the court should certify a 49 state "class" because Hyundai used similar notices in each of the states.  *Id.* at *2.  The court denied certification of a multi-state class, ruling that "[w]hile many aspects of the Article 9 provisions at issue in the case are uniform, variations do exist in the Notice requirements from state to state" and "[i]n many states, UCC provisions are modified or superseded by provisions contained in other statutes."  *Id.* at 7.  Ultimately, the court concluded that the plaintiff "failed to provide the Court with a demonstrable method to maneuver through the hurdles posed by analyzing and applying the laws of 49 jurisdictions[,]" and that "[t]he burden of analyzing and applying the nuances in multiple states' laws at issue in this case" overwhelm the fact finder.  *Id.*[20]

Similarly, in *Henry*, the California appellate court addressed the trial court's denial of class certification for a multi-state class wherein the plaintiff alleged that the creditor sent him a defective

---

[19]     *See also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 725 (5th Cir. 2007); *Walsh*, 807 F.2d at 1016; *Doster Lighting, Inc. v. E-Conolight, LLC*, 2015 WL 3776491, at *15 (E.D. Wis. June 17, 2015); *In re Gen. Motors Corp. Dex-Cool Products Liab. Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007); *In re Baycol Products Litig.*, 218 F.R.D. 197, 208 (D. Minn. 2003); *Duncan v. Nw. Airlines, Inc.*, 203 F.R.D. 601, 613-14 (W.D. Wash. 2001).

[20]     Despite citing an earlier *Jenkins* opinion in Plaintiff's Appendix 1, *see* Dkt. 148-1 at 21, Plaintiff's counsel did not apprise the Court of the denial of the multi-state class.

post-repossession notice.  2007 WL 1053787, at *1.  The trial court held that "individual proof

predominated the UCC claims since the act differed from state to state."  *Id.* at *2.  The appellate

court affirmed, ruling that "[a] thorough analysis of all the applicable state laws is required, so that

the trial court may make a detailed assessment of how any state law differences could be managed

fairly and efficiently at trial" and that the plaintiff had not shown that the trial court erred in finding

that "individual proof would predominate the UCC claims given the differences in the UCC from

state to state."  *Id.* at *5, 9.[21]

The specific differences from state to state are numerous:

***First***, there are significant textual differences in the commercial codes.  In particular, textual

differences exist with respect to how the commercial codes interact with other state consumer

protection statutes.  By way of background, about the same time that state commercial codes were

being enacted around the country, special "consumer protection" legislation, such as RISAs and

deceptive trade practices acts, also were being enacted in various states.  The state legislatures that

enacted the state commercial codes deferred to these special state consumer statutes in many

instances.  The Maryland Commercial Code, for example, states that its provisions relating to

secured transactions do not apply to transactions that are governed by the state's Credit Grantor

---

[21]    Plaintiff cited no contrary cases to support his position that a multi-state class of this nature
can be certified.  And although Plaintiff's counsel cite cases in their Supplemental Declarations (filed
without seeking leave of Court or M&T's consent), five of Plaintiff's counsel's eight prior class
actions admittedly involved single-state classes, mostly in South Carolina.  Dkt. 149-51.  The other
three identified cases are equally inapposite and no more helpful to Plaintiff:  (1) *Barbiero v. Citizens
Fin. Group, Inc.*, No. 06-cv-10019-RGS (D. Mass.), was dismissed on the defendants' motion to
dismiss; (2) *Beard v. Vanderbilt Mortgage & Fin., Inc.*, 2008 WL 2323235, at *5 (M.D. Tenn. June 2,
2008), was dismissed when the district court held that a one-year statute of limitations applied to the
plaintiff's claim, re-filed in Tennessee state court, certified as a settlement class by agreement and
quickly resolved while the federal appeal was pending; and (3) *Starks v. Sunstar Acceptance Corp.*, No.
2000-12 (Perry Co., Ala. 2002), involved a claim under Alabama Code § 7-9-504, and the
unpublished, state trial court decision certifying a class was being challenged on appeal when the
case was settled.  The county court in *Starks* also did not have the benefit of *Jenkins* and *Henry*.  The
inapposite nature of these cases is confirmed by the fact that Plaintiff did not cite any of them as
even persuasive authority in his opening Brief.

Closed End Credit Law (CLEC) or the state's RISA.  *See* Md. Code, Com. Law § 9-201(c)(3).  The

provision of the Maryland Commercial Code setting forth the required components for a post-

repossession notice explicitly provides that "[s]ecured parties subject to . . . 12-624 through 12-627

[the RISA], or § 12-1021 [the CLEC] of this article . . . ***are not subject to the provisions of this***

***section***."  Md. Code, Com. Law § 9-614(7) (emphasis added), and courts have fully recognized this

aspect of the Maryland Commercial Code, *see Ford Motor Credit Co. v. Edwards*, 485 A.2d 1010 (Md.

1985) (examining commercial code conflict provision and holding that a creditor satisfied its notice

obligations by giving notice under Maryland's RISA); *Anderson v. Peoples Sec. Bank of Maryland*, 503

A.2d 670, 677 (D.C. 1986) (holding that "failure to provide notification" under Maryland's

commercial code "was inconsequential" and that creditors that acquired a security interest were

required only to comply with the notice provisions contained in the RISA); *see also Cropper v. Peninsula

Bank*, 1990 WL 964522, at *2 (Del. Com. Pl. Apr. 27, 1990) ("[E]ven though the parties have

contracted for a security interest under the Maryland Commercial Code, their rights are governed,

not by the Commercial Code, but by the Maryland Retail Installment Sales Act.").

Plaintiff acknowledges this variation of § 9-614 in his superficial and incomplete Appendix 3,

*see* Dkt. 148-3; however, he fails to inform the Court that it extinguishes any purported class claim

under the Maryland Commercial Code.  As set forth in the Ryan Declaration, all of the consumer

goods financing transactions made by M&T in Maryland are made pursuant to the CLEC, (Ryan

Decl. ¶ 29), and the CLEC does not require that a creditor send a notice of repossession that states

that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any,

for an accounting before the sale of the repossessed collateral.  *See* Md. Code Ann., Com. Law § 12-

1021(e), (j)(1).

The commercial codes of other states—while not explicitly exempting entities subject to

other state laws from the commercial code's post-repossession notice requirement, as Maryland has

done—do provide that the commercial code will defer to other state laws, such as RISAs, that conflict with the commercial code, thus creating the potential for non-uniformity.  *See, e.g.*, C.G.S. § 42a-9-201; O.R.C. § 1309.201; D.C. Code § 28:9-201; N.Y. UCC § 9-201.  As relevant here, Connecticut, the District of Columbia, New York, and Ohio all have enacted RISAs that separately require at least one post-repossession notice but do not provide for a right to an accounting of the borrower's unpaid indebtedness.  *See* C.G.S. § 36a-785(d); D.C. Mun. Regs. tit. 16, § 341.4; N.Y. Pers. Prop. Law § 316; O.R.C. 1317.12 and 1317.16(B).  Additionally, notice provisions in the Connecticut and New York RISAs do not require a description of the liability for any deficiency.  *See* C.G.S. § 36a-785(d); N.Y. Pers. Prop. Law § 316.  However, these states' highest courts have yet to address definitively the statutory conflict provisions under the commercial codes as they relate to post-repossession notices provided in accordance with state RISAs and, as a result, this Court would be put in the unenviable and unmanageable position of addressing these issues on a state-by-state basis.  Plaintiff's Motion wholly fails to address this problem.[22]

It is well-settled that a New York federal court should not address unsettled, important questions of foreign state law, particularly in a situation such as this where Plaintiff is seeking to have the Court make such decisions on a sweeping multi-state basis.  *See Allstate Ins. Co. v. Serio*, 261 F.3d 143, 152 (2d Cir. 2001) ("[F]ederal courts ought not to deprive the state courts of the opportunity to construe their own statutes, using the interpretive tools, presumptions, and standards they deem proper.  For this too would infringe on the sovereign authority of the states."); *see also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

---

[22]    Contrary to Plaintiff's strained contention (Dkt. 148 at 13), a demurrer argument premised on the allegations of Plaintiff's Complaint (Dkt. 8 at 8 n. 4) does not preclude a subsequent argument demonstrating non-uniformity.

In addition to the textual differences in the commercial codes that affect how the codes interact with state consumer protection laws, textual differences in the commercial codes also affect a secured party's ability to collect on an underlying deficiency when a borrower alleges that the secured party violated the commercial code's notice provisions and claims statutory damages. The model UCC cited by Plaintiff provides guidance for the states with respect to non-consumer transactions, but contains no guidance with respect to whether a secured party can collect on an underlying deficiency when the borrower alleges that the secured party violated the commercial code's notice provisions with respect to consumer transactions. *See* UCC § 9-626(b). The Ohio Commercial Code has adopted a mandatory offset rule for consumer transactions, which provides that statutory damages for violations of its provisions relating to secured transactions "shall be reduced by the amount that the sum of the secured obligation, expenses, and attorney's fees exceeds the proceeds of collection, enforcement, disposition, or acceptance" regardless of whether the debtor's deficiency is challenged and ultimately eliminated or reduced. O.R.C. § 1309.625(D). In contrast, several states have adopted a "rebuttable presumption rule" under which the creditor has the burden of proving that the alleged noncompliance with the commercial code did not prejudice the debtor or that the sale was held in a commercially reasonable manner. *See, e.g.*, Fla. Stat. Ann. § 679.626; N.J. Stat. Ann. § 12A:9-626(a)(3); Va. Code Ann. § 8.9A-626; *In re Massaquoi*, 412 B.R. 702, 710 (Bankr. E.D. Pa. 2008) (citing *Savoy v. Beneficial Consumer Discount Co.*, 468 A.2d 465 (Pa. 1983)). In further contrast, a few states have adopted an "absolute bar rule" under which the creditor's failure to comply with the commercial code precludes the recovery of any deficiency. *See, e.g.,* Me. Rev. Stat. Ann. tit. 11 § 9-1626(2)(c).

Because there are significant differences among state commercial codes and judicial interpretations, Plaintiff's assertions that "New York law will apply to all" 21 different state statutory claims, Dkt. 148 at 1, and that the Court should "simply apply the New York UCC," *id.* at 14, are

wholly without merit and just plain wrong. Plaintiff ignores, once again, the fact that he is asserting state statutory causes of action enacted by 21 different legislatures and interpreted by 21 different judicial systems. And, Plaintiff's assertion that Appendix 3 "flags any departure from the UCC Official Text . . . [and that] [n]one are in any way material to the liability or damages issues in this case," Dkt. 148 at 11, is profoundly untrue such that the Court should disregard its contents.

*Second*, state commercial code notice of repossession requirements are interpreted differently by different courts in different states. Some courts require "strict compliance," *see, e.g., States Res. Corp. v. Gregory*, 339 S.W.3d 591, 598 (Mo. Ct. App. 2011); *Limtiaco v. Auction Cars.com, LLC*, 2012 WL 4911726, at *6 (D. Nev. Oct. 15. 2012), while others permit "substantial compliance" with commercial code requirements, *see, e.g., Waithe v. Citigroup, Inc.*, 983 N.Y.S.2d 207 (N.Y. Sup. Ct. 2013); *Gen. Electric Corp. v. NET Transportation, Inc.*, 2006 WL 3741828, at *2 (D. Conn. Dec. 18, 2006).[23] In this case, Plaintiff claims that the notice of repossession sent to him by M&T failed to explicitly "state that the debtor is entitled to an accounting of his unpaid indebtedness or state the charge, if any, for the accounting." Dkt. 1 ¶ 18.A. Whether an explicit statement of the right to an accounting or the provision of an accounting itself is sufficient can depend on whether a state employs a "strict compliance" or a "substantial compliance" approach. Therefore, this Court would need to examine the case law of each of the 21 states proposed by Plaintiff to determine whether each state has adopted a "strict compliance" or "substantial compliance" approach and, if the issue has not yet been addressed, this Court would need to predict the approach that the state's highest court would likely adopt based on the jurisprudence of each

---

[23]     Plaintiff's assertion of a "uniform standard," Dkt. 148 at 12, is further undermined, for example, by the fact that Kentucky's Commercial Code provision on post-repossession notice did not adopt any of the model UCC's commentary. *See* KRS § 355.9-614.

particular state.[24]  Plaintiff failed to address these disparate judicial interpretations, despite

acknowledging his burden of proving complete uniformity.

**Third**, the claims of the proposed 21 state classes are subject to multiple and different

limitations periods.  It is well-settled that when "the claims of many class members may be subject

to individual defenses such as … the statute of limitations" then the proponent of class certification

cannot overcome his burden.  *In re Rezulin*, 210 F.R.D. at 67; *see also Vincent*, 304 F.R.D. at 442 (court

must consider "statute of limitation issues within Rule 23(b) analysis"); *Henry*, 2007 WL 1053787, at

*2 (affirming trial court's conclusion that statute of limitations issues precluded class certification of

a multi-state class dealing with alleged defective notices under state commercial code provisions).

Here, Plaintiff is correct that New York has a borrowing statute, CPLR § 202, under which a

non-resident plaintiff must file a claim within the **shorter** of either (1) the New York statute of

limitations or (2) the statute of limitations of the jurisdiction in which the claim accrued.  *IKB*

*Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*, 634 F. App'x 19, 21-22 (2d Cir. 2015); *Glob. Fin.*

*Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528, 693 N.Y.S.2d 479, 715 N.E.2d 482 (N.Y. 1999).  Plaintiff,

however, fails to mention that when a court applies the New York borrowing statute to import a

limitation period from a foreign state, it imports the "total package" of the statute, including the

---

[24]      Under either approach, M&T's Notice complies with the South Carolina Code.  M&T
exceeded the requirement that a notice "states that the debtor is entitled to an accounting of the
unpaid indebtedness and states the charge, if any, for an accounting" by providing an actual
accounting free of charge, as well as a phone number at which M&T could be contacted with any
questions.  *See* S.C. Code Ann. § 36-9-613(1); Ex. 1.  Moreover, M&T provided "a description of any
liability for a deficiency" by explicitly stating that "[i]f there is still money owing after" the sale of the
collateral then the debtor is "responsible to pay [M&T] this deficiency."  *See* S.C. Code Ann. § 36-9-
614(1); Ex. 1.  Indeed, "[a] particular phrasing of the notification is not required."  *See* S.C. Code
Ann. § 36-9-614(2)-(3); *see, e.g., Suntrust Bank v. Wasserman*, 2013 WL 4351725, at *8 (N.Y. Sup. Ct.
Aug. 12, 2013) (finding that "[a]lthough the word 'accounting' was not utilized in the Notice, under
UCC 9-613(d) and 9-614(b) . . . a 'particular phrasing of the notification is not required'"); *Hudson v.*
*Eaglemark Sav. Bank*, 2011 WL 1755540, at *6, n.5 (E.D. Pa. May 9, 2011), *aff'd*, 475 F. App'x 423 (3d
Cir. 2012) (stating that "[a] particular phrasing of the notification is not required" with respect to a
description of liability for deficiency).

state's interpretation of its limitation period and any tolling doctrines.  *See In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 801 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2d Cir. 1987); *Smith Barney, Harris Upham & Co. v. Luckie*, 85 N.Y.2d 193, 207, 623 N.Y.S.2d 800, 808, 647 N.E.2d 1308, 1316 (N.Y. 1995).  Thus, in applying the borrowing statute, the court must undergo extensive analysis of the foreign state's law.  *See, e.g., SCM Grp., Inc. v. McKinsey & Co.*, 2011 WL 1197523, at *4 (S.D.N.Y. Mar. 28, 2011).  In deciding which limitations period should apply, the court should "lean toward the result more likely to achieve the underlying policy" to prevent "forum shopping."  *Cafferty v. Scotti Bros. Records*, 969 F. Supp. 193, 203 (S.D.N.Y. 1997); *Fitzgerald v. Thompson*, 187 A.D.2d 557, 558, 590 N.Y.S.2d 221 (2d Dep't 1992).

As a threshold matter, the Court would need to address which statute of limitations is applicable in each of the 21 states for which Plaintiff seeks certification.  And, Plaintiff admits that "no appellate authority" exists regarding the applicable limitations' period in at least 18 of these states.  Dkt. 148-1 (Pl. App. 1).  As a result, in many instances, this Court would need to decide important issues of individual state law as a matter of first impression.  Plaintiff's conclusory, superficial and incomplete Appendix 1 is wholly inadequate, as the Court would need to conduct a detailed analysis of each state's law to determine, among other things, what constitutes a "penal statute" or "forfeiture," and whether that state's commercial code's provision meets that definition under the particular state's jurisprudence.  *See, e.g., Beard v. Vanderbilt Mortg. & Fin., Inc.*, 2008 WL 2323235, at *5 (M.D. Tenn. June 2, 2008) (Tennessee would apply one-year limitations period governing an action for a statutory penalty).

Once the Court determines which limitations period applies in each state, it would then need to analyze decisions interpreting that limitations period, including the application of tolling and discovery rules.  Plaintiff's Motion has failed to address any of these state law issues.[25]

Based on his proposed class definition, Plaintiff also apparently contends that a person possesses a cause of action so long as the re-sale of his or her consumer goods collateral was conducted within the proposed 3-year limitations period (2 years in Virginia), regardless of whether the challenged notice of repossession was sent within the applicable limitations' period.  Dkt. 148 at 6 ("sent them a Notification of Disposition . . . , prior to the disposition of collateral, *where the disposition* occurred during the 'Class Period,' which shall be from March 14, 2011 for the State of Virginia, and from March 14, 2010 in all other Class Jurisdictions") (emphasis added).  However, Plaintiff has presented no authority to support his contention that a claim accrues under each of the 21 states' commercial codes at the time of disposition rather than when the repossession notice was sent to or received by the debtor.[26]  In fact, Plaintiff's position is contrary to South Carolina case law providing that the limitations period on a repossession notice claim under the South Carolina Code begins to run when the plaintiff received the notice.  *Delaney v. First Financial of Charleston, Inc.*, 2013 WL 9921461, at *3 (S.C. Com. Pl. Apr. 30, 2013) ("Plaintiff received the alleged unlawful Notice of Sale on or around May 2, 2008 and did not file suit [until] October of 2011, more than

---

[25]     With respect to the limitations issues and the predominance inquiry, Plaintiff argues only that, per *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 n.10 (2d Cir. 2013), predominance can be maintained if only one state imposes a limitations period shorter than the others.  Dkt. 148 at 17.  In *U.S. Foodservice*, the defendant did not contest that only one state imposed a shorter limitations period.  Here, however, as shown above, the law in 18 of the states is uncertain and many states could apply shorter limitations periods. Plaintiff has failed to provide the extensive analysis necessary for this Court to conclude otherwise.  *U.S. Foodservice* is completely inapposite.  The case involved civil RICO and breach of contract claims, not state statutory claims that differ in their text and how they interact with other state laws.

[26]     Plaintiff's citation to *Hales v. HSBC Bank U.S.A., N.A.*, 347 F. App'x 698 (2d Cir. 2009), undercuts his position because the Second Circuit held that the three-year limitation period began to run when the bank allegedly violated the commercial code.

five months after the longer [potential] statute had run.").  As a result, Plaintiff's proposed "class" definition improperly includes persons whose claims are barred by, at least, the South Carolina statute of limitations.[27]

Individual issues predominate as a result of variations in: (1) the text of the state commercial codes and how they interact with other state laws; (2) judicial interpretations of the notice provisions at issue; and (3) the applicable limitations periods.  Accordingly, Plaintiff has failed to satisfy the predominance requirement.

## 2.   The Existence Of Compulsory Counterclaims For Deficiency Balances Creates Individualized Issues That Would Be Unmanageable.

Counterclaims accentuate the individual nature of any adjudication of a multi-state class by raising individual questions that, "at least in their aggregate, threaten to overwhelm the original claims."  *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549, 552 (S.D.N.Y. 1972).  Where a substantial number of counterclaims must be brought against putative class members, there is likelihood that "individual adjudications on these counterclaims will be required and individual questions will predominate over class ones."  *Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378, 381 (N.D. Ga. 1979); *see also Heaven v. Trust Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997) (affirming denial of class certification because consideration of counterclaims "would require the court to engage in multiple separate factual determinations").  Thus, "[t]o determine predominance, a court should take the entire case into account, including the claims, defenses, facts, underlying substantive law, and even compulsory counterclaims and any permissive counterclaims already brought."  *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 72 (E.D.N.C. 2008).

---

[27]       Plaintiff also admits that the availability of prejudgment interest, if at all, would require an examination of the laws of 21 different states.  Dkt. 148 at 18.

Where counterclaims are compulsory in nature, in that they arise out of the transaction or occurrence that is the subject matter of the opposing party's claim, Fed. R. Civ. P. 13(a)(1)(A), additional complications arise that defeat predominance and make a certified class unmanageable. "Since these counterclaims must be brought in order to avoid being barred in any subsequent suit by principles of *res judicata*, individual adjudications on these counterclaims will be required and individual questions will predominate over class ones." *Parker*, 83 F.R.D. at 381. A prime example of a compulsory counterclaim is a claim "seeking a deficiency judgment resulting from the resale of plaintiffs' automobile" in response to a suit "alleging that defendant's repossession and resale of plaintiff's automobile" violated a state commercial code or RISA. *See Czepiel v. Chemical Bank*, 764 F. Supp. 255, 256, 258 (D. Conn. 1991) (plaintiff's claims for unlawful repossession and sale of an automobile under commercial code and RISA were subject to compulsory counterclaims for deficiency judgments). And, there is no doubt that M&T would be required to assert counterclaims here. The South Carolina customer information produced by M&T to Plaintiff's counsel demonstrates that 172 of the 176 repossession transactions (97.72%) resulted in a deficiency balance as to which M&T can file a counterclaim. Ryan Decl. ¶ 22; Ex. 7. Plaintiff and his counsel conceded the existence of such deficiency counterclaims or set-offs in his bankruptcy case when he acknowledged his post-sale liabilities. *See* Ex. 18 at 6.

Because M&T would be required to assert compulsory counterclaims against putative class members who still owe deficiency balances, this Court would necessarily be required to conduct mini-trials on those claims with fact discovery, witness testimony and documentary evidence. Moreover, as explained above p. 40, the states have adopted different approaches on how a secured party can collect on an underlying deficiency in a consumer transaction when the borrower alleges that the secured party violated the commercial code's notice provisions. While Ohio has adopted a mandatory "offset rule," other states have adopted a "rebuttable presumption rule," and a few have

adopted an "absolute bar rule." *See supra* p. 40.  This Court would need to determine which of the approaches to the recovery of deficiency balances applies in each state and conduct mini-trials on the counterclaims where permitted, thereby interjecting numerous additional individual issues relating to the reasonableness of the sale process, price and vehicle condition.  As a result, individual issues predominate and the proposed "class" is unmanageable.

### 3.    The Existence Of Judgments Obtained Against Putative Class Members After The Complaint Was Filed Creates Individualized Issues With Respect To Set-Off And Res Judicata Defenses.

Plaintiff has manufactured a purported "class" definition in an attempt to avoid a multitude of predominance and manageability issues.  In particular, Plaintiff has excluded from his proposed class "[a]ll persons against whom Defendant[] filed suit prior to March 14, 2013, seeking to collect a deficiency balance in connection with an account giving rise to a notification of disposition claim that is the subject of this Action, and where such collection action has been reduced to judgment or is ongoing, but only as to that account."  Dkt. 148 at 7.  This exclusion, however, does not solve Plaintiff's predominance and manageability problems because the proposed "class" definition does not exclude persons against whom M&T filed suit *after* March 14, 2013 for a deficiency balance where such action has been reduced to a judgment.  By definition, Plaintiff's proposed "class" includes individuals against whom judgments have been entered after March 14, 2013, and these individuals will be subject to a set-off defense for the amounts of any existing judgments, which will present additional individualized issues.  *See Nouveau Indus. Inc. v. Liberty Mut. Ins. Co.*, 2011 WL 10901796, at *10 (S.D.N.Y. Sept. 7, 2011) (recognizing "setoff" as an affirmative defense); *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 265 (S.D.N.Y. 2001) ("[T]he issue of setoff is an affirmative defense").

In addition to set-off defenses against some subset of the proposed classes, M&T will have *res judicata* (or claim preclusion) defenses against these individuals to the extent that they failed to

raise their claims in a prior deficiency action.  The doctrine of *res judicata*, in general, bars a party

from litigating a claim where a final judgment on the merits has been rendered on the same subject

matter, between the same parties, and thus once a claim is brought to a final conclusion, all other

claims arising out of the same transaction or series of transactions are barred, even if based upon

different theories or if seeking a different remedy.  *See, e.g.*, *Bernstein v. State of New York*, 129 A.D.3d

1358, 1359, 10 N.Y.S.3d 752, 753 (3d Dep't 2015).  Depending on the applicable state laws, when

certain claims should have been brought in a prior proceeding as compulsory counterclaims, such

claims can be barred in a later proceeding under the doctrine.  *See, e.g.*, *RA Glob. Servs., Inc. v. Avicenna*

*Overseas Corp.*, 843 F. Supp. 2d 386, 391 (S.D.N.Y. 2012) (applying New York law on *res judicata*);

*SMS Mktg. & Telecommunications, Inc. v. H.G. Telecom, Inc.*, 949 F. Supp. 134, 139 (E.D.N.Y. 1996)

(applying Texas law on *res judicata*).

      Here, deficiency claims and repossession notice claims arise out of the same transaction or

occurrence and are thus "compulsory" counterclaims.  *See, e.g., Czepiel*, 764 F. Supp. at 258.

Numerous courts have held that when a creditor brings suit for a deficiency, a borrower who

possesses a claim that arises out of the same transaction or occurrence as the deficiency must raise

the claim in the same action, or else the borrower will be barred from raising the claim in a later

action under the doctrine of *res judicata*.  *See, e.g.*, *Williams v. Nat'l Mortgage Co.*, 903 S.W.2d 398, 404

(Tex. App. 1995) (concluding that plaintiffs' claims "were compulsory counterclaims to [defendant's]

suit for deficiency" and that "[w]here a counterclaim is compulsory, a defendant is barred by the

doctrine of res judicata from asserting the claim in a later lawsuit"); *First Bank, (N.A.) W. Montana*

*Missoula v. Dist. Court for Fourth Judicial Dist.*, 737 P.2d 1132, 1133 (Mont. 1987) (creditor misconduct

claims were compulsory in deficiency action barred by *res judicata*); *see also Weissinger v. First Fed. Sav.*

*& Loan Ass'n of Warner Robins*, 533 So. 2d 234, 234 (Ala. 1988) (debtor's counterclaim was

compulsory in prior deficiency action and barred by *res judicata* in a later action).

The existence of deficiency judgments and the need to examine a multitude of states' *res judicata* laws further complicate the adjudication of the putative class members' claims so as to create an unmanageable series of individual inquiries. The existence of judgments against putative class members after Plaintiff's Complaint was filed necessarily creates individualized issues with respect to set-off and *res judicata* defenses. As a result, individual issues will predominate and Plaintiff cannot satisfy the predominance requirement of Rule 23(b)(3).

## C.     Plaintiff's Proposed "Class" Fails The Superiority Requirement Of Rule 23(b)(3).

Plaintiff also fails to satisfy Rule 23(b)(3)'s requirement "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability—should be considered in making this determination. *See* Fed.R.Civ.P. 23(b)(3). Determinations of manageability—"the most critical concern in determining whether a class action is a superior means of adjudication," *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 142 (S.D.N.Y. 2015)—encompass "the whole range of practical problems that may render the class action format inappropriate for a particular suit[,]" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). In particular, when claims "must be adjudicated under the law of many jurisdictions," a multi-state class is "not manageable." *In re Rezulin*, 210 F.R.D. at 71; *see also Jenkins*, 2008 WL 781862, at *7; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189-90 (9th Cir. 2001) (affirming conclusion "that there was no manageable trial plan adequate to deal with individualized issues and variances in state law" where claims came under the laws of "multiple jurisdictions").

Because Plaintiff's proposed "class" involves claims under a multitude of non-uniform state laws, a class action is not the superior method for adjudicating this controversy. The court in *Jenkins* addressed this very point in denying certification of a proposed multi-state class based on alleged deficiencies in post-repossession notices under state commercial codes. The *Jenkins* court stated that

"[i]n order to demonstrate that a class action is superior to other forms of litigation, the Plaintiffs must show that such an action is manageable in light of state law variations." 2008 WL 781862, at *7. Due to the variations in state laws, the court declared that the manageability factor was "the most apposite and difficult to overcome" and held that "[b]ased on the burden of applying multiple states' laws, the Court concludes that certification of a 49-state class is unsuitable and, therefore, the class action is not the superior method of adjudicating the several consumer protection statutes at issue in this case." *Id.*; *see also Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 688-89 (D. Kan. 2007) (denying certification of putative class from 18 jurisdictions due to lack of superiority because application of Kansas two-year statute of limitations would foreclose claims of putative class members in jurisdictions with longer limitations period). Moreover, some putative class members may have an interest in pursuing their individual claims in their states of residence before their home state forum, while others may have an interest in avoiding litigation that subjects them to counterclaim exposure.

Additionally, Plaintiff's own allegations and "evidence" show that any actual claims and any associated counterclaims are more than capable of being pursued as individual lawsuits. Plaintiff alleges that he should recover $70,144.20. Dkt. 1, ¶ 21. Attorney Lindsay admitted that she has litigated similar notice claims in South Carolina on an ***individual*** basis. *See* Dkt. 149 (Supp. Decl. of Kathy Lindsay), at ¶ 4. In fact, Plaintiff's cited commercial code cases ***all*** confirm the viability of individual lawsuits because they all are ***individual*** lawsuits. *See supra* n. 21. Superiority is lacking because individual suits are feasible and Plaintiff makes no argument that his claim is a "negative value" suit. *See, e.g., Castano* 84 F. 3d at 748. Plaintiff's Motion ignores these facts and fails to explain why such a potential recovery is insufficient to motivate a person to pursue a claim to the extent that he believed that M&T actually harmed him. Accordingly, Plaintiff has failed to satisfy the superiority requirement of Rule 23(b)(3).

**D.      Plaintiff Fails To Satisfy All Of The Requirements Of Rule 23(a).**

Rule 23(a) requires the named plaintiff to show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The Rule's four requirements—numerosity,[28] commonality, typicality, and adequacy of representation—"effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349.  Here, Plaintiff fails to satisfy the typicality, commonality, and adequacy of representation requirements of Rule 23(a).

**1.      Plaintiff Fails To Satisfy The Typicality And Commonality Requirements.**

**a.      Plaintiff Fails The Typicality Requirement Because He Is Subject To Unique Defenses And Must Make Disparate Legal And Factual Arguments.**

According to Rule 23(a)(3), a named plaintiff may sue on behalf of all class members only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The typicality requirement is not satisfied when putative class members' claims arise from different events or when putative class members must make different legal arguments to prove the defendant's liability.  *Taylor v. Zucker*, 2015 WL 4560739, at *8 (S.D.N.Y. July 27, 2015) (citing *In re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir. 1992)).  A plaintiff's claim also is not typical if it is "'subject to unique defenses which threaten to become the focus of the litigation.'"  *Scott v. New*

---

[28]      As it previously stated, M&T does not contest the numerosity requirement.  However, it is inaccurate for Plaintiff to say that there is "a class of approximately 11,500 consumer obligors," Dkt. 148 at 1, or that M&T admitted that all such accounts are class members.  M&T provided information requested by Plaintiff in discovery and Plaintiff admits that further factual inquiries are necessary to ascertain class membership.  Likewise, Plaintiff's suggestion that this Court or any other has held that he merely must plead "class standing" to satisfy his evidentiary burden of satisfying each element of Rule 23 is profoundly mistaken.  *See* Dkt. 148 at 4, 9.

*York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)). "[T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Gary Plastic*, 903 F.2d at 180. Here, in addition to the fact that Plaintiff must make legal and factual arguments based on the South Carolina Commercial Code that differ from the legal and factual arguments of putative class members in other states, Plaintiff is subject to several unique defenses: (1) his claim is barred by South Carolina's one-year statute of limitations for "an action upon a penalty"; (2) judicial estoppel due to his prior representations to the bankruptcy court that his claim was worth less than $5,000; and (3) he engaged in a straw purchase of the Big Country trailer.

 *First*, South Carolina has adopted a one year statute of limitations for "an action upon a statute for a penalty . . . given, in whole or in part, to any person who will prosecute for it," S.C. Code Ann. § 15-3-570. Although the South Carolina Supreme Court has yet to decide the statute of limitations applicable to a claim under South Carolina Code § 36-9-625(c)(2), at least one South Carolina trial court found that the one-year limitation "might be reasonably applied" to § 36-9-625(c)(2). *Delaney*, 2013 WL 9921461, at *3. Of course, Plaintiff's Appendix 1 fails to mention or acknowledge the *Delaney* case. Mr. Pinks filed this lawsuit on March 14, 2013, more than two years after M&T sent him the Notice on July 29, 2010 and the Big Country trailer was sold at auction on September 15, 2010. *Supra* pp. 11, 14. As a result, Mr. Pinks is subject to the unique defense that his claim is barred by South Carolina's one year statute of limitations.[29]

---

[29] Most assuredly, this is the chief reason that a South Carolina resident and three South Carolina lawyers elected to file this case in New York. In addition to trying to avoid South Carolina's one year limitations period, Plaintiff's counsel are seeking to avoid the impact of South Carolina's "door closing statute," S.C. Code Ann. § 15-5-150, which precludes them from pursuing a multi-state class action in South Carolina. *Farmer v. Monsanto*, 579 S.E.2d 325, 328 (S.C. 2003). As

**Second**, the doctrine of judicial estoppel holds that "'[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The rationale for the doctrine is that "a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" *Id.* The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50. In evaluating the applicability of the doctrine, courts look for the existence of three factors: "(1) that a party's new position is clearly inconsistent with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (citing *New Hampshire*, 532 U.S. at 750-51).

Here, in direct contrast to his Complaint's claim that he is "entitled" to $70,144.20, Plaintiff, through Attorney Fairbanks, represented to the bankruptcy court that his claim had a value less than $5,000. Specifically, at the March 1, 2012 Meeting of Creditors and Examination of Debtor, in response to the Chapter 13 trustee's questioning about the existence of any lawsuit assets, Attorney Fairbanks represented: "we have listed on the schedule as they have a potential UCC notice claim. We believe that's worth about under $5,000. There's a $39,000 deficiency claim against which it would be set off." Ex. 18 at 6:13-15; 6:17-21; Ex. 8 at 77:11-78:2. Immediately after hearing those representations, the Chapter 13 trustee declared the bankruptcy a "no asset case" and "abandon[ed] the schedule[d] property," including Plaintiff's South Carolina Code claim. Ex. 18 at 7:3-5. Plaintiff

---

with the policy of New York's borrowing statute, this Court should not encourage such blatant forum shopping.

received a discharge on May 1, 2012.  Ex. 8 at 80:4-8.  As a result, the deficiency balances that Plaintiff owed to M&T were extinguished.  Ex. 20.

Plaintiff therefore has taken directly contrary positions regarding the value of his South Carolina Code claim in two different courts.  In the bankruptcy court, he valued his claim at less than $5,000.  In this Court, he claims $70,144.20.  Citing the fact that Plaintiff allegedly incurred attorney fees here, the bankruptcy court exercised its discretion to deny M&T's motion to reopen, but that decision only reinforces the benefit that Plaintiff obtained when he minimized his claim value.  As a direct result of his representations, Plaintiff received a discharge of substantial liabilities, all while convincing the Trustee to abandon his litigation claim back to him.  Plaintiff's and his attorneys' intent to minimize the alleged value of his claim is reinforced by the representation agreement signed by Mr. Pinks during the pendency of his bankruptcy case to act as a named plaintiff.  Ex. 8 at 83:10-84:13; Ex. 21.

*Third*, Plaintiff is atypical of other putative class members because the Big Country trailer was not purchased for his own use.  As his testimony clearly shows, he had no interest in redeeming the Big Country trailer, could not afford the purchase in the first instance, and paid no attention to the Notice.  Therefore, his admissions that he did not incur any actual harm subject him to a compelling *Spokeo* defense based on his individual circumstances, as discussed above.

### b.   Plaintiff Fails The Commonality Requirement Because Of The Differences In The State Laws Applicable To The Proposed Class.

According to Rule 23(a)(2), a named plaintiff may sue on behalf of all class members only if "there are questions of law or fact common to the class."  The Supreme Court has noted that Rule 23(a)(2) is "easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Dukes,* 564 U.S. at 349.  "What matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to

generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 350.  The potential for common answers is lacking when the claims are being brought under multiple state laws, "each with its own peculiar requirements and defenses." *Barrus*, 732 F. Supp. 2d at 252; *see also Feinstein*, 535 F. Supp. at 605 (denying class certification for lack of commonality and concluding the commercial code claims under different state laws could not be brought as a class action because "each jurisdiction has developed its own interpretation of the Code, thus leading to potentially conflicting legal authorities").

For the same reasons that the application of 21 different state laws will result in a predominance of individual issues, Plaintiff's proposed classes lack commonality, and his Motion should be denied.  *Supra* pp. 37-49.

### 2.    Plaintiff Fails To Satisfy The Adequacy Of Representation Requirement.

According to Rule 23(a)(4), a named plaintiff may sue on behalf of all class members only if "the representative parties will fairly and adequately protect the interests of the class."  This entails an inquiry as to whether "plaintiff['s] interests are antagonistic to the interest of other members of the class." *Wynn v. New York City Hous. Auth.*, 314 F.R.D. 122, 127 (S.D.N.Y. 2016).  The adequacy inquiry "is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.'" *Id.* (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).  Plaintiff fails to satisfy the adequacy requirement.

Because Plaintiff obtained a bankruptcy discharge, he has a conflict with putative class members who are subject to counterclaims for deficiencies.  "To satisfy Rule 23(a)(4), the named plaintiffs must 'possess the same interest[s] and suffer the same injur[ies] as the class members." *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).  To the

extent putative class members are subject to deficiency counterclaims that the named plaintiff is not

subject to, then the named plaintiff does not possess the same interests as the class members.  *See*

*Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378, 380 (N.D. Ga. 1979).  As one district court

described the lack of adequacy under similar facts:

> Plaintiff [] is in the position of having had a car repossessed with no deficiency
> asserted. Most members of the purported class, however, either still have their cars
> and a continuing relationship with defendants or have had their cars repossessed and
> face counterclaims for deficiencies. Since plaintiff would not be subject to such
> counterclaims and would receive no benefit from defeating these claims, plaintiff
> would have no incentive to expend time and effort vigorously defending others
> against these numerous counterclaims.

*Id.*

Here, Plaintiff obtained a discharge of his liabilities for the deficiencies on the Big Country

trailer and the Yellowstone motor home, precluding M&T from pursuing counterclaims for these

discharged debts.  However, the evidence produced as to the putative South Carolina class

demonstrates that more than 97% of the alleged class is subject to counterclaims for deficiencies.

Therefore, Plaintiff has a conflict with over 97% of the putative South Carolina class that he seeks to

represent.  M&T likewise has deficiency counterclaims against debtors in each of the other states

(Ryan. Decl. ¶ 23), and Plaintiff has similar conflicts.

Plaintiff also has interests that are antagonistic or in conflict with residents of multiple states

as to whom New York's borrowing statute admittedly truncates claims with statutes of limitations

longer than New York's three year limitations period, such as Pennsylvania.  Courts have denied

class certification due to a lack of adequacy where, like here, a plaintiff and his counsel sacrifice the

claims of putative class members that would be timely under their own state's applicable statute of

limitations in order to comply with the venue state's shorter statute of limitations.  *See, e.g., Doll,* 246

F.R.D. at 688-89 (denying certification of putative class from 17 states and District of Columbia due

to lack of adequacy because application of Kansas two-year statute of limitations would foreclose claims of putative class members in jurisdictions with longer limitations period).[30]

## E.     Plaintiff's Proposed "Class" Fails The Ascertainability Requirement.

The Second Circuit, "[l]ike [its] sister Circuits, [has] recognized an 'implied requirement of ascertainability' in Rule 23 of the Federal Rules of Civil Procedure." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quoting *In re IPO*, 471 F.3d at 30); *accord Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012). "[T]he touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Breacher*, 806 F.3d at 24. "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24-25. Thus, the class definition must do more than make a "reference to objective criteria"; the plaintiff also must show that class is defined by objective criteria "that are administratively feasible." *Id.*; *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 64 (S.D.N.Y. 2015) (ascertainability failure because "[w]hile the criteria may be objective, Plaintiff has not shown that it is 'administratively feasible.'").

Here, because Plaintiff has manufactured a "class" definition with numerous carve-outs trying to avoid a host of Rule 23 issues, the proposed class is not ascertainable. First, Plaintiff's

---

[30]     As detailed above, Plaintiff also lacks basic knowledge of his claim and his duties as a class representative. He admitted that he "leave[s] everything in [his] attorney's hands." Ex. 8 at 76:6-77:5; *see also* Ex. 8 at 86:21-88:12; 98:23-99:4; 95:8-12; 96:18-97:4; 98:18-99:5; 92:16-93:17. Plaintiff also has provided no justification for abandoning putative class members in 24 states, after he purported to represent them for more than two years. Plaintiff plainly has abdicated control to his counsel. Accordingly, he is inadequate as a representative. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F. 3d 1072, 1077-78 (2d. Cir. 1995); *Scott v.New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004). The lawyer-drafted Declaration submitted by Plaintiff (Dkt. 140-1) is inconsistent with Plaintiff's deposition testimony and should be rejected. *See Overseas Direct Imp. Co. v. Family Dollar States Inc.*, 929 F. Supp. 2d 296, 308 (S.D.N.Y 2013) ("'It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded . . .'") (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)).

proposed class definition excludes "[a]ll persons who, after default have signed a statement in conformity with UCC § 9-602 and 9-624(c) renouncing or modifying the right to be sent notification of disposition of their collateral in compliance with UCC § 9-613 and 9-614, but only as to notification of that disposition." Dkt. 148 at 6. Whether putative class members have renounced or modified their rights to be sent notifications can be determined only based on the laws of 21 different states with 21 different commercial code enactments. Plaintiff has the burden of proving that the class is ascertainable, yet Plaintiff has provided no evidence that the laws of the 21 states do not differ with respect to a consumer's ability to renounce or modify rights. Moreover, putative class members still could not be ascertained without conducting a tedious and time-consuming, file-by-file review to determine whether a particular individual signed a statement modifying or renouncing his rights. Ryan Decl. ¶ 28.

Similarly, Plaintiff's exclusion of "[a]ll persons, who after the disposition of their collateral, filed for bankruptcy and were thereafter discharged in bankruptcy but did not schedule their UCC claim that is the subject of this action as an asset of the bankruptcy estate" creates an ascertainability issue. Dkt. 148 at 7. Except in South Carolina, the repossession information provided by M&T per the parties' agreement did not exclude customers who filed for and were discharged from bankruptcy following the repossession and sale of the consumer goods collateral. Ryan Decl. ¶ 24. To determine whether a particular customer who filed for bankruptcy and received a discharge scheduled a claim against M&T relating to the sufficiency of M&T's notice of repossession sent by M&T, the parties would need to: (a) conduct an individual bankruptcy filing search for each customer; and (b) analyze the docket and filings of each bankruptcy case to determine whether a claim against M&T was scheduled and, if so, whether that claim was abandoned by the bankruptcy estate. Ryan Decl. ¶ 25. Such reviews would be enormously time consuming and expensive, and require the fact finder to adjudicate individual disputes. Ryan Decl. ¶ 26.

Finally, Plaintiff's exclusion of "[a]ll persons who, with respect to a claim, have given Defendants a valid release of any claim which is at issue in this action" raises ascertainability problems. Whether putative class members have given a "valid" release is a question of state law—here, 21 different state laws. Determining whether each potential release is valid under the 21 different state laws would "require a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24-25. Plaintiff has not even identified the objective criteria that the Court could use to determine whether any releases are valid.

Without such objective criteria to determine class membership and without an administratively feasible way to determine whether an exclusion applies, Plaintiff's proposed "class" cannot be ascertained in accordance with the requirements of Rule 23. Thus, Plaintiff's Motion also should be denied for failure to satisfy the ascertainability requirement.

## V.   CONCLUSION

M&T respectfully requests that Plaintiff's Motion be denied and the action thereafter dismissed for lack of subject matter jurisdiction.

Dated: June 21, 2016

**REED SMITH LLP**

By: */s/ Roy W. Arnold*
    Roy W. Arnold
    Andrew J. Soven
    Justin J. Kontul
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA  15222
    Telephone:  412.288.3131

    Steven Cooper
    599 Lexington Avenue
    New York, NY  10022
    Telephone:  212.521.5400

    *Attorneys for Defendant M&T Bank Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2016, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to counsel or

parties of record electronically by CM/ECF.

*/s/ Roy W. Arnold*
*Counsel for Defendant M&T Bank Corp.*